UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC.                                   Index No.  07 Civ. 3657 (CLB)

               Plaintiff,                          **NOTICE OF MOTION**

     - against -

TOLL BROS., INC.

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       PLEASE TAKE NOTICE that upon the annexed Statement of Undisputed Facts, the

Affirmation of Joseph J. Haspel, Esq., the affidavit of David Zigler, and the accompanying

Memorandum of Law,  a motion will be made to this Court before the Honorable Charles L.

Brieant, District Court Judge, at the Courthouse, 300 Quaropas Avenue, White Plains, New York

10601, on July 18, 2008 at 10:00 a.m. or as soon thereafter as counsel can be heard, for an Order

pursuant to FRCP 56 granting summary judgment, together with such other and further relief as

may seem just proper.

May  28, 2008                                   Respectfully Submitted,

 

Joseph J. Haspel Esq.
*Attorneys for Plaintiff*
40 Matthews Street
Suite 201
Goshen, New York 10924
845-294-8950

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC.                              Index No. 07 Civ. 3657 (CLB)

                Plaintiff,            **STATEMENT PURSUANT**
    - against -                           **TO LOCAL RULE 56.1**

TOLL BROS., INC.

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Local Civil Rule 56,1 of the United States District Court for the Southern

District of New York, defendants, Plaintiff, Briarwood Farms, Inc., by its attorneys, Joseph J.

Haspel, submit that there is no genuine issue requiring a trial on the following material facts:

1.    On or about November 7, 2005 (the "Contract Date"), Briarwood Farms, Inc.

("Briarwood") and Toll Bros., Inc. ("Toll") executed an "Agreement of Sale" relating to Halley

Estates II (the "Contract").

2.    The Contract price was $325,000 per lot sold with an estimate of forty-one lots to

be sold. Specifically, Paragraph 2 of the Contract provided:

> 2.    Purchase Price. The purchase price (the "Purchase Price") for the
> Property is Thirteen Million Three Hundred and Twenty-Five Thousand and
> no/100 Dollars ($13,325,000) based on a Property yield of 41 Lots. The
> Purchase Price shall be increased or decreased by $325,000 for each Lot
> more than or less than 41, respectively, which the Property yields. The
> Purchase Price shall be paid as follows ... :

3.    Paragraph 2 of the Contract also provided for a deposit of $1.3 Million (the

"Deposit"), which, at Toll's option could take the form of an irrevocable letter of credit.

4.    The $1.3Million deposit represented 10% ($32,500) for each approved building

lot based upon 40 approved lots.

5.    Paragraph 4 of the Contract provides:

Closing … shall be made at the offices of the Title Company and on or by the date which is thirty (30) days following the date upon which all conditions to Closing set forth in Section 16 hereunder have been satisfied.

6.    Paragraph 16 of the Contract provided:

16.  Conditions to Buyer's Obligations
(a) Buyer's obligation to complete Closing under this Agreement is expressly conditioned upon the following, and Buyer shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Buyer's other rights, conditions or obligations:

(i)  all representations and warranties of Seller herein being true and correct at the time of Closing;

(ii) Seller having performed all of its covenants and obligations hereunder;

(iii) the receipt by Seller for Buyer, at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the "Final Approval"), and, the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits;

(iv) the receipt by Seller for Buyer, at Seller's sole cost and expense, of all written agreements, arrangements and other evidence satisfactory to Buyer to the effect that (a) there is immediately available at the Property adequate public sewer treatment and capacity on a permanent basis for the effluent from the Property as intended to be developed, (b) sufficient public water is immediately available at the Property to adequately service the homes intended to be developed on the Property, and (c) electric, cable, gas and telephone are available at the Property, all at connecting fees and expenses that are not greater than those which are customary and ordinary for similar developments in the County in effect on the date of this Agreement;

(v)  Intentionally Omitted; and

(vi) the installation by Seller of off-site sewer and water to the edge of the Property.

(b)  The conditions set forth in Section 16(a)(iii) and (iv) shall be final and unappealable at the time of Closing and shall be subject only to such conditions as Buyer may approve at Buyer's sole discretion., which approval shall not be unreasonably withheld with respect to those

modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such condition shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed condition.

(c) If on or before the date of Closing all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer shall have the option of (i) completing Closing hereunder if it so chooses at the Purchase Price, or (ii) canceling this Agreement in which case this Agreement shall become null and void and the Deposit shall be paid to Buyer. In the event such failure constitutes a failure of the condition set forth in Section 16(a)(i) or 16(a)(ii), Buyer shall be entitled to treat such failure as Seller's Default entitling Buyer to exercise the remedies set forth in Section 9 above.

