# EXHIBIT H

Page 1

2       UNITED STATES DISTRICT COURT

3       SOUTHERN DISTRICT OF NEW YORK

4       ----------------------------------

5       BRIARWOOD FARMS, INC.,

6                       Plaintiff.

7       - vs -                  07civ. 3657 (clb)

8       TOLL BROS., INC.

9                       Defendant.

10      ----------------------------------

11                      TUESDAY, MARCH 25, 2008
                        1:08 P.M.
12

13              DEPOSITION of P.J. CORLESS, called for

14      examination by counsel for the Defendants, held

15      at the Pomona Village Hall, 100 Ladentown Road,

16      Pomona, New York 10870, before Nancy Anne Flynn,

17      Registered Professional Reporter and a Notary

18      Public in and for the State of New York, and

19      transcribed under her direction.

20

21

22

23

24

25                                      **CERTIFIED COPY**

Page 2

1    A P P E A R A N C E S :

2

3          JOSEPH J. HASPEL, ESQ.
           Attorney for Plaintiff
4          40 Matthews Street
           Suite 201
5          Goshen, New York 10924
           (845) 294-8950
6

7          WILLIAM HARRINGTON, ESQ.
           BLEAKLEY, PLATT & SCHMIDT, LLP
8          Attorneys for Defendant
           One North Lexington Avenue
9          Seventh Floor
           White Plains, New York 10272
10         (845) 354-0545

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P.J. Corless                                                                                         March 25, 2008

Pomona, NY

Page 3

```
 1                              CONTENTS

 2     EXAMINATION OF P.J. CORLESS                    PAGE
```

```
 3     BY MR. HARRINGTON                                4

 4     BY MR. HASPEL                                   50

 5     BY MR. HARRINGTON                               62
```

```
 6

 7


 8     EXHIBITS

 9     DEFENDANT'S   DESCRIPTION                      PAGE
```

```
10     A   Chapter 119 of Village Code re              9

11         steep slopes law.

12     B   Copy of chapter 118 of the Village          13

13         Code re Subdivision Land.

14     C   Cover Sheet Preliminary Subdivision         34

15         Halley Estates II.

16     C-1 Drawing number seven from Exhibit C,        39

17         drawing entitled "Disturbed Slope Map."

18     D   One-page village calendar.                  36

19     E   Documents received pursuant to FOIL         47

20         request.
```

```
21            (Exhibits retained)

22

23

24

25
```

Page 4

1                          P.J. CORLESS,

2              having been duly sworn by a Notary

3              Public for the State of New York,

4              testified as follows:

5    EXAMINATION BY

6    BY MR. HARRINGTON:

7         Q    Good afternoon, Mr. Corless.

8         A    Good afternoon.

9         Q    My name is Bill Harrington and I'm

10   with the firm of Bleakley, Platt & Schmidt in

11   White Plains, and we represent Toll Bros in a

12   lawsuit, which is the defendant in a lawsuit

13   brought in the Southern District of New York by

14   Briarwood Farms, Inc.

15             You are here today pursuant to

16   subpoena, correct?

17        A    Yes.

18        Q    Can you give, please, the reporter

19   for the record your address, and you can use the

20   village address if you like.

21        A    No, I use my home address, 44 Halley

22   Drive, Pomona, New York.

23        Q    Can you just briefly outline your

24   educational background for me?

25        A    I have a Bachelor's of Civil

1                          P.J. Corless

2       Engineering, a Master's of Business in Economics

3       and a Master's in Environmental Technology, and

4       licensed as a Professional Engineer in New York

5       and New Jersey and licensed as a land surveyor as

6       well.

7              Q       Have you ever been deposed before?

8              A       Yes, I have.

9              Q       So, you know generally the rules?

10             A       Generally.

11             Q       Let me go through them very

12      briefly.  Please allow time to expire between

13      when I ask the question and you respond so the

14      reporter can get everything down.  If you don't

15      understand a question, please let me know and I

16      will try and rephrase it in a fashion so you can

17      understand it.  Please give audible responses to

18      all my questions, and in the event you don't know

19      the answer to my question, please tell me.

20             A       Okay.

21             Q       Don't guess.  To the extent I ask a

22      question and it's not clear, please tell me, all

23      right?

24             A       Yes.

25             Q       Okay.  Now, did you speak to anyone

Page 6

```
 1                    P.J. Corless

 2    in preparation for this deposition?

 3         A    The village attorney, I told her I

 4    was given a subpoena, and that was all.

 5         Q    Did you review any documents?

 6         A    I did not.

 7         Q    Are you aware of the nature of the

 8    lawsuit between the parties?

 9         A    No.

10         Q    Who is your current employer?

11         A    I'm self-employed, Corless &

12    Associates Engineers.  I am under contract with

13    the Village of Pomona for the past 31 years.

14         Q    In what capacity do you contract

15    with the Village of Pomona?

16         A    As the village engineer.

17         Q    And you've held that position for

18    the last --

19         A    Thirty-one.

20         Q    So it's fair to say that you're

21    familiar with the Village Code of the Village of

22    Pomona?

23         A    I'm reasonably familiar with it,

24    yes.

25         Q    In your capacity as village
```

Page 7

1                         P.J. Corless

2      engineer, do you ever work with the village's

3      planning board?

4              A      Yes.

5              Q      And in that work do you become

6      involved with the planning board's review of

7      proposed subdivision applications?

8              A      I do.

9              Q      Does the village have a steep slope

10     law?

11             A      Yes, it does.

12             Q      And are you familiar with it

13     generally?

14             A      I'm familiar with it, yes.

15             Q      In your capacity as village

16     engineer, have you ever been involved with the

17     planning board's review of a subdivision

18     application involving steep slopes?

19             A      Yes, I have.

20             Q      Can you describe for me in general

21     terms what the planning board does with respect

22     to a subdivision application that involves land

23     that has steep slopes as defined by the

24     ordinance?

25             A      The applicant is required to produce

Page 8

1                          P.J. Corless

2      maps that have topography illustrating two-foot

3      contours, and then that piece of land is

4      identified for slopes within various percentages

5      up to 15 percent, up to 24 percent, and greater

6      than that, in general terms.  And the purpose of

7      that is to determine the amounts of steep slopes,

8      extremely steep slopes, and moderate slopes.

9          Q      And what is the significance, if

10     any, of property that is defined as moderate,

11     extreme, or however the ordinance defines it?

12         A      The intent of the ordinance was to

13     have the applicant evaluate the necessity to

14     build on steep slopes, and to encourage not to

15     build on the steep slopes so that you don't

16     create erosion control and soil problems related

17     to that kind of construction.

18         Q      And that would also lead to

19     potential runoff and water pollution, correct?