(d) Seller agrees that no substantial modifications to the Subdivision Plan may be made without the Buyer's prior written consent, which shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such modification shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed modification.

7.    Paragraph 8 of the Contract provided that upon Toll's default, the Deposit shall be

retained as Briarwood's sole and exclusive remedy as liquidated damages.

8.    The Contract provided at Paragraph 13 for Toll to have a forty-five day "Due

Diligence Period" in which Toll could terminate the agreement without default. Specifically, the

Contract provided:

13. Due Diligence Period. Between the time of execution of this Agreement and Closing, Seller agrees that Buyer, its representatives and consultants shall have the right to enter upon the Property to perform engineering, environmental and such other feasibility studies as Buyer determines in its sole discretion. Buyer and Seller further agree that within forty-five (45) days of the date of this Agreement (the "Due Diligence Period"), should Buyer desire not to purchase the Property as a result of such studies, or as a result of Buyer's dissatisfaction with the Property based upon Buyer's review of Seller's Plans or for any other reason whatsoever, Buyer shall have the right to terminate this Agreement upon written notice to Seller in which case the Deposit shall be returned to Buyer and there shall be no further liability of the parties hereunder. Failure to notify Seller prior to the expiration of the Due Diligence Period shall act as Buyer's election to waive this contingency. If Buyer causes any damage to the

Property as a result of its studies performed pursuant to this Section, and Buyer elects not to purchase the Property, Buyer shall reasonably repair such damage. If Buyer terminates this Agreement pursuant to this Section 13, Buyer shall deliver, to Seller, without representation, warranty or recourse, copies of any materials (excluding any proprietary or confidential materials or information) developed by third parties for Buyer in connection with the Property.

9.    Pursuant to the Contract, Toll's obligation to close the transaction was conditioned upon Briarwood obtaining "Final Approval" of a proposed subdivision plan, "such that upon posting of customary security and payment of application and inspection fees by [Toll], [Toll may file the plat and commence infrastructure improvements and apply for and obtain building permits."

10.    By letter dated December 22, 2005, the Contract was modified through a letter agreement, which, *inter alia,* extended Toll's due diligence period through January 6, 2006. (Ex. B).

11.    Toll performed its due diligence, and it did not cancel the Contract during the due diligence period.

12.    By letter dated December 22, 2006, Toll provided Briarwood with a letter which set forth its objections to certain conditions raised by Pomona, but it did not cancel the Contract. (Ex. C)

13.    By letter dated January 22, 2007 (Ex. D), Toll acknowledged that certain of its concerns set forth in its prior letter were "adequately addressed," but it nevertheless set forth that it was cancelling the Contract (the "Contract Termination") pursuant to Contract Section 16(c) based upon the following issues:

1. **The "Klinger Court Issue"** - Pomona's review of Briarwood's subdivision indicated that if Klinger Court, which would be an access road to the subdivision, was damaged: "the Developer shall install a 1-1/2" wearing course, curb to curb, for the entire length of Klinger Court." (See

Dec. 22, 2006 letter). Toll's Contract Termination letter provided:

"The revised condition that the developer repaves Klingher Court is
unacceptable, as it gives the village the unrestricted right to require a
complete resurfacing rather than requiring repair for damage actually
caused. If the condition cannot be omitted, we will agree only to repair any
damage caused by construction traffic as required by the initial plans sent
during due diligence. Seller must bear the cost of any complete resurfacing,
if required."

2. **The "Steep Slope Issue:** - Pomona's Village Code provides that any
development of a lot which has a "steep slope" is subject to steep slope
review by the Planning Board. This ordinance has been in place since 1998.
Toll's Contract Termination letter provided:

"As a general matter, Section I 6(a)(iii) of the Agreement requires
"satisfaction by Seller of any conditions of Final Approval, such that upon
posting of customary security and payment of application and inspection
fees by Buyer, Buyer may file the plat and commence infrastructure
improvements and apply for and *obtain building permits*" (emphasis added).
It is precisely this type of additional review and approval process which is
intended to be addressed as part of the closing conditions, so that Buyer has
comfort that all lots are fully developable without the need for further
approvals.

Further, specifically regarding the "steep slope" ordinance, we understand
that the application process and review standards are extensive and time
consuming and there is no guaranty that any given lot would be approved
for development with acceptable conditions. As you know, the village has
the right to require the phasing of construction of improvements on each lot,
additional inspections, and certifications of completion of each phase of
development of each lot. In addition, the planning board has the right to
relocate proposed improvements and/or to reduce building envelopes and
may require issuance of letters of credit to secure completion of these lot
improvements. Further, rock blasting might be prohibited and. landscape
mitigation might be required. We cannot evaluate whether any of these
conditions would be acceptable until after the steep slope permits are
issued."