20         A      Yes.

21             MR. HARRINGTON:  I'm going to

22         mark as Exhibit A, Chapter 119 of what

23         I understand is the Village Code, which

24         we obtained on line, which is the steep

25         slopes law, which is entitled Site

Page 9

```
 1                    P.J. Corless

 2           Development.

 3                (Chapter 119 of Village Code re

 4           steep slopes law was marked as

 5           Defendant's Exhibit A for

 6           identification.)

 7           Q    Mr. Corless, I show you what we

 8    marked as Exhibit A.  I can represent we obtained

 9    it off the website.  If you could just in general

10    review it very quickly and confirm for me that

11    that is, in fact, the Village's steep slope law?

12           A    It looks like our law.  I brought my

13    code book with me, it looks like our --

14           Q    I'm not trying to trick you.

15           A    I understand.  It looks like the law

16    we've discussed, moderately steep, very steep,

17    and extremely steep.

18           Q    Let's go through it a little bit.

19    If you could look at section 119-1, subsection

20    (a) would be the second page.

21           A    Yes.

22           Q    That defines moderately steep slope,

23    very steep slope, and extremely steep slope; do

24    you see that?

25           A    Yes.
```

P.J. Corless                                                          March 25, 2008

Pomona, NY

Page 10

1                      P.J. Corless

2          Q      And that's what you referred to

3    earlier?

4          A      Yes.

5          Q      What is your understanding of the

6    purpose of creating three categories of slope?

7          A      The purpose, again, was to control

8    land disturbance on areas that would result in

9    water pollution impacts and perhaps even some

10   slope unstabilization, et cetera.

11         Q      Okay.  Now, if you could refer to

12   Section 119-2, which is Article 2 of the

13   ordinance?

14         A      Yes.

15         Q      And subsection (a) states, quote,

16   "Regulated Activities:  It shall be unlawful to

17   create a new steep slope or to disturb an

18   existing steep slope, or to create any other

19   disturbance of land on a steep slope, including

20   the installation of retaining walls, other than

21   an exempt activity as defined in subsection (b)

22   hereof without having first obtained site plan

23   approval from the planning board or such other

24   approving authority as provided in this chapter

25   and a work permit from the building inspector."

P.J. Corless                                                                    March 25, 2008

Pomona, NY

1                          P.J. Corless

2              Now, is that your understanding of

3    the law?

4         A    Yes.

5         Q    If you go to section 119-4 under the

6    title Approving Authority, the permit in question

7    is known as a site development plan permit; is

8    that right?

9         A    Yes.

10        Q    And is it fair to say that under the

11   law, where you have either a very steep slope as

12   defined in the ordinance or an extremely steep

13   slope as defined in the ordinance, that you have

14   to get approval from the planning board for such

15   a permit?

16        A    The applicant does, yes, that's

17   correct.

18        Q    And it's only in the instances of a

19   moderately steep slope that the village engineer

20   can issue the permit, correct?

21        A    That's correct.  Actually, I review

22   the site plan and submit a recommendation to the

23   building inspector.  He issues the building

24   permit, if you will, I mean procedurally.

25        Q    If we go to section 119-5 of Exhibit

Page 12

1                    P.J. Corless

2    A, that sets forth in detail the information that

3    an applicant for a steep slope permit would have

4    to provide, correct?

5         A     Correct.

6         Q     Section 119-6 of the ordinance

7    reflects the various fees that would have to be

8    paid by an applicant seeking a steep slope

9    permit, correct?

10        A     Correct.

11        Q     And that includes fees to be placed

12   in escrow to pay for the Village's consultants to

13   review the application, correct?

14        A     Yes.

15        Q     Now, you go back to 119-4,

16   subsection (b) states, quote, "Where the planning

17   board is reviewing an application under the

18   provisions of chapter 118 of the Village Code, it

19   shall also be the approving authority for any

20   site development plan permit required in

21   connection with such application."  What is

22   chapter 118?

23        A     Subdivision, realty subdivision, any

24   realty subdivision falls under the planning board

25   purview.

Page 13

1                    P.J. Corless

2        Q    So any steep slope permit that's

3   required in conjunction with a subdivision --

4        A    Any.

5        Q    -- has to be obtained from the

6   planning board?

7        A    Yes sir.

8             MR. HARRINGTON:   Put that aside

9             for a second and let me show you what

10            we will mark as Exhibit B for

11            identification.

12            (Copy of chapter 118 of the

13            Village Code re Subdivision Land was

14            marked Defendant's Exhibit B for

15            identification.)

16       Q    Mr. Corless, I am going to show you

17   what we marked as Exhibit B, and again I'll

18   represent to you it is a copy of chapter 118 of

19   the Village Code entitled Subdivision Land, which

20   we secured from the Village's website.  If you

21   could just look at it, and without going through

22   it in detail, are you generally familiar with

23   chapter 118 of the Village Code?

24       A    I am.

25       Q    That's the chapter that governs

Page 14

1                        P.J. Corless

2      subdivision approvals, correct?

3            A      That's correct.

4            Q      In the Village of Pomona, the

5      planning board is the authority that approves

6      subdivision applications?

7            A      It is, yes.

8            Q      If you look at section 118-5, on the

9      second page it states that, "No building permit

10     can be issued for a single-family home until

11     final subdivision approval has been issued by the

12     planning board," correct?

13           A      Correct.

14           Q      And that's generally true in most

15     municipalities, correct?

16           A      In general.  Sometimes older

17     ordinances allow model homes, but ours does not.

18           Q      If you go to 118-9, it's a

19     definition section?

20           A      Yes.

21           Q      And under the definition of

22     Subdivision plat, or final plat, you see that?

23           A      I don't see -- I see major

24     subdivision, minor subdivision.  Subdivision plat

25     or final plat, okay.

Page 15

1                    P.J. Corless

2          Q      That states, quote, "A drawing in

3    final form, showing a proposed subdivision and

4    containing all information or detail required by

5    law and by these regulations to be presented to

6    the planning board for approval, and which if

7    approved may be duly filed and recorded by the

8    applicant in the office of the County Clerk."

9                  Now, can you please explain for me,

10   in general, the process an applicant goes through

11   in securing subdivision approval say, for

12   example, a forty lot subdivision, generically the

13   process?

14         A      Applications are taken from the

15   village clerk for subdivision.  We, in this

16   village we use the county standard form for

17   realty subdivision.  And that's completed and

18   submitted with an environmental impact assessment

19   form, usually the long form, because of this you

20   say forty lots.

21         Q      Right.

22         A      Then the engineer together with a

23   surveyor will map out the properties in terms of

24   topography and boundary lines, and then lay out

25   roads horizontally, and then do some calculations

1                            P.J. Corless

2     about size of lots.  We have a minimum of one

3     acre, actually 40,000 square feet not 43,560, in

4     our village, so they would start laying out lots.

5     There's minimum widths and minimum depths.  And

6     they would go through that process and submit

7     what's called a sketch plat and compare that

8     layout.

9                     The guidance would be from this

10    section 118, our law, which spells out the widths

11    of streets and the lengths of cul-de-sacs and the

12    curvature, horizontal and vertical, a whole bunch

13    of standards from which the geometry is based on

14    for the breaking up of a large parcel into

15    several smaller parcels.

16                    And then when it is submitted for

17    sketch, it goes through a series of iterations on

18    changes, either brought on by the village

19    comments or by more information being collected

20    by the applicant related to traffic, to drainage,

21    to water, sewer, all the utilities.  So it's an

22    involved process, generally takes a couple of

23    years for that big a project.

24         Q      Does there come a time that the

25    applicant actually submits a formal plat or plan

1                          P.J. Corless

2    to the planning board for consideration?