3. **The "Cul-de-sac Grade Issue"** - Pomona's review of Briarwood's
subdivision indicated that the subdivision's proposed cul-de-sac should
have a maximum grade of 4%.   Toll's Contract Termination letter
provided:

"This requirement poses significant economic impact as it affects premium
cul de sac lots. In addition to additional site improvements, there will be a

diminution of value to these lots.

As indicated in Item 3 above, our Agreement requires issuance of full and final approvals. For information as to this requirement in particular, our due diligence indicated that these streets would be treated as a "local street" and a Maximum grade of 10% slope could be maintained. The 4% requirement is a new and unacceptable condition.

4. **The "Drainage Easement Issue"** - As the Plan existed at the time of the Contract Termination Letter (later modified to obviate this issue), two lots contained a drainage easement. Toll's Contract Termination letter provided:

"We do not believe omitting these lots from the purchase is an acceptable solution and we have not received any information or clarification on your other two proposals and cost estimates (for Seller's proposed reimbursement) to assess the merits. We are unclear as to who will be the beneficiary of any easements and who will be responsible for the maintenance of the drainage facilities."

5. **The "Landscaping Issue"** - Pomona's review of Briarwood's subdivision indicated possible landscaping requirements. Toll's Contract Termination letter provided:

"Once again, as indicated in Item 3 above, the Agreement requires full and final approvals. Any landscaping requirements would need to be specified and reviewed and approved by us prior to Closing."

14.     After the "Klingher Court Issue was raised, Briarwood offered to bear the expense

of repaving Klinger Court to the extent Toll found it not its obligation. (Ex. E, p. 2, Zigler aff.

¶17)

15.     After the Drainage Easement Issue was raised, Briarwood redrew its plans

removing the drainage easements which Toll found objectionable. (Zigler aff. ¶20)

16.     Pomona's Village Engineer mandated a maximum 4% grade for the cul-de-sac.

(Zigler aff. ¶19)

17.     By letter dated January 30, 2007, Briarwood disputed Toll's purported reasons for

Termination. (Ex. E).

18.    Toll did not retract its cancellation, and this lawsuit followed.

19.    Pomona's Steep Slope Ordinance (the "Ordinance") has never resulted in a denial of a building permit. (Village Engineer Corless Aff. p. 29, 53)

20.    That under the Ordinance, Steep Slope approval is generally an issue addressed after the filing of the subdivision plat ("Final Approval") as part of the building permit process (Zigler aff. ¶9).

21.    It is possible to get Steep Slope approval during the subdivision application process only if proposed site improvements (*i.e.* house building plans) are submitted as part of the subdivision approval process. . (Village Engineer Corless Aff. pp. 25, 43, 50-51,.

22.    Toll was given the opportunity to present building plans during the subdivision application process, but it failed to do so. (Zigler aff. ¶10-11).


May  26, 2008                                        Respectfully Submitted,


                                                    Joseph J. Haspel, Esq.
                                                    *Attorneys for Plaintiff*
                                                    40 Matthews Street
                                                    Suite 201
                                                    Goshen, New York 10924
                                                    845-294-8950

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC.                                Index No.  07 Civ. 3657 (CLB)

                            Plaintiff,               **AFFIRMATION**

            - against -

TOLL BROS., INC.

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Joseph J. Haspel, an attorney, duly admitted to practice before this Court and the Courts

of the State of New York, affirms under penalty of perjury:

1.      I am counsel for the Plaintiff, Briarwood Farms, Inc. ("Briarwood"), and as such,

I am fully familiar with the facts and circumstances contained herein

2.      I make this affirmation in support of Briarwood's motion of summary judgment.

3.      The purpose of this affidavit is to present documents and deposition testimony

which supports Briarwood's motion.  The facts are presented in the annexed Statement pursuant

to Local Rule 56.1, the affidavit of David Zigler ("Zigler"), which encapsulates his deposition

testimony, and the deposition testimony of the Village Engineer of the Village of Pomona, New

York, P.J. Corless ("Corless" of "Village Engineer") which is quoted at length below.

4.      This case presents a claim of breach of a written contract of the sale of a parcel of

real property (the "Contract").   A copy of which is provided as Exhibit A.

5.      By letter dated December 22, 2005, the Contract was modified through a letter

agreement, which, *inter alia,* extended Toll's due diligence period through January 6, 2006.  A

copy of this letter agreement is provided as Exhibit B.

6.     By letter dated December 22, 2006, Toll provided Briarwood with a letter which set forth its objections to certain conditions raised by Pomona.   A copy of this letter is provided herewith as Exhibit C.