3          A     Yes.

4          Q     Does there come a time that the

5    planning board holds a public hearing with

6    respect to that issue?

7          A     Yes, we hold both preliminary and

8    final, and nowadays for environmental impact, so

9    we have three.

10         Q     Just so I'm clear, that initial map

11   is known as a preliminary subdivision map,

12   correct?

13         A     Yes, in village law it's

14   preliminary, although we treat it as a sketch,

15   which is an old fashioned way.  But it's

16   preliminary, yes.

17         Q     If we look at Section 118 in the

18   Definition section, there is a definition for

19   Preliminary plat?

20         A     Yes.

21         Q     That is the initial drawing that

22   you're referring to, correct?

23         A     That's correct.

24         Q     And that's distinct from a final

25   plat as we discussed a moment ago, correct?

P.J. Corless                                                    March 25, 2008

Pomona, NY

Page 18

1                    P.J. Corless

2          A     That's correct.

3          Q     The final plat is in fact the plat

4     that's been ultimately approved by the planning

5     board, correct?

6          A     Correct.  Most villages issue a

7     preliminary approval on the plat which fixes

8     horizontal control and then they can go on to

9     other details.

10         Q     Let's talk about that.

11         A     Okay.

12         Q     You mentioned a moment ago that the

13    planning board conducts a public hearing?

14         A     Yes.

15         Q     And presumably hears testimony from

16    both the applicant and the public with respect to

17    a proposed subdivision?

18         A     Correct.

19         Q     Then there comes a time that they

20    close the public hearing, correct?

21         A     Usually.

22         Q     At some point?

23         A     Yes.

24         Q     At that point in time, the planning

25    board, within a statutory period of time, has to

```
 1                      P.J. Corless
 2      vote on whether to approve or not approve that
 3      preliminary subdivision?
 4           A      That's correct.
 5           Q      And if the preliminary subdivision
 6      plan is approved, what is in fact approved at
 7      that point?  Again, using a 40 lot subdivision as
 8      an example.
 9           A      Explicitly the horizontal alignments
10      are fixed, the number of lots are, quote,
11      established, and the road location again
12      horizontal control.  And usually a conceptual,
13      water, sewer, drainage, utilities, are
14      established, and environmental issues have been
15      resolved to get to that point.
16           Q      Now, with respect to the issue of
17      steep slopes?
18           A      Yes.
19           Q      In the preliminary subdivision
20      review phase, what if any review is given by the
21      planning board to steep slopes, as it relates to
22      lot count and road construction?
23           A      Well, the surveyor would identify
24      and show on various hatching means on the map
25      steep slope, extremely steep slope, you know,
```

Page 20

1                      P.J. Corless

2      those kind of things, and based upon the geometry

3      of the site, he would attempt to lay out lots

4      without going into extremely steep slopes and

5      certainly avoid them for roads and those kind of

6      things.  So it's an involved process.

7           Q     How about with respect to very steep

8      slopes?  And my question is with respect to very

9      steep slopes, if a lot is comprised of entirely

10     property or land that's characterized as very

11     steep slope under the ordinance, what impact if

12     any, would that have?

13          A     He would lose his, some of the area

14     proportionally to the amount of steep slopes.  We

15     don't allow them to build the roads across the

16     steep slopes, unless there is no alternative, and

17     we can't prevent the guy from using his property.

18     But we do deduct, or the code refers to a

19     deduction in area, and it's spelled out in the

20     ordinance.

21          Q     Okay.  Now, once a preliminary plat

22     is approved by the planning board, what happens

23     next in the subdivision approval process?

24          A     Well, once preliminary is received,

25     the process is essentially on the way to

Page 21

```
 1                       P.J. Corless
 2    completion.  All the major issues that could
 3    prevent approval have been resolved to the
 4    satisfaction of the village planning board, and
 5    the completion of all kinds of details related to
 6    engineering and perhaps even legal issues are
 7    then put through the hoops.  All the details are
 8    furnished and they're reviewed, and then we go
 9    back for --
10              And when they are satisfied to all
11    the agencies, there are outside agencies that we
12    refer maps to, then we set it up again for a
13    public hearing.
14         Q    If those details aren't resolved,
15    can the preliminary plat be approved?
16         A    No.  Usually it's a conditioned
17    preliminary approval.
18         Q    So if I'm clear, preliminary
19    approval is just that, it's a preliminary
20    approval, it's not a final approval, and it's
21    subject to certain conditions?
22         A    Yes, you can imagine that there are
23    conditions that the planning board may want the
24    applicant to get approval of another agency, and
25    another agency may not want to review the map
```

Pomona, NY

Page 22

1                     P.J. Corless

2    until there is a preliminary map given, approval

3    given.  So you're caught between jurisdictions.

4    So they would say, we will give you preliminary

5    approval based upon your submitting to New York

6    State Department of Transportation and getting

7    approval for the traffic, whatever.

8         Q     Okay.  Let's go back to the steep

9    slopes ordinance, in you could, that's chapter

10   119, and if you could refer to section 119-7.  I

11   am going to read it into the record and then ask

12   you a couple of questions.

13        A     Yes.

14        Q     Subsection (a) states, quote, "It is

15   the intent of this chapter to incorporate the

16   consideration of steep slope protection into the

17   village's existing land use and development

18   approval procedures in conjunction with the

19   procedures of the New York State Environmental

20   Quality Review Act.

21              "To the maximum extent possible the

22   review hearings and decisions upon any

23   application process under this chapter will run

24   concurrently with similar procedures that the

25   approving authority may undertake in connection

```
 1                          P.J. Corless

 2      with the other applications that are directly

 3      related."

 4                   Now, are you familiar with that

 5      provision?

 6           A     I am.

 7           Q     And with respect to securing steep

 8      slope -- I am going to refer to it as a steep

 9      slope permit, if that's okay with you?

10           A     Yes.

11           Q     In conjunction with obtaining steep

12      slope permits, can those permits be obtained in

13      conjunction with the subdivision review process?

14           A     They are obtained with, the site

15      plan incorporates that, quote, steep slope

16      requirements in the review process, they are not

17      issued separately.

18           Q     Let me just put a finer point on

19      that.  With respect to the process as you've

20      defined it a moment ago, before final subdivision

21      approval is granted by the planning board, is

22      there anything that would prohibit an applicant

23      from obtaining the necessary steep slope permits

24      for a, say, a 40-lot subdivision, given this

25      section?
```

Page 24

1                     P.J. Corless

2        A      Again, for the sake of clarity and

3   detail, if you were to have a mythical 40-lot

4   subdivision, the applicant by his engineer and

5   attorney, would put on a mythical house, a 40 by

6   60 box, and show grading for that and show where

7   that is in relation to steep slopes, and where

8   the driveways are and where the utilities

9   are.  And when final subdivision is granted, that

10  lot would have a steep slope approval for that

11  mythical 40 by 60 box.

12              In the real world the house might be

13  40 by 72 or 32 and 75, and all kinds of -- so we

14  make them come back, whenever it's bigger, come

15  back for another steep slope permit and another

16  public hearing.  So you could go away with

17  approval for 40 lots, but you really don't have a

18  specific site plan approval until you come up

19  with a real house.