7.     By letter dated January 22, 2007, Toll provided Briarwood with a letter cancelling the contract.  A copy of this letter is provided herewith as Exhibit D

8.     By letter dated January 30, 2007, Briarwood disputed Toll's purported reasons for Termination.  A copy of this letter is annexed as Exhibit E.

9.     The complaint in this case, a copy of which is annexed as Exhibit F, has only one cause of action for breach of contract, and it seeks liquidated damages as set forth in the Contract.

10.     Toll's answer, a copy of which is annexed as Exhibit G, presents one counterclaim seeking declaratory relief in the form a judicial ratification of Toll's renunciation of the contract.

11.     The Village Engineer's deposition was taken on March 25, 2008.  A copy of the transcript is annexed as Exhibit H.   With respect to these issues presented in this case, the Village Engineer's testimony was as follows:

P. 24

> Coreless:  Again, for the sake of clarity and detail, if you were to have a mythical 40-lot subdivision, the applicant by his engineer and attorney, would put on a mythical house, a 40 by 60 box, and show grading for that and show where that is in relation to steep slopes, and where the driveways are and where the utilities are.  And when final subdivision is granted, that lot would have a steep slope approval for that mythical 40 by 60 box.
>
> In the real world the house might be 40 by 72 or 32 and 75, and all kinds of -- so we make them come back, whenever it's bigger, come back for another steep slope permit and another public hearing.  So you could go away with approval for 40 lots, but you really don't have a specific site plan approval until you come up with a real house.

Q    Unless, of course, you built the real house within the confines of --

A    Correct.

* * *

P.25

A    So in this village, if you make the footprint of the real house smaller, than the building inspector is allowed to issue a building permit.  If the house is bigger in any dimension, then it's back to the planning board.  So there are some fine lines.

Q    I understand?

A    And it varies.

Q    At the end of the day, in order to secure final subdivision approval, an applicant must obtain steep slope approval for the mythical houses that are depicted on each lot?

A    Correct.

Q    If the developer subsequently wants to exceed the boundaries of that mythical house, he, she, or it has to come back to the planning board to obtain a new steep slope permit?

A    But he does have the right to build on the mythical house footprint.

* * *

p. 28

Q    Now, when was this ordinance passed, the steep slope ordinance?

A    Nineties, early nineties.  It's on a while.

Q    That's good enough.  During your tenure as the village engineer, have you been involved in any subdivision applications that have involved steep slope permits?

A    Yes, several.

* * *

p. 29

Q    Can the severity of the slope of a given lot disqualify it as a buildable lot, based upon your experience with the planning board?

A    No, it has not, but I think the ordinance goes in that direction, but that seems to imply some sort of condemnation of land, which I don't think the village trustees want to accommodate.

\* \* \*

Q    Now, based upon your experience, we are going to talk about two distinct hypotheticals here. In a situation where the steep slope permits are secured based upon the hypothetical houses --

A    Yes.

\* \* \*

p. 30

Q    Focusing on the first process where the steep slope approvals are secured in conjunction with the final subdivision approval, based upon the hypothetical houses, typically how long, based upon your experience with subdivisions that range from thirty to forty lots, how long does that process take for the steep slope permits?

A    At least twelve months and more likely twenty-four months. The number of lots is probably not the deciding factor, it's probably the objections of community members.

Q    What kind of objections?

A    To environmental concerns, whether real or perceived.

Q    Okay. In the second situation where the developer comes back after securing final subdivision approval and seeks to build a house outside the parameters of the hypothetical box on the lot, based upon your experience, typically how long does it take to secure steep slope approval in that scenario?

A    Three to six months.

Q    Again, is that per lot or does it make a difference?

A    Each application. You could technically do four lots in one night, but they have a public hearing procedure which there is some notice required and then there is a landscape plan that comes after that, so that's another process.

So it could technically go in three months, but it usually takes six or eight months because there's turnaround times between getting an action from a board on a Thursday night and then the deadline to submit the next round of papers is Monday, so you can't do it fast enough usually.

Q    Again, focusing on the scenario where a developer comes back and wants to build a bigger house?

A    Yes.

Q    In that scenario, it's fair to say that the steep slope law as we discussed it today has to be complied with again, correct?

A    Correct.

\* \* \*

p. 43

Q    With respect to each of the lots that you identified as there being a disturbance, since it involved the planning board, a steep slope permit would be required from the planning board?

A    Yes. And what the planning board has done is given a steep slope permit for the project based upon these forty lots, and then individual houses will come back as they exceed their footprint.

Q    Let me take a step back. Has there been final subdivision approval yet?

A    No.

Q    So there has been no steep slope approval for this subdivision yet?