20       Q      Unless, of course, you built the

21  real house within the confines of --

22       A      Correct.

23       Q      In certain jurisdictions that's

24  known as a building envelope?

25       A      No, the building envelope is the

Page 25

1                           P.J. Corless

2    maximum extent of the house.  This would be the

3    footprint.

4              Q      Okay.

5              A      So in this village, if you make the

6    footprint of the real house smaller, than the

7    building inspector is allowed to issue a building

8    permit.  If the house is bigger in any dimension,

9    then it's back to the planning board.  So there

10   are some fine lines.

11             Q      I understand?

12             A      And it varies.

13             Q      At the end of the day, in order to

14   secure final subdivision approval, an applicant

15   must obtain steep slope approval for the mythical

16   houses that are depicted on each lot?

17             A      Correct.

18             Q      If the developer subsequently wants

19   to exceed the boundaries of that mythical house,

20   he, she, or it has to come back to the planning

21   board to obtain a new steep slope permit?

22             A      But he does have the right to build

23   on the mythical house footprint.

24             Q      Okay?

25             A      Not the building envelope.

P.J. Corless                                              March 25, 2008

Pomona, NY

Page 26

```
 1                        P.J. Corless
 2          Q      Okay.  And the steep slope permits
 3     are the types of the final details that you
 4     talked about between preliminary subdivision
 5     approval and final approval?
 6          A      Right.
 7          Q      If we look at section 119-7, it's
 8     fair to say that that articulates the procedures
 9     for the review and the making of the decision
10     with respect to steep slopes?
11          A      Almost more than enough detail, yes.
12          Q      It goes on for --
13          A      Pages.
14          Q      And it's rather elaborate; is it
15     not?
16          A      Yes.
17          Q      It involves an additional public
18     hearing, correct?
19          A      Correct.
20          Q      And it involves a posting of a
21     letter of credit, correct?
22          A      Yes.
23          Q      And it also permits the planning
24     board to require a phased site plan review?
25          A      Yes.
```

Page 27

```
 1                    P.J. Corless

 2        Q      Whether or not you recommend it or

 3    not?

 4        A      Correct, that's a new amendment to

 5    the local law.

 6        Q      Okay.

 7        A      It's not phase site plan review,

 8    it's a phase site plan construction.

 9        Q      Let's look if you could, because I'm

10    new to this ordinance.  Under section C6U.

11        A      119-7?

12        Q      Yes.

13        A      C6U, okay.

14        Q      In the first sentence it says,

15    quote, "The planning board shall have the

16    authority to require phase site development plan

17    review, whether or not recommended by the

18    building inspector or village engineer and

19    regardless of the source of the information upon

20    which the planning board bases its decision to

21    require phase site development plan review."

22               What does that mean?

23        A      Those words talk about the planning

24    board reviewing the site plan in various

25    phases.  In actuality, what the planning board
```

Page 28

1                    P.J. Corless

2    does in their review, they specify steps to be

3    taken during the construction, or phases.

4           Q    Okay.  If we could look at 119-9 of

5    the ordinance, and under subsection (c) that

6    provides that a building inspector, the building

7    inspector, cannot issue a CO until the village

8    engineer has verified that all the work has been

9    completed under steep slope?

10          A    Correct.

11          Q    And under subsection (c) a stop work

12   order can be issued if the work isn't properly

13   completed?

14          A    That's correct.

15          Q    Now, when was this ordinance passed,

16   the steep slope ordinance?

17          A    Nineties, early nineties.  It's on a

18   while.

19          Q    That's good enough.  During your

20   tenure as the village engineer, have you been

21   involved in any subdivision applications that

22   have involved steep slope permits?

23          A    Yes, several.

24          Q    Okay.  Do you recall the names of

25   any of them?

Page 29

1                         P.J. Corless

2          A     High Gate Estates; Summit At Pomona;

3     the one we're calling Halley II.  So there are

4     several.

5          Q     Okay.

6          A     Other names I don't recall.

7          Q     Okay.

8          A     We're running out of land, so not

9     too much left.

10         Q     Can the severity of the slope of a

11    given lot disqualify it as a buildable lot, based

12    upon your experience with the planning board?

13         A     No, it has not, but I think the

14    ordinance goes in that direction, but that seems

15    to imply some sort of condemnation of land, which

16    I don't think the village trustees want to

17    accommodate.

18         Q     Okay.

19         A     In that manner.

20         Q     Now, based upon your experience, we

21    are going to talk about two distinct

22    hypotheticals here.  In a situation where the

23    steep slope permits are secured based upon the

24    hypothetical houses --

25         A     Yes.

1                          P.J. Corless

2           Q      -- in conjunction with the final

3    subdivision plat approval, typically how long

4    does that process take, based upon your

5    experience?

6           A      From the day the application is

7    filed until the day it's --

8           Q      Yes, steep slopes.  Of course, I

9    imagine it's a function of the number of lots,

10   but basically how long does it take?

11                 MR. HASPEL:  Can you rephrase

12           that, because I got confused?

13                 MR. HARRINGTON:  Sure.

14                 MR. HASPEL:  Hopefully, the

15           witness is smarter than me, but maybe

16           not.

17                 MR. HARRINGTON:  Well, the

18           witnesses are usually smarter than all

19           the lawyers, but that's not here nor

20           there.

21           Q      Focusing on the first process where

22   the steep slope approvals are secured in

23   conjunction with the final subdivision approval,

24   based upon the hypothetical houses, typically how

25   long, based upon your experience with

1                        P.J. Corless

2     subdivisions that range from thirty to forty

3     lots, how long does that process take for the

4     steep slope permits?

5          A     At least twelve months and more

6     likely twenty-four months.  The number of lots is

7     probably not the deciding factor, it's probably

8     the objections of community members.

9          Q     What kind of objections?

10          A     To environmental concerns, whether

11    real or perceived.

12          Q     Okay.  In the second situation where

13    the developer comes back after securing final

14    subdivision approval and seeks to build a house

15    outside the parameters of the hypothetical box on

16    the lot, based upon your experience, typically

17    how long does it take to secure steep slope

18    approval in that scenario?

19          A     Three to six months.

20          Q     Again, is that per lot or does it

21    make a difference?

22          A     Each application.  You could

23    technically do four lots in one night, but they

24    have a public hearing procedure which there is

25    some notice required and then there is a

Pomona, NY

1                     P.J. Corless

2    landscape plan that comes after that, so that's

3    another process.

4                 So it could technically go in three

5    months, but it usually takes six or eight months

6    because there's turnaround times between getting

7    an action from a board on a Thursday night and

8    then the deadline to submit the next round of

9    papers is Monday, so you can't do it fast enough

10   usually.

11        Q    Again, focusing on the scenario

12   where a developer comes back and wants to build a

13   bigger house?

14        A    Yes.

15        Q    In that scenario, it's fair to say

16   that the steep slope law as we discussed it today

17   has to be complied with again, correct?

18        A    Correct.

19        Q    There has to be a new public

20   hearing?

21        A    Correct.

22        Q    SEQR has to be triggered, if

23   appropriate?