A    Not yet.

Q    Presuming that final subdivision approval is granted, it will be granted for these hypothetical, steep slope approvals will be granted for the hypothetical houses that are depicted?

A    In those locations.

Q    In those locations, right.

A    Yes.

Q    And if the developer or homeowner, as the case may be, ultimately wants to vary the location of the house or the driveway, then they would have to come back and go through the steep slopes process again, correct?

A    Correct, if he or she is going to disturb the slopes.

Q    To your knowledge, and this is the last time I will ask this question, I promise; I've asked it twice. To date, has any steep slope permits been issued for this particular project?

A    No.

Q    Before any building permits can be issued with respect to any individual lot, a steep slope permit would be necessary for those impacted lots that we just discussed?

A    That's correct. But as of now no lots exist. It is one parcel.

Q    Right.

A    That's not until the final plat.

Q    Right. Now, in a situation where you have very steep slopes on a particular lot --

A    Right.

Q    -- what impact, if any, does that have on the construction of a home on that lot?

And let's use for example --

A    Use this one, we moved the over here (indicating).

Q    Okay, that's lot number seven.

A    Yes.

Q    That's extremely steep slopes, correct?

A    Yes, so what the applicant's surveyor or engineer would do is try to construct, configure a lot that would allow him room outside of that steeped area and build a house outside of it, so he wouldn't have to impact it. But there are some times when he has no choice.

Q    And that's under the category of very steep slope?

A    Yes, very steep.

Q    I appreciate that the quality of this map is not completely clear, because it's been copied a number of times. But using as an example, lot number nine.

A    Yes, well, in lot number nine's case they have identified some area in the building envelope, and the house has been sited to the front of the

envelope. It looks like it's the same size as the other homes, but it has been tilted and turned so that it doesn't have to be built within that steep slope area, although I suspect that some of the backyard, when the homeowner gets in there, may be impacted. But that's a different issue.

Q    Well this dark area, number nine, is an extremely steep slope, right?

A    That's correct.

Q. The balance is either a very steep slope or a moderately steep slope, right?

A    Moderately steep slope, correct.

Q    We can't tell?

A    We can't tell.

\* \* \*

p. 50

EXAMINATION BY MR. HASPEL:

Q    These I'm showing the witness C-1 for identification, which is the page, disturbed slope map, that Mr. Harrington was questioning about. Each of these lots have what we have now defined as a mythical footprint of a house?

A    Correct.

Q    Was it your testimony that unless the ultimately designed house fits into that footprint -- let's go one step back. Let's assume for one second that this map receives final subdivision approval, okay. Under that assumption, was it your testimony that unless the proposed house at the time that a house is being planned fits within the footprint that's designated as the mythical footprint on this map, a new process would have to take place?

\* \* \*

p. 51

A    Yes, that's correct. If an applicant came in with a building that was slightly less than the approved one, and had an adjusted driveway to accommodate it or something like that, on my action I would send it back to the planning board for approval. If it complied with it completely as approved by the planning board, we would process without going further to the planning board.

Q    I'm even more confused now.  If the footprint of the proposed house fits within the box, do you have to go back?

A    No.

Q    Okay.  If the footprint of the house was going to move a nominal amount, would you have to go back?

A    It's my practice to send it back if there is any change.

Q    Any change whatsoever?

A    The planning board chairman prefers, and it's not in the law, she prefers to see any change, so I have complied with that request.

Q    How long did you say we had this steep slope ordinance in place?

A    '98.

Q    In your experience, what percentage of steep slope applications after a subdivision approval is done, after final plat is filed, what percentage of steep slope applications, in your experience, have been declined?

MR. HARRINGTON:  Objection.  You can answer.

A    I need to understand the question.   After the map is filed.

Q    Let me take you through it.  Let's say this map is the final plat?

A    Okay.

Q    And at that point in time, every one of these lots came in?

A    Approved.

Q    In your experience, throughout the Village of Pomona, what percentage of steep slope applications are denied?

A    None would be denied but more than 90 percent of them would be sent back to the planning board as a practical matter.

Q    When you say, "sent back to the planning board," once it gets sent back to the planning board, in your experience, how many times has a builder been denied the opportunity to build on that lot?

A    Never been denied.  There may be changes, but never has been denied.

Q    When you say changes, can you describe what kind of changes you are referring to?

A    He might be asked to flatten the slope of the driveway or not make the length of the house as long as it's proposed, or perhaps change the imperviousness of one of the surfaces, of a driveway.  I mean there are lots of more tweaking of details rather than an approval being denied.

Q    You used the word tweaking.  Is that pretty much what happens in this process, a tweaking, rather than a massive relook?