24        A    As appropriate.  Usually it's

25   reaffirmed, but it could be triggered for more

Page 33

1                    P.J. Corless

2      investigation.  Certainly opens it up.

3      Everything is for sale.

4            Q     It's a new process?

5            A     It's a new process.

6            Q     And then the planning board has to

7      go through the criteria and the protocol that's

8      mentioned in the law?

9            A     Correct.

10           Q     And that's with respect to each lot?

11           A     Yes.

12           Q     Now, did there come a time that as

13     the village engineer you became involved in the

14     planning board's review of a single-family

15     subdivision application known as Halley Estates

16     II?

17           A     Yes.

18           Q     Do you recall when that was?

19           A     I think it's five or six or seven

20     years ago.  It's a few years ago.

21           Q     Is there a Halley Estates I?

22           A     There is.

23           Q     Is that where you live?

24           A     No, I live on Halley Drive, which is

25     the street parallel to where Halley I Estates

Page 34

```
 1                      P.J. Corless

 2    is.   That's just a short little stub street that

 3    was developed by the same Briarwood Farms people.

 4         Q     And do you know the attorney who

 5    represented Halley Estates II in the subdivision

 6    process?

 7         A     Yes, Martin Cornell, he's

 8    deceased.  He was their attorney.  Their attorney

 9    now is Tracy & Edwards, John Edwards.

10              MR. HARRINGTON:  Off the record.

11              (Brief recess)

12              MR. HARRINGTON:  I would like to

13         mark as Exhibit C what is styled Cover

14         Sheet Preliminary Subdivision Halley

15         Estates II, prepared by the firm of

16         Atzl, Scatassa and Zigler, which was

17         last revised August 2, 2006.

18              THE WITNESS:  What is the

19         original date way down on the bottom

20         there?

21              MR. HARRINGTON:  The original

22         date is January 25th, 2002.

23              THE WITNESS:  Six years ago.

24              MR. HARRINGTON:  And it's

25         comprised of a total of 21
```

Page 35

```
 1                    P.J. Corless

 2         drawings.  We will mark that C.

 3              (Cover Sheet Preliminary

 4         Subdivision Halley Estates II was

 5         marked as Defendant's Exhibit C for

 6         identification.)

 7         Q    Can I ask you, Mr. Corless, just for

 8    a second, I'll represent to you that we obtained

 9    this from Briarwood Farm, but if you could look

10    at Exhibit C and if that refreshes your

11    recollection that's a true and accurate copy of a

12    set of subdivision drawings that were submitted

13    to the planning board which you reviewed in your

14    capacity as village engineer?

15         A    I've seen a later one than this but

16    this is reasonably representative of what they

17    have.

18         Q    When you say you've seen a later

19    one?

20         A    There is a water easement that's

21    been added somewhere along.

22         Q    Since when?

23         A    I don't know, last couple of months,

24    water supply.

25         Q    I noticed when I got here a little
```

Page 36

```
 1                      P.J. Corless

 2     early, I noticed that there is a planning board

 3     meeting here tonight, correct?

 4          A     No, there was a TAC meeting this

 5     morning.  There is a planning board meeting April

 6     10th.  Do you want to know for sure?

 7                 MR. HARRINGTON:  Can I mark this

 8            as the next exhibit?

 9                 (One-page village calendar was

10            marked as Defendant's Exhibit D for

11            identification.)

12          Q     Let me just show you what I marked

13     as Exhibit D for identification, the TAC calendar

14     for the Village of Pomona scheduled for this

15     evening?

16                 THE WITNESS:  Today, this

17            morning.

18          Q     This morning, I'm sorry.

19          A     Isn't there a time on it?

20          Q     Yes, there is, today, 10:00 a.m.

21     And did you attend that meeting?

22          A     I did.

23          Q     Was the Halley Estates II

24     Subdivision on?

25          A     Yes, it was.
```

Page 37

1                          P.J. Corless

2          Q       It says on Exhibit D that it was on

3     for the purpose of final subdivision plan

4     approval?

5          A       Yes.

6          Q       Forty-lot subdivision.

7          A       That's correct.

8          Q       Today, has the applicant for Halley

9     Estates II secured final subdivision approval?

10         A       No, they have not.  John at silver

11    first name was here on behalf of the applicant

12    and he requested that a public hearing be set for

13    the April planning board meeting, to give final

14    approval that would be a planning board action,

15    and that requires a public hearing and

16    discussion, et cetera.

17         Q       When is that scheduled for?

18         A       April 10th.

19         Q       That's the public hearing, correct?

20         A       That's the public hearing.

21         Q       And what are the odds, based upon

22    your experience, that there will be approval

23    granted that evening?

24              MR. HASPEL:  We're bookmakers

25         now?

Page 38

1                          P.J. Corless

2                    MR. HARRINGTON:   And I'm not

3              being a wise guy.

4              A      Very, very slim.   Normally the

5       purpose of the public hearing is to allow the

6       neighbors and the residents an opportunity to

7       comment on the proposed action.   Usually the

8       planning board does not close the hearing the

9       first night regardless of what the comments

10      are.   So that would be carried over to May.   And

11      then we would meet once a month.   At the May

12      meeting if the comments are resolved to their

13      satisfaction, not to some technical satisfaction,

14      to their satisfaction, then they could close the

15      hearing and they have 45 days.   They would not

16      vote that night either.   There are five people,

17      and if they were in agreement, they would vote up

18      or down at the following meeting.

19              Q      So it's fair to say that at this

20      point in time, the Halley Estates II, the

21      applicant for the Halley Estates II subdivision

22      hasn't secured any steep slope approvals.

23              A      No.

24              Q      And you say that rather

25      emphatically?

Page 39

1                          P.J. Corless

2           A       There is nothing related to this

3       application until the final map is filed with the

4       county clerk.  That makes the subdivision of the

5       property.  They are very much along in the

6       process, 90 percent, but they are not there.

7                   MR. HARRINGTON:  Okay.  Let me

8               have marked as Exhibit C-1 Drawing

9               number seven from Exhibit C, it's the

10              drawing entitled "Disturbed Slope Map."

11                  (Disturbed Slope Map was marked

12              as Defendant's Exhibit C-1 for

13              identification.)

14          Q       Let me show you, Mr. Corless what we

15      have marked as Exhibit C-1.  I'll represent to

16      you it's an exact copy of drawing seven on

17      Exhibit C.  Do you recall having seen this on or

18      about August 2006 in conjunction with the

19      planning board's review of this application?

20          A       Yes.

21          Q       How long has this application been

22      pending before the planning board?

23          A       The initial application was March of

24      '01.  You see the date on the bottom.

25          Q       Yes.  And as a practical matter,

1                        P.J. Corless

2      they may have been in a couple of meetings before

3      that, just to chat about the project.

4            A      Sure.

5            Q      Based upon your experience, what was

6      the purpose of this disturbed slope map as it

7      related to the approval process?

8            A      The purpose was to identify those

9      areas of this track of 66 acres and the relative

10     slopes, breaking them down into four categories,

11     up to 15 percent, 15 to 25, 25 to 35, and greater

12     than 35.

13           Q      Okay.  And this map depicts each of

14     the forty proposed lots, correct?