 MR. HARRINGTON:  Objection.

Q.    You can answer.

A    Yes, in general the applicants come in for much bigger houses in this village, during the upsurge in the economy, and they generally are allowed to build as large as they want, but they have trade-offs with more extensive landscaping or some retaining walls and that kind of stuff.  But if that's tweaking, that's what they do.  But they are generally not denied the right to build.

Q    When you say much larger houses, are we talking about houses twice the size of the mythological footprint?

A    Yes.

Q    Three times the size?

A    Yes.

Q    Four times the size?

A    Most of these houses are shown at 3,000 footprint at the most, maybe 2800, and we're getting 6,000 and 8,000 very routinely as of last year.  I don't know this year.

Q    So it's your testimony that you go back to the planning board, you tweak it, you have different landscaping, you may have to do a little bit more excavation for a driveway or something like that; that's what it will take to get the approval?

MR. HARRINGTON:  Object to the form.

A    You may have to do all those things, and all those things are obviously money. Usually those changes are in the hundreds of thousands of dollars, not in the neighborhood of $5,000.

Q    That's when you are talking about creating something larger than the footprint?

A    Yes, bigger driveways, bigger walls.

Q    I assume it would be proportional to a smaller change?

A    Sure.

Q    So you are not talking a hundred thousand dollars worth of changes on a ten-percent growth of the footprint?

MR. HARRINGTON: Objection.

A    Not generally, no.

* * *

p. 58

Q    What is the purpose of even putting the mythical footprint? Is it your working assumption that these footprints are not going to be the end-of-the-day planned houses?

MR. HARRINGTON: Objection.

Q    Do you understand the question?

A    Yes, I understand the question.

MR. HARRINGTON: Same objection.

A    The planning board wants assurances that a house can be built on the lot that's going to be created. So to do that, the engineer has to create the size of the lot, show it, show a building and show a driveway, show the drainage. And a lot of that information then is filtered down to the amount of run-off for drainage. The water and sewer connections are shown on other sheets.

Q    But you are doing this with the working assumption that you've going to be doing it again at a later date, or may be doing it again at a later date?

MR. HARRINGTON: Objection.

A    With various lots.

MR. HARRINGTON:  Same objection.

A    My advice to the planning board is that if this shape of the house was
originally presented to us in the year 2000, by the time it gets built, and that
might be normally three or four years later, the shape of the house will
probably have changed.  We used to submit houses with 24 by 42 as the
standard Rockland County bilevel.  Now they're showing these shapes.  If
you'll notice, this shape is the same for every lot.  That's probably highly
unlikely that everybody will build the same house with side-load garages, et
cetera.  So what the applicant's engineer does is represent a reasonably sized
house for this subdivision that might sell for X dollars, whatever it is, and
that could be built.  But as individual buyers come in they will make
changes and the builder will accommodate him to the best of his ability, and
sometimes that requires going back to change it.  It doesn't make it easy for
a track builder, but it's easy for a custom builder, who is more used to a
longer process time.

Q    I think I understand.  So let me try to repeat it in a condensed form.
You want the mythological houses so you can do your standard drainage
analysis, water analysis, road analysis and that kind of stuff?

A    Utilities, yes, right.

MR. HARRINGTON:  Objection.

Q    And at that point in time if there is going to be a steep slope issue on
another design, you deal with all those issues within the context of that
particular lot?

MR. HARRINGTON:  Objection.

Q    Is that correct?

A    That's correct.  You'll notice that all these homes have very small areas
indicated for a deck, and obviously no, quote, in-ground swimming pools.
We get many applications a year afterwards, someone, the homeowner is in
now, they're going to put the pool in here or they're going to put a detached
garage up or they're going to put up a hobby shop.  People do lots of things
with these.

Q    If you put in a pool, would that require you to go back and do a steep
slope analysis?

A    You take the original analysis and that application will be placed

against this. If they are fortunate enough to hire the firm that has that information, he just puts it on that --

Q   But it would have to go through the same process?

A   Same process, just as if he is building a house.

Q   Same thing for a detached garage?

A   Yes.

Q   Workshop?

A   Yes. It's a very rigorous ordinance.

MR. HASPEL: I have nothing further.

MR. HARRINGTON: I just have one follow up.

CONTINUED EXAMINATION BY MR. HARRINGTON:

Q   Mr. Corless, regardless of whether an applicant comes back when final subdivision approval is granted, say for example in Halley Estates, if and when it's granted, when that final plat is approved, the planning board will have considered, evaluated, all the criteria under the steep slope law, correct?

A   Correct.

Q   And will have issued for those hypothetical houses a permit for those houses, correct?

A   Correct.