15           A      Correct.

16           Q      And it also depicts each of those

17     hypothetical houses that we talked about a moment

18     ago, correct?

19           A      Right, just for accuracy, there will

20     be 41 lots platted.  One lot will be a municipal

21     lot for the detention basin, so there are forty

22     building lots.

23           Q      Thank you.  And this map depicts --

24     let's go through each of the lots, because first

25     let's talk about the roads.  The roads that are

Page 41

1                         P.J. Corless

2      proposed as it relates to this map before you, do

3      they go through areas that are designated as very

4      steep slopes?

5           A     Very steep?  I'm trying to match up

6      -- they go through moderately steep.  It does

7      appear that it goes through some very steep

8      areas, yes.

9           Q     And --

10          A     One little piece here.

11          Q     And that would be between lots seven

12     and eight?

13          A     Yes, seven and eight.

14          Q     And ultimately if and when final

15     subdivision approval is granted, that would

16     require a steep slope permit?

17          A     Yes, it would be given a steep slope

18     permit for constructing that road there.

19          Q     Let's look at each of the individual

20     building lots.  Looking at building lot number

21     one?

22          A     Okay.

23          Q     There is a hypothetical house

24     depicted on that, correct?

25          A     Correct.

1                    P.J. Corless

2          Q     The drawing reflects that there are

3    very steep slopes on this lot?

4          A     Looks like very steep slopes, yes.

5          Q     Based upon --

6          A     Yes, looks like the cross-section is

7    very steep slopes, there are some.

8          Q     Okay.  And how about with respect to

9    lot two?

10          A     Yes, right where the home is

11    proposed.

12          Q     And how about lot three, same thing?

13          A     Same thing.

14          Q     Both of those homes are located

15    right amidst very steep slopes?

16          A     Very steep or moderately steep.  I

17    can't tell the difference in the coloration.

18          Q     What about four.

19          A     Four is the same, five is the same,

20    six is the same.

21          Q     How about lot seven?

22          A     Yes, seven is the same.  Eight and

23    nine and ten and eleven, twelve, thirteen,

24    yes.  Fourteen, no.

25          Q     But there are steep slopes with

1                        P.J. Corless

2    respect to the proposed driveway?

3         A     Yes, there are.

4         Q     And that would require a permit as

5    well?

6         A     That's correct.

7         Q     How about lot 15?

8         A     The house is in steep slope on 15,

9    on 16, a portion on 17, a portion on 18, a

10   portion on 19, a portion on 20, a portion on 21.

11   22 and 23 are without disturbance of steep

12   slopes.

13        Q     Lot 24?

14        A     Twenty-four yes, disturbance; 25

15   disturbance; 26 disturbance; 27 disturbance; 29

16   disturbance; 29 disturbance; 30 there is no

17   disturbance; 31 there is disturbance; 32 there is

18   disturbance; 33 there is disturbances just for

19   driveway; 34 there is disturbance; 35 disturbance

20   driveway only; 36 there is disturbance, driveway

21   only; 37; 38; 39; and 40 are without disturbance.

22        Q     With respect to each of the lots

23   that you identified as there being a disturbance,

24   since it involved the planning board, a steep

25   slope permit would be required from the planning

Page 44

1                      P.J. Corless

2    board?

3        A      Yes.  And what the planning board

4    has done is given a steep slope permit for the

5    project based upon these forty lots, and then

6    individual houses will come back as they exceed

7    their footprint.

8        Q      Let me take a step back.  Has there

9    been final subdivision approval yet?

10       A      No.

11       Q      So there has been no steep slope

12   approval for this subdivision yet?

13       A      Not yet.

14       Q      Presuming that final subdivision

15   approval is granted, it will be granted for these

16   hypothetical, steep slope approvals will be

17   granted for the hypothetical houses that are

18   depicted?

19       A      In those locations.

20       Q      In those locations, right.

21       A      Yes.

22       Q      And if the developer or homeowner,

23   as the case may be, ultimately wants to vary the

24   location of the house or the driveway, then they

25   would have to come back and go through the steep

Page 45

1                          P.J. Corless

2       slopes process again, correct?

3           A       Correct, if he or she is going to

4       disturb the slopes.

5           Q       To your knowledge, and this is the

6       last time I will ask this question, I promise;

7       I've asked it twice.  To date, has any steep

8       slope permits been issued for this particular

9       project?

10          A       No.

11          Q       Before any building permits can be

12      issued with respect to any individual lot, a

13      steep slope permit would be necessary for those

14      impacted lots that we just discussed?

15          A       That's correct.  But as of now no

16      lots exist.  It is one parcel.

17          Q       Right.

18          A       That's not until the final plat.

19          Q       Right.  Now, in a situation where

20      you have very steep slopes on a particular lot --

21          A       Right.

22          Q       -- what impact, if any, does that

23      have on the construction of a home on that lot?

24      And let's use for example --

25          A       Use this one, we moved the house

Page 46

1                         P.J. Corless

2      over here (indicating).

3             Q      Okay, that's lot number seven.

4             A      Yes.

5             Q      That's extremely steep slopes,

6      correct?

7             A      Yes, so what the applicant's

8      surveyor or engineer would do is try to

9      construct, configure a lot that would allow him

10     room outside of that steeped area and build a

11     house outside of it, so he wouldn't have to

12     impact it.  But there are some times when he has

13     no choice.

14            Q      And that's under the category of

15     very steep slope?

16            A      Yes, very steep.

17            Q      I appreciate that the quality of

18     this map is not completely clear, because it's

19     been copied a number of times.  But using as an

20     example, lot number nine.

21            A      Yes, well, in lot number nine's case

22     they have identified some area in the building

23     envelope, and the house has been sited to the

24     front of the envelope.  It looks like it's the

25     same size as the other homes, but it has been

Page 47

1                          P.J. Corless

2      tilted and turned so that it doesn't have to be

3      built within that steep slope area, although I

4      suspect that some of the backyard, when the

5      homeowner gets in there, may be impacted.  But

6      that's a different issue.

7              Q      Well this dark area, number nine, is

8      an extremely steep slope, right?

9              A      That's correct.

10             Q      The balance is either a very steep

11     slope or a moderately steep slope, right?

12             A      Moderately steep slope, correct.

13             Q      We can't tell?

14             A      We can't tell.

15             MR. HARRINGTON:  Okay.  Mark this

16             as the last exhibit, documents that my

17             office received pursuant to a FOIL

18             request from Carolyn LaChiana.  It's a

19             packet of document in response to a

20             FOIL request, the first page is a card

21             entitled Village of Pomona, High Gate

22             Estates.  If we could just mark that as

23             Exhibit E.

24             (Documents received pursuant to

25             FOIL request were marked as Defendant's

Page 48

1              P.J. Corless

2         Exhibit E for identification.)

3         Q    I represent to you, Mr. Corless,

4    these are copies of minutes relating to the High

5    Gate Estates subdivision application.  You

6    testified earlier that this was one of the

7    subdivision applications that you were involved

8    with as engineer that involved steep slope

9    permits, correct?

10        A    Yes.

11        Q    And rather than have you go through

12   the minutes, I just want to -- is it typical

13   protocol for the planning board to review minutes

14   from the prior meeting?