Q   And in the event an individual or a developer subsequently decides, for whatever reason, to exceed the size of that hypothetical house, then he, she or it has to go back to the planning board for a new steep slope permit?

A   Modified steep slope permit.

Q   And they will have to go through the process that's articulated in the statute?

A   Yes.

Q   And the length of that process depends on the nature of the change,

correct?

A    Yes.

MR. HARRINGTON:  Thank you.

The testimony of Zigler is annexed as Exhibit I.  In addition, provided herewith is an

affidavit of Zigler which encapsulates the deposition testimony.

Dated:  May 26, 2008

Joseph J. Haspel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC.                                    Index No. 07 civ. 3657 (clb)

                Plaintiff,

      - against -                                   **AFFIDAVIT**

TOLL BROS., INC.

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK    )
                    ) SS.:
COUNTY OF ROCKLAN   )

     David Zigler, being duly sworn, deposes and says:

     1.     I am the president of Atzl, Scatassa & Zigler, P.C. ("ASZ"), which is the firm

retained by Plaintiff, Briarwood Farms, Inc. ("Briarwood") to pursue and obtain final approval of

a subdivision known as Halley Estates, II ("Halley") in the Village of Pomona, Rockland

County, New York ("Pomona"). As such, I am fully familiar with the facts and circumstances

contained herein

     2.     ASZ is in the business of engineering, surveying and land planning. Developing

subdivision plans and shepherding those plans through the subdivision approval process has been

our principal business since 1968. Our business has been focused in the lower Hudson Valley

and principally in Rockland County, New York.

     3.     I and ASZ have significant experience in obtaining subdivision approval in

Pomona. In addition, I and ASZ have significant experience in obtaining, when necessary,

"Steep Slope" approval as required by the Pomona's Village Code. Our experience goes back to

Pomona's enactment of the Steep Slope Ordinance in or around 1998.

4.    A Steep Slope Permit is required when a developer intends to build a house on land which has a significant slope.   When implicated by the slope of a particular lot, obtaining a Steep Slope Permit is part of the Building Permit application process.  A Building Permit application is site specific, and can only be made after a subdivision receives final approval and subdivision improvements (*i.e.* roads and sewers) have been made.

5.    I have been the individual at ASZ who has been principally involved with obtaining final approval for Halley's proposed subdivision.  Halley is the project which was the subject of the contract of sale between Briarwood, as seller, and Toll Bros. Inc. ("Toll"), as buyer.  The proposed subdivision contains forty lots.  A map of the proposed subdivision is annexed as Exhibit A.

6.    Like all applications for subdivision approval, obtaining final approval for Halley is a process which involves a consistent mutation of plans resulting from discussions and negotiations between the owner/proponent (Briarwood), the municipal body (Pomona), and permitting agencies.   In the process, the municipal body must address a full spectrum of issues ranging from environmental, water, drainage, clearing limit lines, etc.  Of course, the municipal body, conducts public hearings giving members of the community a voice in development.

7.    The process relating to obtaining the Halley subdivision approval has been slow as a result of Pomona's and the permitting agencies' methodology.   Specifically, the municipality and the agencies make written comments on the proposed plans, as amended, and the applicant is required to make written responses to each comment.  Notwithstanding the slowness of the process resulting from Pomona's and the permitting agencies' comments, the process has been steady as a result of Briarwood's diligent responses to each set of comments, including the modification of plans when appropriate.  Unfortunately, the Planning Board meets

only once a month, so the turn-around time for a single set of comments can easily take a few months at no fault of the applicant.

      8.     Pomona's Steep Slope Ordinance is a result of the hilly terrain in the Village. When it comes to development, Hills, of course, present unique environmental issues, including water run-off and erosion. To address these issues, Pomona, in 1998, enacted its so called "Steep Slope Ordinance," which requires an examination of the environmental issues based upon how a developer intends to improve a lot which contains steep slopes.

      9.     Since obtaining Steep Slope approval is part of the Building Permit application process, unless a developer presents specific building plans as part of the subdivision approval process, it is not possible to obtain actual Steep Slope Approval for a lot until after the subdivision plat is filed (final approval) and a building permit is requested.

      10.     With respect to Halley, after Toll became the contract vendee, my firm met with representatives of Toll on various occasions to discuss the ongoing subdivision approval process and the subdivision maps, as amended, we were presenting. It is important to note that the amending of maps is ongoing in any project as those maps are the vehicles through which the owner's professionals and the municipality's professionals discuss the proposed land use and modifications thereof. During my meetings with Toll's representatives, we discussed the idea of presenting building plans showing specific house footprints for each lot at that time, rather than after final subdivision approval. Notwithstanding Toll's articulated desire of getting all approvals at once, house plans were never provided for incorporation into the proposed subdivision maps. One must note that Toll's representatives were aware of Pomona's Steep Slope Ordinance from the outset of our discussions. It was clear that Toll entered its agreement with Briarwood with its eyes wide open.