15        A    Usually at the next meeting.

16        Q    Okay.  And is it typical protocol

17   that they review them and approve them as

18   accurate.

19        A    Their practice is that they review

20   them at the next meeting.  They do not always get

21   consensus and sometimes the vote is taken the

22   following month.  But they do try to do it each

23   month, for the last month.

24        Q    I'm just trying to save some time.

25        A    Yes, their practice, yes.

P.J. Corless                                                    March 25, 2008

Pomona, NY

Page 49

```
 1                     P.J. Corless

 2         Q       These minutes say what they

 3    say.  They have been approved, rather than drag

 4    you through?

 5         A       What they are, they are, yes.

 6         Q       So my question to you is, do you

 7    recall the approval process for the steep slopes

 8    in this --

 9         A       Sure.

10         Q       And how would you characterize it

11    with respect to its length?  Was it short and

12    sweet, was it typical, was it long?

13         A       High Gate was typically long.

14         Q       Okay.

15         A       Long being defined as several

16    meetings, more than two.

17         Q       And how many months between the

18    application for the steep slope permits and the

19    issuance of them?

20         A       Six months or more.

21         Q       And this involved the latter

22    scenario that you described where the applicant

23    actually came back after final subdivision

24    approval and asked for --

25         A       Correct.
```

Page 50

```
 1                    P.J. Corless

 2        Q      -- permits because they wanted to

 3    move the houses around?

 4        A      Correct.

 5            MR. HARRINGTON:  I have no

 6        further questions.  Thank you.

 7            THE WITNESS:  That's it?

 8            MR. HARRINGTON:  That's it.

 9            MR. HASPEL:  I have a couple.

10            MR. HARRINGTON:  I may have some

11        more but --

12            MR. HASPEL:  I just want to make

13        sure I understand.

14    EXAMINATION

15    BY MR. HASPEL:

16        Q      These I'm showing the witness C-1

17    for identification, which is the page, disturbed

18    slope map, that Mr. Harrington was questioning

19    about.  Each of these lots have what we have now

20    defined as a mythical footprint of a house?

21        A      Correct.

22        Q      Was it your testimony that unless

23    the ultimately designed house fits into that

24    footprint -- let's go one step back.  Let's

25    assume for one second that this map receives
```

Page 51

1              P.J. Corless

2    final subdivision approval, okay.  Under that

3    assumption, was it your testimony that unless the

4    proposed house at the time that a house is being

5    planned fits within the footprint that's

6    designated as the mythical footprint on this map,

7    a new process would have to take place?

8              MR. HARRINGTON:  Objection to

9         form.

10        A    Yes, that's correct.  If an

11   applicant came in with a building that was

12   slightly less than the approved one, and had an

13   adjusted driveway to accommodate it or something

14   like that, on my action I would send it back to

15   the planning board for approval.

16              If it complied with it completely as

17   approved by the planning board, we would process

18   without going further to the planning board.

19        Q    I'm even more confused now.  If the

20   footprint of the proposed house fits within the

21   box, do you have to go back?

22        A    No.

23        Q    Okay.  If the footprint of the house

24   was going to move a nominal amount, would you

25   have to go back?

Page 52

```
 1                        P.J. Corless

 2          A      It's my practice to send it back if

 3      there is any change.

 4          Q      Any change whatsoever?

 5          A      The planning board chairman prefers,

 6      and it's not in the law, she prefers to see any

 7      change, so I have complied with that request.

 8          Q      How long did you say we had this

 9      steep slope ordinance in place?

10          A      '98.

11          Q      In your experience, what percentage

12      of steep slope applications after a subdivision

13      approval is done, after final plat is filed, what

14      percentage of steep slope applications, in your

15      experience, have been declined?

16                 MR. HARRINGTON:  Objection.  You

17          can answer.

18          A      I need to understand the question.

19      After the map is filed.

20          Q      Let me take you through it.  Let's

21      say this map is the final plat?

22          A      Okay.

23          Q      And at that point in time, every one

24      of these lots came in?

25          A      Approved.
```

P.J. Corless                                                    March 25, 2008

Pomona, NY

Page 53

1                      P.J. Corless

2          Q      In your experience, throughout the

3    Village of Pomona, what percentage of steep slope

4    applications are denied?

5          A      None would be denied but more than

6    90 percent of them would be sent back to the

7    planning board as a practical matter.

8          Q      When you say, "sent back to the

9    planning board," once it gets sent back to the

10   planning board, in your experience, how many

11   times has a builder been denied the opportunity

12   to build on that lot?

13         A      Never been denied.  There may be

14   changes, but never has been denied.

15         Q      When you say changes, can you

16   describe what kind of changes you are referring

17   to?

18         A      He might be asked to flatten the

19   slope of the driveway or not make the length of

20   the house as long as it's proposed, or perhaps

21   change the imperviousness of one of the surfaces,

22   of a driveway.  I mean there are lots of more

23   tweaking of details rather than an approval being

24   denied.

25         Q      You used the word tweaking.  Is that

Page 54

1                          P.J. Corless

2     pretty much what happens in this process, a

3     tweaking, rather than a massive relook?

4                    MR. HARRINGTON:  Objection.

5          Q     You can answer.

6          A     Yes, in general the applicants come

7     in for much bigger houses in this village, during

8     the upsurge in the economy, and they generally

9     are allowed to build as large as they want, but

10    they have trade-offs with more extensive

11    landscaping or some retaining walls and that kind

12    of stuff.  But if that's tweaking, that's what

13    they do.

14                    But they are generally not denied

15    the right to build.

16         Q     When you say much larger houses, are

17    we talking about houses twice the size of the

18    mythological footprint?

19         A     Yes.

20         Q     Three times the size?

21         A     Yes.

22         Q     Four times the size?

23         A     Most of these houses are shown at

24    3,000 footprint at the most, maybe 2800, and

25    we're getting 6,000 and 8,000 very routinely as

1                          P.J. Corless

2      of last year.  I don't know this year.

3           Q     So it's your testimony that you go

4      back to the planning board, you tweak it, you

5      have different landscaping, you may have to do a

6      little bit more excavation for a driveway or

7      something like that; that's what it will take to

8      get the approval?

9                MR. HARRINGTON:  Object to the

10               form.

11          A     You may have to do all those things,

12     and all those things are obviously money.

13     Usually those changes are in the hundreds of

14     thousands of dollars, not in the neighborhood of

15     $5,000.

16          Q     That's when you are talking about

17     creating something larger than the footprint?

18          A     Yes, bigger driveways, bigger walls.

19          Q     I assume it would be proportional to

20     a smaller change?

21          A     Sure.

22          Q     So you are not talking a hundred

23     thousand dollars worth of changes on a

24     ten-percent growth of the footprint?