11.     Since Toll did not provide site plans for each lot, we went forward in the subdivision approval process by presenting maps containing hypothetical site improvements (house layout, driveway, etc.), which corresponded with Briarwood's typical house footprint. This procedure is the typical way developers proceed in Pomona because it provides the developers flexibility once the subdivision is approved.

12.     In addition, until the final configuration of the subdivision is made, the number of lots which would be subject to the Steep Slope Ordinance is not certain. Moreover, a developer may be able to develop a lot which may be subject to the Steep Slope Ordinance without implicating the Steep Slope Ordinance. Indeed, the Steep Slope Ordinance is only implicated when the area of a lot which contains the steep slopes is disrupted by construction of the home.

13.     With respect to Halley, the configuration of the subdivision was developed in a manner to minimize the number of lots where building thereon would implicate the Steep Slope Ordinance. Indeed, during the subdivision approval process, the applicant must provide a topographical map which illustrate steep slopes in three different criteria of slope (the "Topo Map"). Yet, the Topo Map does not identify which lots need steep slope permits under the ordinance. This is because the Topo Map generally does not contain the final site plan for the lot. It does, however, indicate a generic home on a generic site so non-specific engineering and environmental issues can be addressed during the subdivision approval process.

14.     Thus, without the presentation of actual site plans for each lot, the number of Halley lots which will require Steep Slope permits is unknown. Moreover, in Halley's case, Briarwood has already taken action during the subdivision approval process which would obviate the need to seek Steep Slope permits at the time of the application for building permits. Specifically, Briarwood has already gathered permission during the subdivision approval process

to grade off road, and with respect to proposed lots 7, 26, 27, 28 and 29 that grading would eliminate the Steep Slopes as currently designated on the Topo Map. In addition, the "hypothetical" house footprint contained on the subdivision maps are, in fact, the footprint of the typical home Briarwood intends to build. Thus, there would be no need to obtain a Steep Slope permit at the time the builder seeks a building permit. For the sake of full disclosure, it must be noted that although our plan to address and mitigate during the subdivision approval process various lots in the Topo Map which contain Steep Slopes has been met with approval by the Planning Board, this approach is cutting edge. Accordingly, one cannot be absolutely certain that a builder may not meet a challenge at the time an application for a building permit is made. Regardless, in the unlikely event that the builder were required to seek a Steep Slope permit based upon the Topo Map, the process in obtaining the permit would be truncated as a result of the prior grading approvals obtained during the subdivision approval process.

15.     At this time, final approval for Halley is imminent. It is anticipated that the Planning Board will vote to approve the subdivision on June 12, 2008.

16.     I have been provided with Toll's letter wherein they cancelled their contract with Briarwood. As a matter of fact, the issues cited by Toll are resolved, or they were never issues at all.

17.     Toll's first issue was that Pomona's review of Briarwood's subdivision indicated that if Klinger Court, which would be an access road to the subdivision, was damaged: "the Developer shall install a 1-1/2" wearing course, curb to curb, for the entire length of Klinger Court." Toll considered this unacceptable indicating that they should only be responsible to repair damage caused by construction traffic. My understanding is that Briarwood offered to bear the expense of repaving Klinger Court to the extent Toll was unwilling.

18.     Toll's second issue related to the Steep Slope Ordinance which is discussed above.

19.     Toll's third issue was Pomona's Village Engineer's requirement that the planned cul-de-sac have a maximum grade of 4%.  As discussed in the accompanying Memorandum of Law, Toll's view that the Pomona Village Code provides for a 10% grade is mistaken.  In my experience the only times a village engineer permits roads with a 10% grade is on straight parts of a road.

20.     Toll's fourth issue was a proposed drainage easement running through lots 26, 27, 28 and 29.  Based upon Toll's concerns Briarwood consented to revise the subdivision plan to remove the drainage easements in accordance with Toll's request.  Accordingly, the final map filed does not have any drainage easements on lots 26, 27. 28 and 29.

21.     Toll's final issue was landscaping issues, which were both undefined by Pomona, and undefined by Toll.  At best, Toll wanted a say, and it would have had its say if it remained in the process.

David U Zigler

David Zigler

Sworn to before me this  22
   Day of May, 2008

Barbara Davenport
Notary Public

**BARBARA DAVENPORT**
Notary Public - State of New York
No. 01DA6109244
Qualified in Orange County
My Commission Expires April 26, 2012