25               MR. HARRINGTON:  Objection.

Page 56

```
1                     P.J. Corless
2          A     Not generally, no.
3          Q     Now, you testified earlier as to
4     intent of the ordinance?
5          A     Yes.
6          Q     Did you participate in the drafting
7     of the ordinances?
8          A     Yes.
9          Q     Could you describe how you
10    participated?
11         A     More in a technical aspect of what
12    the slopes are and what percentages, et cetera,
13    but not in the legislative intent of the elected
14    board of trustees, that was their decision.
15         Q     As they were going through making
16    their decision, were you consulting the
17    legislators, or were they asking to consult with
18    you?
19         A     The legislators asked that the
20    planning board and engineer participated in
21    workshops about the intent of this steep slope
22    law and what was practical and what was
23    reasonable expense?
24         Q     Do you have any personal knowledge
25    of the discussions of intent outside the
```

1                    P.J. Corless

2    ordinance's statements of intent?

3         A    No, I do not.  The discussion of

4    this law went on for a couple of years.  It

5    didn't happen in one round, and I do know that

6    they sought guidance from other municipalities,

7    from California to North Carolina to wherever.

8         Q    You indicated you were at the TAC

9    meeting this morning?

10        A    I was, yes.

11        Q    The map that's before you or the

12   group of maps, do these drawings represent

13   substantial similarity to what is still being

14   presented?

15        A    Yes.

16        Q    Was there any specific purpose of

17   this morning's TAC meeting?

18        A    Well, the senior partner here was

19   sent in by his client to request a public hearing

20   and we spent most of the discussion on procedural

21   issues.

22        Q    Getting it on to the agenda?

23        A    Getting it on to the public hearing,

24   what maps are required, if he needed additional

25   one thing or another.  But we were not at

Page 58

1                    P.J. Corless

2    substantive issues this morning.

3         Q    When you view these maps and the

4    planning board, if you have any knowledge of how

5    they view it, and you look at them with these

6    mythical footprints?

7         A    Right.

8         Q    What is the purpose of even putting

9    the mythical footprint?  Is it your working

10   assumption that these footprints are not going to

11   be the end-of-the-day planned houses?

12              MR. HARRINGTON:  Objection.

13        Q    Do you understand the question?

14        A    Yes, I understand the question.

15              MR. HARRINGTON:  Same objection.

16        A    The planning board wants assurances

17   that a house can be built on the lot that's going

18   to be created.  So to do that, the engineer has

19   to create the size of the lot, show it, show a

20   building and show a driveway, show the drainage.

21   And a lot of that information then is filtered

22   down to the amount of run-off for drainage.  The

23   water and sewer connections are shown on other

24   sheets.

25        Q    But you are doing this with the

1                        P.J. Corless

2      working assumption that you've going to be doing

3      it again at a later date, or may be doing it

4      again at a later date?

5                   MR. HARRINGTON:  Objection.

6          A     With various lots.

7                   MR. HARRINGTON:  Same objection.

8          A     My advice to the planning board is

9      that if this shape of the house was originally

10     presented to us in the year 2000, by the time it

11     gets built, and that might be normally three or

12     four years later, the shape of the house will

13     probably have changed.

14                   We used to submit houses with 24 by

15     42 as the standard Rockland County bilevel.  Now

16     they're showing these shapes.  If you'll notice,

17     this shape is the same for every lot.  That's

18     probably highly unlikely that everybody will

19     build the same house with side-load garages, et

20     cetera.

21                   So what the applicant's engineer

22     does is represent a reasonably sized house for

23     this subdivision that might sell for X dollars,

24     whatever it is, and that could be built.  But as

25     individual buyers come in they will make changes

Page 60

1                        P.J. Corless

2    and the builder will accommodate him to the best

3    of his ability, and sometimes that requires going

4    back to change it.

5              It doesn't make it easy for a track

6    builder, but it's easy for a custom builder, who

7    is more used to a longer process time.

8         Q    I think I understand.  So let me try

9    to repeat it in a condensed form.  You want the

10   mythological houses so you can do your standard

11   drainage analysis, water analysis, road analysis

12   and that kind of stuff?

13        A    Utilities, yes, right.

14             MR. HARRINGTON:  Objection.

15        Q    And at that point in time if there

16   is going to be a steep slope issue on another

17   design, you deal with all those issues within the

18   context of that particular lot?

19             MR. HARRINGTON:  Objection.

20        Q    Is that correct?

21        A    That's correct.  You'll notice that

22   all these homes have very small areas indicated

23   for a deck, and obviously no, quote, in-ground

24   swimming pools.  We get many applications a year

25   afterwards, someone, the homeowner is in there

Pomona, NY

Page 61

1                    P.J. Corless

2    now, they're going to put the pool in here or

3    they're going to put a detached garage up or

4    they're going to put up a hobby shop.  People do

5    lots of things with these.

6        Q     If you put in a pool, would that

7    require you to go back and do a steep slope

8    analysis?

9        A     You take the original analysis and

10   that application will be placed against this.  If

11   they are fortunate enough to hire the firm that

12   has that information, he just puts it on that --

13       Q     But it would have to go through the

14   same process?

15       A     Same process, just as if he is

16   building a house.

17       Q     Same thing for a detached garage?

18       A     Yes.

19       Q     Workshop?

20       A     Yes.  It's a very rigorous

21   ordinance.

22             MR. HASPEL:  I have nothing

23        further.

24             MR. HARRINGTON:  I just have one

25        follow up.

Pomona, NY

Page 62

1                        P.J. Corless

2       CONTINUED EXAMINATION

3       BY MR. HARRINGTON:

4            Q      Mr. Corless, regardless of whether

5       an applicant comes back when final subdivision

6       approval is granted, say for example in Halley

7       Estates, if and when it's granted, when that

8       final plat is approved, the planning board will

9       have considered, evaluated, all the criteria

10      under the steep slope law, correct?

11           A      Correct.

12           Q      And will have issued for those

13      hypothetical houses a permit for those houses,

14      correct?

15           A      Correct.

16           Q      And in the event an individual or a

17      developer subsequently decides, for whatever

18      reason, to exceed the size of that hypothetical

19      house, then he, she or it has to go back to the

20      planning board for a new steep slope permit?

21           A      Modified steep slope permit.

22           Q      And they will have to go through the

23      process that's articulated in the statute?

24           A      Yes.

25           Q      And the length of that process

Page 63

1                        P.J. Corless

2     depends on the nature of the change, correct?

3           A      Yes.

4                 MR. HARRINGTON:  Thank you.

5                 THE WITNESS:  You're welcome.

6                 (Whereupon, at 2:24 p.m., the

7           deposition was concluded.)

8

9

10        _____

11                     P. J. CORLESS

12

13

14     Subscribed and sworn to before me

15     this_____day of_____, 2008.

16

17     _____

18     NOTARY PUBLIC

19

20

21

22

23

24

25

Page 64

1                         CERTIFICATION

2

3          I, Nancy Anne Flynn, Registered Professional

4     reporter and a Notary Public in and for the State

5     of New York, do hereby certify:

6          THAT the testimony hereinbefore set forth of

7     said witness, duly sworn, was recorded by me; and

8          THAT the within transcript is a true record

9     of the testimony given by P.J. CORLESS.

10         I further certify that I am not related,

11    either by blood or marriage, to any of the parties

12    to this action; and

13         THAT I am in no way interested in the outcome

14    of this matter.

15         IN WITNESS WHEREOF, I have hereunto set my

16    hand this 4th day of April 2008.

17

18

19         _____

20

21              Nancy Anne Flynn, RPR

22

23

24

25