Page 1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -----------------------------------

5    BRIARWOOD FARMS, INC.,

6              Plaintiff.

7    - vs -                    07civ. 3657 (clb)

8    TOLL BROS., INC.

9              Defendant.

10   -----------------------------------

11              FRIDAY, MAY 2, 2008
               11:15 A.M.
12

13         DEPOSITION of DAVID ZIGLER, 30(b)6

14   witness, called for examination by counsel for

15   the Defendants, held at the offices of Atzel,

16   Scatassa & Zigler, 234 North Main Street, New

17   City, New York, before Nancy Anne Flynn,

18   Registered Professional Reporter and a Notary

19   Public in and for the State of New York, and

20   transcribed under her direction.

21

22

23

24                        **CERTIFIED COPY**

25

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 2

1     A P P E A R A N C E S :

2

3          JOSEPH J. HASPEL, ESQ.
           Attorney for Plaintiff
4          40 Matthews Street
           Suite 201
5          Goshen, New York 10924
           (845) 294-8950
6          jjhaspel@warwick.net

7

8          MICHAEL P. BENENATI, ESQ.
           BLEAKLEY, PLATT & SCHMIDT, LLP
9          Attorneys for Defendant
           One North Lexington Avenue
10         Seventh Floor
           White Plains, New York 10272
11         (914) 287-6100
           wpharrington@bpslaw.com.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 3

1                        CONTENTS

2    EXAMINATION OF DAVID ZIGLER                    PAGE

3    BY MR. BENENATI                                  4

4

5

6    EXHIBITS

7    DEFENDANT'S   DESCRIPTION                       PAGE

8    1  Notice of Deposition.                         6

9    2  Complaint.                                    8

10   3  November 7, 2005 Agreement between           19

11      Briarwood Farms and Toll Brothers.

12   4  December 22, 2006 letter from Toll           51

13      Bros. to Briarwood Farms and Isaac Shiner.

14   5  January 22, 2007 letter to Briarwood Farms   70

15      and Donald Tirschwell from Toll Brothers.

16   6  January 30th, 2007 letter from Donald        84

17      Tirschwell to Toll Brothers.

18   7  Village of Pomona Certification of           29

19      Resolution adopted January 12, 2006.

20   8  Set of drawings.   (Deemed marked)           39

21          (Exhibits retained)

22

23

24

25

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 4

1                        David ZIGLER,

2              having been duly sworn by a Notary

3              Public for the State of New York,

4              testified as follows:

5    EXAMINATION BY

6    BY MR. BENENATI:

7         Q    Mr. Zigler, my name is Michael

8    Benenati.  I am from the Law Offices of Bleakley,

9    Platt & Schmitt.  We represent a defendant named

10   Toll Bothers, Inc. in litigation brought by

11   Briarwood Farms, Incorporated.

12              I'm going to be asking you a few

13   questions today.  If at any time you don't

14   understand a question of mine, please ask me to

15   rephrase it or we will do the best we can do with

16   that.

17              Also, all your answers have to be

18   verbal since she's recording everything we say;

19   she can't record nods of the head, et cetera.

20   Also, it's very important, you may anticipate a

21   question that I'm going to ask you, but please

22   let me complete the question prior to answering

23   because, again, she can only record one of us

24   speaking at a time.

25              If you want to take a break at any

David Zigler 30(b)(6)                                      May 2, 2008

New City, NY

Page 5

```
1                      David Zigler
2     point in time, that's fine, talk to your attorney
3     here today, that's fine, but as long as there is
4     not a pending question.  All right?
5          A     Not a problem.
6               MR. HASPEL:  Just for the record,
7          although Mr. Zigler is in fact friendly
8          to my client, he is not my client.
9               MR. BENENATI:  Right, but he is
10         the 30(b)6 designee that your client
11         presumably designated for this
12         deposition today, correct?
13              MR. HASPEL:  No.  We designated
14         Mr. Zigler by communication between
15         myself and Mr. Harrington as the person
16         best suited to answer the questions
17         that we believe are going to be
18         proposed, and that was basically by a
19         friendly discussion between attorneys,
20         trying to get to the answers to the
21         root questions as quickly as possible.
22              Mr. Zigler is, in fact, a
23         professional employed by my client, but
24         I think it would be a stretch to say
25         that he is my client.
```

Page 6

1              David Zigler

2          MR. BENENATI: Okay. I'm just

3       going to introduce Exhibit 1 and ask

4       Mr. Zigler to take a look at it. It's

5       a Notice of Deposition.

6          (Notice of Deposition was marked

7       as Exhibit 1 for identification.)

8          Q    I'll ask the witness, Mr. Zigler,

9  have you ever seen this document before

10 (handing)?

11         A    No.

12         Q    If you could turn to the second

13 page, do you see at the top it has topic areas.

14 Can you just read those topic areas, read off,

15 just for the record? Or I can read it. On page

16 two it says Designated Issues?

17         A    Oh, "Contract of sale entered into

18 by the parties for the development of Halley

19 Estates II subdivision." That's number one.

20         Q    Okay. Let me ask you a question

21 about that. Do you have any knowledge about that

22 issue?

23         A    No, not at all.

24         Q    The second issue, and I'll read it,

25 "The plaintiff's efforts, if any, to secure

Page 7

```
 1                    David Zigler
 2    approvals from the Village of Pomona Steep Slope
 3    Ordinance for the Halley Estates II subdivision.
 4    Do you have any knowledge about that issue?
 5         A    I would have to ask you to describe
 6    "secure approvals," what does that mean?
 7         Q    Steep slope permits, with respect to
 8    procuring steep slope permits pursuant to the
 9    steep slope ordinance.
10         A    Steep slope permits require an
11    application.
12         Q    So let me back up, sorry to
13    interrupt you.  It would be the application
14    process, everything in between the issuance of a
15    permit?
16         A    No, we have not tried to get a steep
17    slope permit.
18         Q    But are you familiar with the issue?
19         A    Oh, absolutely.
20         Q    Okay.  And Briarwood Farms' efforts,
21    if any, to cure the alleged contract defaults
22    cited in Toll Brothers' January 22nd, 2006 letter
23    to plaintiff."  I know that's kind of a --
24         A    Broad scope.
25         Q    Right.  I don't know if you have any
```

David Zigler 30(b)(6)                                                    May 2, 2008
New City, NY

Page 8

1                        David Zigler

2      knowledge with respect to the letter that's

3      referred to in there?

4            A      I have a little knowledge of some of

5      the items when they pertain to our portion of the

6      proposal.

7            Q      Okay.  And the final issue, "The

8      factual basis of the claims asserted by plaintiff

9      in this litigation?

10           A      No, no knowledge.

11                  (Complaint was marked as Exhibit

12           2 for identification.)

13           Q      Okay.  That's all for that one.  I'm

14     just going to show you what has been marked as

15     Exhibit 2, it's titled Complaint.  I ask you to

16     take a look at that (handing).  Mr. Zigler, have

17     you ever seen this document before?

18           A      No.

19           Q      Okay.  If you would just look

20     through it.  I'm going to ask you, are you

21     familiar with any of the claims that are asserted

22     in the Complaint?

23           A      What am I actually looking for now?

24           Q      The claims.

25           A      Some of them I'm familiar with, yes.

Page 9

1                          David Zigler

2          Q      Why don't you look through the whole

3    thing.

4          A      How would you describe familiar?  I

5    mean, I'm familiar with trying to appropriate a

6    final approval.

7          Q      We'll go into some of those issues

8    later.  I'm just saying generally with respect to

9    the claims as asserted in the complaint?

10         A      Very few of them.

11         Q      Okay.  We will go into more detail

12   about what claims you are familiar with.

13         A      Okay.

14         Q      Have you ever seen that document

15   before, though?

16         A      Not that I'm familiar with, no.

17         Q      I'll take that back.  I'm just going

18   to first ask you some background questions,

19   generally.  What is your date of birth?

20         A      7/1/53.

21         Q      Are you currently employed?

22         A      Yes.

23         Q      Where are you employed?

24         A      Atzel, Scatassa & Zigler.

25         Q      And generally, what is that business

1                    David Zigler

2    that you refer?

3         A    Engineering, surveying, and

4    planning.

5         Q    What is your position with that

6    firm?

7         A    I'm a licensed land surveyor but I'm

8    president of the firm.

9         Q.   By president, what do you mean?

10        A    My wife says that too.  Really

11   nothing, just a title.

12        Q    Are you responsible for the business

13   operations of your firm?

14        A    Not really, although there is a

15   title to it, we pretty much all four of us run

16   the business together.  It's just really for tax

17   purposes and for, you know, parties.

18        Q    Is each named person of the firm a

19   licensed land surveyor?

20        A    Yes, although Ray Amate who is an

21   engineer isn't, he is a part the firm, but his

22   name is not on the door.

23        Q    And when were you licensed as a land

24   surveyor?

25        A    1983.

Page 11

1                          David Zigler

2          Q      And what is your educational

3     background, generally?

4          A      Basically, just various courses,

5     continuing education, no really thorough college

6     background in surveying.

7          Q      Do you have a college degree?

8          A      No.

9          Q      But you've taken various courses?

10         A      Right.

11         Q      In order to get licensed as a land

12    surveyor, correct?

13         A      Yes.

14         Q      When was your firm first retained by

15    Briarwood Farms with respect to the Halley

16    Estates II project?

17         A      I would have to guess in the late

18    eighties or early nineties.  It's been quite a

19    while, so, maybe early nineties.

20         Q      Do you know from whom retained your

21    firm, whom from Briarwood Farms?

22         A      Mr. Hershkowitz, Senior.

23         Q      What is Mr. Herskowitz' first name?

24         A      Israel.

25         Q      Were you the person from your firm

Page 12

1                          David Zigler

2      that spoke with Mr. Hershkowitz upon the

3      retention of the --

4          A      Always, since the very beginning, I

5      handled it in the firm, although I wasn't the

6      president then.

7          Q      And what did Mr. Hershkowitz retain

8      your firm to do, if anything?

9          A      Gather final approval for a

10     subdivision, hopefully.

11         Q      Is that subdivision, was that named

12     Halley Estates at some period in time?

13         A      Halley Estates II.  It was actually

14     a proposed section off of Halley Estates I.

15         Q      When you say "proposed section,"

16     what do you mean by that?

17         A      Halley Estates I was a dead-end

18     street, so by planning standards, you must at

19     least give a concept layout of the portion of

20     property which that dead-end street would serve.

21     So although there was never a submission to

22     Halley Estates II, there was always a concept map

23     of the possible subdivision.

24         Q.     Did you participate in Halley

25     Estates I?

David Zigler 30(b)(6)                                        May 2, 2008
New City, NY

Page 13

1                        David Zigler

2          A     No, I think that was Halloran and

3     Caruso, a different firm.

4          Q     Do you know when Halley Estates I

5     received its final subdivision approval?

6          A     I would have to say about five years

7     before we started, whatever that date was.  It

8     was five or six years, it was basically completed

9     before we started Halley Estates II, completed in

10    construction.

11         Q     Was Mr. Hershkowitz a land owner or

12    something else?

13         A     I deal with the person, I don't know

14    if he's a contract vendee or owner when I deal

15    with him.  The only time I know that is when I

16    start to fill out the application.

17         Q     Do you know that now?

18         A     I believe when we started he was

19    just a vendee.  I'm not too sure.  It was a long

20    time ago.

21         Q     Sure.

22         A     I was younger.

23         Q     How long has your firm been in

24    existence?

25         A     The original proprietors were Atzel

David Zigler 30(b)(6)

New City, NY

May 2, 2008

1                    David Zigler

2     and Scatassa, and that started in 1968.  I became

3     a partner in the firm, which then changed the

4     name to Atzel, Scatassa & Zigler in the late

5     eighties, '89 I'll guess.

6          Q     Have you ever participated in

7     obtaining steep slope approvals?

8          A     The firm or me personally?

9          Q     Well, you through the firm, in your

10    employment with the firm.

11         A     Well, being again the president, I

12    know what goes on all the time, and our firm has

13    obtained many of them.  Personally I've probably

14    only worked on less than ten, I'll say.

15         Q     And when you say less than ten, what

16    do you mean?

17         A     Ten separate lots.

18         Q     Is that ten separate lots within a

19    subdivision or subdivisions?

20         A     In this case it happens to be one

21    single subdivision.

22         Q     Do you know the name of that?

23         A     High Gate Estates.

24         Q     What was the basis for your role in

25    obtaining the steep slope approvals?

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

Page 15

1                          David Zigler

2          A      Application, submission,

3     representation and final approval with whatever

4     modifications had to be made to that plan.

5          Q      Was that in conjunction with

6     securing a final subdivision approval from the

7     planning board?

8          A      No.  Highgate Estates was approved

9     and filed in the late sixties.

10         Q      How did it come about that you were

11    retained to obtain these steep slope approvals

12    for the Highgate Estates?

13         A      Somebody walked in and paid us money

14    to represent them.

15         Q      Were they the owners of the ten

16    separate lots?

17         A      No, again, it was various

18    contractors in various degrees, whether they were

19    representing a person who owned a lot, let's say

20    a single homeowner, or whether they were

21    representing themselves building several lots, or

22    they were representing themselves as a contract

23    vendee, building several lots.  So it could be in

24    various degrees of ownership.

25         Q      When you obtained or initiated these

Page 16

1                    David Zigler

2     steep slope approvals, did you do it in

3     conjunction with all ten or was it separate?

4          A     No, all separate.  Every lot is a

5     separate application.  Although, if you are doing

6     contiguous lots, you can sometimes process them

7     together.  But there is still a separate

8     application.

9          Q     Do you recall generally how long

10    each of those application processes took?

11         A     They can be as simple as three

12    months, I guess, because you still have to do the

13    SEQR process; some of them have been as long as

14    five months.

15         Q     Is that based on your personal

16    history with Highgate Estates, the lots in

17    Highgate Estates, or something else?

18         A     No, personal history.

19         Q     You said your firm has personnel

20    that is capable of obtaining or has obtained

21    steep slope approvals?

22         A     We are all capable.  But most of

23    them I have done, as I said, there were maybe ten

24    or less.  John Atzel, who you hear speaking in

25    the other room, has probably applied for and

Page 17

```
 1                    David Zigler
 2    obtained approvals for I'll guess maybe fifteen
 3    to twenty.
 4         Q     Is there someone in your firm that
 5    you collectively designate to do that type of
 6    work or is it based on --
 7         A     It's either me or John, because it
 8    depends on who is fool enough to attempt it, but
 9    either John or I.
10         Q     As part of the firm's retention by
11    Mr. Hershkowitz, did you or your firm ever obtain
12    steep slope approvals for the Halley Estates II?
13         A     Never been denied.
14         Q     Did anybody from your firm start the
15    application process?
16         A     Oh, you were saying just for Halley?
17         Q     Yes, just for Halley Estates II --
18         A     -- Halley Estates II? No, no, we
19    didn't start.  We never started that process.
20         Q     And just so I'm clear, because I
21    think there was back and forth between us, with
22    respect to the Halley Estates II project, did
23    your firm ever initiate the steep slope
24    application process?
25         A     Yes and no.  We have discussed this
```

David Zigler 30(b)(6)
New City, NY
May 2, 2008

Page 18

1                     David Zigler

2    before preliminary, and as recently as two weeks

3    ago --

4          Q      Sure.

5          A      -- with Pomona, and the advisors to

6    Pomona, and at the last workshop they asked me to

7    compile a list of lots which I thought would

8    require the steep slope application.

9          Q      Was that at the April 25th meeting?

10   Let me back up, March 25th meeting?

11         A      No, it was at the workshop which

12   would have been about two weeks ago, early April.

13         Q      Did you compile a list of lots?

14         A      Not yet, because that workshop

15   produced a resolution, and that's hopefully they

16   are going to vote on this month, May.  And

17   whatever is in that resolution I'll have to

18   address.  So I only address things when somebody

19   writes it down.  At the workshop we were talking

20   verbally about something.

21         Q      Is that just to get an idea as to

22   how many lots might be impacted by the steep

23   slope ordinance?

24         A      That was what their request was.

25   They had a thought on how many, and I had a

Page 19

1                          David Zigler

2    completely different thought.  But if I can prove

3    I was correct, I would have less lots then they

4    thought it would be.

5          Q      How many lots did you calculate

6    within the Halley Estates II subdivision would be

7    impacted by the steep slope ordinance?

8          A      I don't do that until I get a

9    written comment or response or memo from the

10   planning board, so I did not address it, didn't

11   look at it.

12         Q      You didn't address it for that --

13         A      I didn't calculate anything.

14         Q      Okay.  Prior to testifying right now

15   here today, did you review any documents?

16         A      What would you say prior is?  Time

17   span.

18         Q      Since you found out that you were

19   going to be testifying here today?

20         A      No.  Even from the previous cancel,

21   I have not pulled out the folders.  Other than to

22   go to the workshop which was, you know -- I think

23   it was early April.

24                (November 7, 2005 Agreement

25                between Briarwood Farms and Toll

Page 20

1                          David Zigler

2          Brothers was marked Exhibit 3 for

3          identification.)

4          Q     I am going to show you a document

5     that's been labeled Exhibit Number 3, and ask you

6     to take a look at that (handing).

7               MR. BENENATI:  Joe, I have a copy

8          for you (handing).

9               MR. HASPEL:  I love copies.

10         A     Why am I studying this for?

11         Q     Just take a look at it, and I will

12    ask you a specific question or questions

13    regarding it after you've done.  Take as much

14    time as you need.

15               You'll see in the first page the

16    document is dated the 7th of November 2005, and

17    it says between -- back up.  It says, "This

18    agreement is made this 7th of November 2005

19    between Briarwood Farms, Inc., and it lists their

20    address, and Toll Brothers, Inc., and it lists

21    their address.

22               Did you ever see this document prior

23    to November 7th, 2005?

24         A     No.

25         Q     Have you ever seen this document

1                      David Zigler

2     prior to today?

3          A     Not that I remember.

4          Q     Would you typically see a contract

5     like this in the course of your work for a seller

6     of land or a vendee?

7               MR. HASPEL:  Why don't we define

8          what kind of contract this is?  I mean,

9          I just think --

10              MR. BENENATI:  You're right,

11         that's a good point.

12              MR. HASPEL:  Or ask him if he

13         knows what this kind of contract is or

14         something like that.

15         Q     Do you know what this contract is?

16         A     No.

17              MR. HASPEL:  Then it's hard to

18         discuss it.

19         Q     All right, let's put the contract

20    away for a second.  Let me ask you this:  When

21    did you start with the process of obtaining the

22    necessary approvals with respect to moving

23    towards final subdivision approval with respect

24    to the Halley Estates II subdivision?

25         A     Well, technically, I guess you would

Page 22

1                          David Zigler

2        say that would be after our preliminary approval,

3        so that would be after the date of that

4        resolution that I handed you.  That's, I guess,

5        you know, for previous years we tried to get

6        final approval too.

7                    MR. HASPEL:  Could you read back

8              the question?

9                    (The question was read.)

10                   MR. HASPEL:  I am going to object

11             to the form of the question.

12                   Did hearing the question over

13             help you any?  Because you answered a

14             different question.

15                   THE WITNESS:  Yeah, well, for

16             final you have to have preliminary,

17             that's the way I answered it.

18        Q      When did you start even before --

19                   MR. BENENATI:  My question

20             referred to --

21                   MR. HASPEL:  When did you start

22             the process, period.

23                   MR. BENENATI:  That's the way I.

24             asked it.

25        A      Early eighties, I mean late

Page 23

1                        David Zigler

2    eighties, early nineties.

3         Q    At some point in time did you obtain

4    or did Mr. Hershkowitz obtain preliminary

5    approval relevant to the Halley Estates II

6    subdivision?

7              MR. HASPEL:  Just for definition

8              purposes, when you say,

9              "Mr. Hershkowitz, you mean Briarwood?

10             MR. BENENATI:  Briarwood, yes.

11        A    Yes, the date of that resolution

12   would be preliminary approval.

13        Q    Just for my sake, is Mr. Hershkowitz

14   a part of Briarwood Farms, Inc., or is he the

15   president of Briarwood Farms, or is he affiliated

16   in any way?

17        A    I don't know that.

18             MR. HASPEL:  And again, just for

19             clarity purposes, when you said

20             Mr. Hershkowitz then, you're talking

21             about Israel Hershkowitz, because he is

22             the one that was mentioned.

23             MR. BENENATI:  He was the one

24             that, yes, I'm sorry.

25             MR. HASPEL:  But he is a

Page 24

1                    David Zigler

2           different name than the name that's on

3           the agreement of sale that you just

4           referred to, that's why I just want to

5           make sure we have our Herskowitzes

6           sorted out.

7                MR. BENENATI:  Right.

8           Q    Do you know who Briarwood Farms --

9      do you deal with anyone from Briarwood Farms,

10     Inc. currently?

11          A    I just deal with people and I don't

12     know what LLC or business or what their handle

13     is.

14          Q    Currently who do you deal with from

15     Briarwood Farms?

16          A    You would have to give me a list of

17     people who are involved with Briarwood Farms.

18                MR. HASPEL:  I think he is asking

19           you that question.

20          A    I deal with Mr. Hershkowitz.

21                MR. HASPEL:  Which

22          Mr. Hershkowitz?

23                THE WITNESS:  Israel, sometimes

24          Joe.

25          Q    Who pays your firm's fees?

Page 25

```
 1                    David Zigler
 2         A     That would be Briarwood.
 3         Q     Do you submit invoices to Briarwood
 4   or Mr. Hershkowitz, Israel Hershkowitz?
 5         A     I believe it's Briarwood.
 6         Q     Do you know whether Mr. Hershkowitz
 7   is associated at all with Briarwood Farms, Inc.?
 8         A     I think he is.  I mean, I could --
 9              MR. HASPEL:  Again, just for
10         clarity purposes, we've now heard two
11         Herskowitzes and you keep saying "Mr.
12         Hershkowitz."
13              MR. BENENATI:  When I refer to
14         Mr. Hershkowitz, I am referring to
15         Israel Hershkowitz, as you mentioned.
16              MR. HASPEL:  I don't care which
17         way it goes, but I want to know what
18         the transcript is going to read.
19              MR. BENENATI:  Okay.
20         Q     My prior question was, other than
21   Mr. Hershkowitz, Israel Hershkowitz who you
22   mentioned, is there anyone else from Briarwood
23   Farms that you regularly speak with?
24         A     Yeah, I'll speak with Joe, would be
25   the only two people I deal with in the
```

Page 26

```
 1                     David Zigler
 2    Hershkowitz family.
 3         Q     Is that Joe Hershkowitz or somebody
 4    else?
 5         A     Joe Hershkowitz.
 6         Q     Who do you believe Joe Hershkowitz
 7    is, is that --
 8         A     Israel's son.  He is usually who I
 9    deal with, the two of them, when I'm doing
10    planning procedures.
11         Q     I'm going to show you what was
12    marked as Exhibit A at a prior nonparty
13    deposition dated March 25, 2008, and ask you to
14    take a look at that (handing).
15              MR. BENENATI:  Sorry, Joe, I
16         don't have another copy.
17              MR. HASPEL:  That's okay.
18              MR. BENENATI:  Just for the
19         record, Exhibit A is identified as Site
20         Development Plan Review Chapter 119,
21         which we took off the Village of
22         Pomona's website.
23              MR. HASPEL:  Do you have a
24         question?
25              MR. BENENATI:  Yes.
```

Page 27

```
 1                      David Zigler
 2          Q      Are you familiar with Chapter 119,
 3    Mr. Zigler?
 4          A      Yes.
 5          Q      And at any time prior to Briarwood
 6    Farms obtaining preliminary approval for the
 7    Halley Estates II subdivision, did you apply for
 8    a steep slope permit pursuant to Chapter 119?
 9                 MR. HASPEL:  I'm going to object
10           to form, but if you can answer that, go
11           ahead.
12          A      It was discussed before preliminary
13    if we actually need to or may we apply, and
14    officially we did not apply.
15                 MR. BENENATI:  Can you read that
16           answer back?
17                 (The answer was read.)
18          Q      When you say, "It was discussed,"
19    who were you referring to, who discussed it?
20          A      Planning board advisors and me.
21          Q      And what, if anything, was discussed
22    relative to steep slope permits and the Halley
23    Estates I subdivision?
24          A      That would really take a couple of
25    days to format all that, because our entire plan
```

David Zigler 30(b)(6)                                              May 2, 2008

New City, NY

Page 28

1                          David Zigler

2      was based on the mitigation of steep slopes, and

3      I was under the impression that that would allow

4      us to grandfather or be exempt from the steep

5      slope application.

6              Q      When you say, "the plan."

7                     MR. BENENATI:  Actually, can you

8          read that back?

9                     (The answer was read.)

10             Q      When you say your plan was to

11     mitigate the steep slope issue, if you will, do

12     you mean the preliminary approval plan?

13             A      When I speak of plans, I'm actually

14     speaking about our drawings.  Our drawings were

15     detailed in excessive amounts to mitigate steep

16     slopes, far more than any other plan developed in

17     the village.

18             Q      Were you ever told that you would be

19     allowed to grandfather in the steep slope

20     ordinance by anybody from the planning board?

21             A      Yes.  We believed that we would be

22     exempt from it at one point, and until the last

23     workshop, I really didn't know where we stood on

24     that.

25             Q      Did that position change at all?

Page 29

1                          David Zigler

2          A       When they asked me to provide a list

3   of lots that would require steep slope

4   application, I would say that that changed it.

5          Q       And that was at the recent meeting,

6   correct, or before?

7          A       The workshop in early April.

8                  MR. BENENATI:  Mark this, please.

9                  (Village of Pomona Certification

10                 of Resolution adopted January 12, 2006

11                 was marked as Exhibit Number 7.)

12         Q       I'm going to show you what has been

13  marked Exhibit 7, it's titled Village of Pomona,

14  it's a certification, it says, "The enclosed is a

15  true and correct copy of the Resolution adopted

16  by the Planning Board of the Village of Pomona on

17  January 12th, 2006 (handing).  I ask you to take

18  a look at that (handing).

19         A       Um-hm.

20         Q       Prior to that resolution being

21  issued, Mr. Zigler, did Briarwood Farms submit

22  any other plans or preapproval subdivision plans

23  with respect to the Halley Estates II

24  subdivision?

25                 MR. HASPEL:  I am going to object

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

1                  David Zigler

2          to form.  Do you understand the

3          question?

4                  THE WITNESS:  ·No, because every

5          time I go to the board I have to submit

6          plans.

7     BY MR. BENENATI:

8          Q     Let me back up.  Was there any

9     package of documents that was submitted -- was

10    there a last set of plans that were submitted

11    before the preliminary approval?

12         A     Absolutely.

13         Q     Does that resolution constitute the

14    preliminary approval?

15         A     Yes.

16         Q     I want to show you what has been

17    previously marked as Exhibit C-1.  I ask you to

18    take a look at that.

19         A     I'm familiar with it.

20         Q     And that document is labeled

21    Disturbed Area Slope Legend.  Did you prepare

22    this document?

23         A     Somebody in the firm did, under my

24    direction, yes.

25         Q     Can you generally describe what this

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 31

1                    David Zigler

2    document shows?

3         A     This map depicts the lots in the

4    subdivision.  And it's detailed with contours and

5    shaded with steep slopes in three different

6    degrees.  And that's only within the lots, that

7    shaded area, if it so meets the criteria, and

8    it's only in the disturbed area of that lot.

9         Q     And what was the purpose for

10   designating the three different slopes?

11        A     The purpose for this map was the

12   disturbance on-site and the slopes are just part

13   of their criteria, so that was incorporated in

14   and they wanted to know what the disturbance was

15   on the site and the type of slope.

16        Q     Would this map be used to identify

17   which lots need steep slope permits under the

18   ordinance?

19        A     No, it doesn't qualify.

20        Q     Why doesn't it qualify?

21        A     Because you have to have a site

22   specific home to apply for the application of

23   steep slopes.  And this is a generic home on a

24   generic site.

25        Q     Why couldn't -- so in order to get

Page 32

```
 1                      David Zigler
 2    the permit, you have to have -- the steep slope
 3    permit -- is it your testimony that you have to
 4    have the site specific home laid out on the lot,
 5    correct?
 6         A     As to the law, it's part of a
 7    building application, and it's the interpretation
 8    of the building inspector at the time of the
 9    application.  As far as I know, that's the way
10    they've been handling it, Pomona.
11              MR. HASPEL:  Just again for the
12         record, Pomona is the municipality that
13         we are --
14              THE WITNESS:  Right.
15         Q     And when I say subdivision, I'm
16    going to be referring to the Halley Estates II
17    subdivision?
18         A     Okay.
19         Q     Is it fair to say that to date the
20    subdivision has not received final approval by
21    the village planning board?
22         A     Absolutely.
23         Q     With respect to after the date that
24    the resolution was initiated that's depicted in
25    Exhibit 7, did you or anyone else from Briarwood
```

Page 33

1                      David Zigler

2    Farms apply for any steep slope approvals

3    relative to the subdivision?

4         A     No, not that I'm aware.  This firm

5    didn't.

6         Q     Would there be anyone else other

7    than this firm that would have made that

8    application after the resolution was issued?

9         A     The owner of the property, the

10   applicant, could make an application.

11        Q     Who would be the applicant?

12        A     Whoever, it could be the owner of

13   the property or contract vendee or whatever.

14        Q     Or anyone on behalf of Briarwood

15   Farms, correct?

16        A     Yes.

17        Q     But to your knowledge was that ever

18   done?

19        A     Not that I'm aware of.

20        Q     And I'm only asking you what you are

21   aware of.  Looking on Exhibit C-1, do you know

22   how many lots within the subdivision would be

23   affected by this steep slope ordinance?

24        A     No, I would wait for the resolution

25   to come out for final, being that we discovered

Page 34

1                        David Zigler

2      it at the workshop.  Whatever comments come out

3      in that resolution, I would address.  I have an

4      understanding that that might be one of them, but

5      I did not calculate anything yet.

6               Q       But can you, right now, as we sit

7      here today looking at this map and determine

8      which lots could be affected by the steep slope

9      ordinance?  Let me back up.  Are you familiar

10     with the steep slope ordinance?

11               MR. HASPEL:  I object to the

12               form.  If you want to go off the

13               record, I will explain to you why.

14               MR. BENENATI:  Okay.

15               (Brief discussion)

16               MR. HASPEL:  In the

17               off-the-record discussion, there was a

18               discussion as to what was creating the

19               ambiguity of the questions, and

20               Mr. Zigler started best describing his

21               understanding.

22               And I think counsel and I agree

23               that the description of this

24               understanding as to the map is the

25               answer to the question and we now are

Page 35

1                    David Zigler

2          going to ask Mr. Zigler to restate what

3          he stated off the records.  Fair

4          enough?

5                    MR. BENENATI:  Fair enough.

6          A       Basically, my explanation, or my

7   question to the advisors to the planning board

8   had to do with our phasing of the site.

9                    And although drawing number seven

10  indicates steep slopes in three different

11  classifications of the steep slopes, we had

12  already gathered permission during the process of

13  developing the plan to grade off road, and that

14  would be as an example, lots 26, 27, 28 and 29,

15  we have gathered that permission to grade that

16  lot before they go for a building permit.

17                   So I've never gotten an answer from

18  the planning board or from its advisors, but then

19  the indicated steep slopes on that lot would be

20  gone.  So do I have to apply for a steep slope

21  application for those lots?

22                   It's very detailed in lot number

23  seven because on lot seven, directly in front of

24  it, our road goes through a very steep slope

25  area, and as we have a right to grade outside the

Page 36

1                          David Zigler

2      road, that would eliminate some steep slope.  So

3      my question was to the planning board, and to the

4      advisors, if we have these rights why do we have

5      to come back in for the steep slope?

6                That's even carried further back

7      into the development of the average density where

8      they wanted us to build.

9           Q      When was that discussion had that

10     you just mentioned with respect to --

11          A      We've had that discussion for two

12     years with the planning board.

13          Q      Two years from today, correct?

14          A      For the last two years, last three

15     years, prior to preliminary.  And that's on the

16     record within the planning board minutes that we

17     discussed that and we tried to mitigate, and

18     basically tried to be exempt from this steep

19     slope law.  Nobody has said one way or the other

20     yet.

21          Q      When you say "prior to preliminary,"

22     do you mean preliminary approval for the

23     subdivision?

24          A      Yes.

25          Q      With respect to a hypothetical

1                          David Zigler

2    building on lot 29, might the steep slope

3    ordinance be impacted if one built outside of

4    that envelope, hypothetical envelope?

5            A        No, because we've already been given

6    permission to level the lot.  So if in fact we

7    followed a phasing of the construction as

8    indicated on another plan, and detailed, we would

9    not have any steep slopes on lot 29 when we

10   applied for a building permit, because, by

11   Pomona's code, you must have all the improvements

12   in and the road paved.  So that would far extend

13   beyond the right of way in some areas.

14           Q        Well, with respect to lot 29, for

15   example, with the hypothetical structure, was the

16   grading performed prior to the creation of this

17   map?

18           A        No, no, the grading I'm speaking

19   about is after you receive final, when you start

20   to install the improvements.

21           Q        But if the actual structure's

22   blueprint changes, doesn't so the grading?

23           A        That's what this map indicates.

24   This map indicates grading on the entire site for

25   a generic house.  But within our set of plans, we

Page 38

1                    David Zigler

2    have details on construction improvements with

3    areas that we are allowed to disturb prior to

4    building permit.

5         Q     What document are you referring to?

6         A     Some drawing in our sequence of

7    maps, whatever drawing depicts construction

8    phasing.

9              MR. HASPEL:  Just again for

10             clarification, the map that we are

11             looking at, C-1, is, in the bottom

12             right-hand corner says something called

13             "Drawing Number 7," does that indicate

14             that this was the seventh page in a

15             collection of drawings?

16        A     Yes.

17        Q     Is it your that many some other page

18    has what you described?

19        A     Absolutely.

20        Q     Within the sequence?

21        A     Yes.

22        Q     Do you have other pages?

23        A     Sure.

24        Q     Can we see them?

25        A     Sure.

Page 39

1                      David Zigler

2           MR. HASPEL:  Prior to today's

3      deposition, Mr. Zigler had provided

4      counsel, including myself, with a full

5      set of drawings which neither counsel

6      unfortunately brought with them to

7      today's deposition.

8           What Mr. Zigler has just produced

9      was a set of drawings, 22 pages long,

10     with page number 7 being a duplicate of

11     Exhibit C-1.

12           So, for instance, we are going to

13     be discussing this, and if Mr. Benenati

14     wants to stipulate at a later date to

15     take what has been previously supplied

16     to us and call it, subject to

17     stipulation between the parties,

18     Exhibit 8, we will mark one of the ones

19     that we have already been supplied

20     subject to the stipulation that that is

21     in fact what we're looking at.

22           We will refer to this complete

23     set as Exhibit 8.

24           (Set of drawings were deemed

25     Exhibit 8.)

David Zigler 30(b)(6)                                                May 2, 2008

New City, NY

Page 40

1                          David Zigler

2               MR. BENENATI:  Okay, that's fine.

3          A       Basically, this is a detail drawing

4    number three of the grading, and this grading

5    page which requires three different drawings to

6    cover the entire site is in such detail that it

7    shows a proposed home and grading around the

8    proposed home.  And the detail within that lot

9    details the envelope of the home, envelope of the

10   lot, which you can build within, and it also

11   details the maximum size of the home and the

12   location on the lot.

13               And that, we thought, was mitigating

14   this steep slope.  But in addition to that, what

15   I was previously talking about was detail on

16   drawing number nine, which is labeled Final

17   Erosion Control Plan, and that has a table of

18   construction phasing which includes some of these

19   steep slope areas to be disturbed.

20               MR. HASPEL:  Could you again for

21          definitional purposes define, when you

22          used the word disturbed a number of

23          times, we are not builders.

24          Q       Yes.

25          A       "Disturbed" in any pretext basically

Page 41

```
 1                    David Zigler
 2    means going in and cutting a tree and regrading a
 3    lot.  So removing trees and regrading the lot is
 4    disturbing.
 5               MR. HASPEL:  I'm sorry to
 6          pre-empt, but I just like to know what
 7          we're talking about.
 8          A    And the table on page nine describes
 9    the construction activities that would be
10    required to do the improvements within the right
11    of way, and it also details areas outside the
12    right of way which would be disturbed, although
13    they are in steep slope areas.
14          Q    Is it your understanding that with
15    respect to disturbing those areas within the
16    steep slope you are not required to get a steep
17    slope permit; is that correct?
18          A    That's correct.
19          Q    Has that been affirmed by the
20    planning board, that understanding?
21          A    I would say the attorney would give
22    direction to that.  I really don't know if it's
23    ever been answered yet, to tell you the truth.
24          Q    Is it something that's been
25    discussed?
```

David Zigler 30(b)(6)                                                    May 2, 2008
New City, NY

Page 42

1                          David Zigler

2          A      Many times.

3          Q      What's generally been the resolution

4    of those discussions?

5          A      Usually when I have a concern about

6    some kind of operation on a subdivision plan,

7    I'll address it directly or try to indirectly

8    solve the problem.

9                 And I believe that what we were

10   trying to do was to bypass that steep slope law,

11   and that's why we offered at the time of the

12   environmental impact, maximum house sizes and

13   direct areas that the houses could be placed in.

14   So we thought that we were mitigating that.

15         Q      And has the planning board disagreed

16   with that assumption about mitigating that you

17   just mentioned?

18         A      They seem to be happy with the plan

19   and were not requirers, I think it's really the

20   interpretation of the attorney whether you have

21   to go.  There's nothing, as far as we understand

22   now, there is no mechanism within the Village of

23   Pomona that allows us to bypass that application,

24   although we have set this product up to high

25   speed the application.

Page 43

1                       David Zigler

2          Q      But you still, as the process has

3     been set up at high speed, you still have to get

4     a sleep slope permit, correct?

5          A      I haven't gotten that answer yet.

6     So as I said, we directly asked them if this

7     being as an average density requires it, and we

8     really never received an answer.

9                 And our thought, meaning the firm's

10    thought, was to try to answer the steep slope

11    requirements during the process, and that way it

12    would, you know, basically make the application

13    if we're required to go, make the application a

14    one-month deal.

15         Q      You mean the application for the

16    final approval?

17         A      Steep slope.

18         Q      Steep slope?

19         A      If it's interpreted.

20         Q      And the attorney that you're

21    referring to, that's the Village of Pomona

22    attorney?

23         A      Doris Ullman.

24         Q      With respect to other subdivisions

25    that you may have worked on, you've worked on

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

Page 44

1              David Zigler

2    other subdivisions, correct?

3         A    In Pomona?

4         Q    Yes.

5         A    Yes.

6         Q    With respect to the work that you're

7    doing with the Halley Estates II subdivision

8    approval, correct?

9         A    No.

10        Q    Okay.

11        A    Previous subdivisions that we have

12   recently received approval on after the steep

13   slope law, none of them qualified for the steep

14   slope.

15        Q    So this is the first one that

16   impacts the steep slope law in the Village of

17   Pomona, right, the first subdivision that you've

18   worked on that impacts?

19        A    No -- yes, I mean, the answer is yes

20   to that.

21        Q    With respect to getting the final

22   subdivision approval.

23        A    Yes, but this was unique because

24   it's an average density plan, which is a whole

25   different realm of subdivision approval.

1                    David Zigler

2          Q      Why is that unique?

3          A      Because the plan, as laid out, is

4    basically designed by the planning board to

5    mitigate certain environmental impacts.

6                  So when we designed this plan, and

7    for years which probably took five years, maybe

8    six years on road pattern, the plan was designed

9    to not impact steep slopes.

10         Q      Um-hm.

11         A      So I thought that would be a portion

12   of how we would be exempt from going for steep

13   slopes.

14         Q      But you are not certain that you

15   will be exempt from steep slopes?

16         A      I don't have an answer on that yet.

17         Q      Do you anticipate getting an answer

18   soon about that or what is your assessment when?

19         A      I listen to the attorney, and the

20   attorney told me, get final approval and then we

21   will ask questions.

22         Q      Meaning final approval for the

23   subdivision, correct?

24         A      Yes.

25         Q      When do you anticipate getting final

David Zigler 30(b)(6)                                                  May 2, 2008

New City, NY

Page 46

```
 1                     David Zigler
 2   approval for the subdivision?
 3          A     We believe the vote will be May 8th,
 4   I believe it is, but when we receive the
 5   resolution, it could be four or five months after
 6   that.  They don't move very fast.
 7          Q     So to date you haven't had,
 8   Briarwood Farms has not had final subdivision
 9   approval?
10          A     Right.
11          Q     Is it typical that the steep slope
12   permit would be applied for after the preliminary
13   approval of a subdivision, generally, if you
14   didn't have this kind of unique situation?
15          A     No.
16          MR. HASPEL:  I object to the
17          form, but if you understood it, go
18          right ahead.  You seem to have
19          understood it.
20          A     No.  A steep slope is a portion of a
21   building permit application.  A building permit
22   application can only be procured after final
23   approval and the improvements are installed on
24   site.  A building permit is the application to
25   build a home, and that's when steep slopes kick
```

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

Page 47

1                              David Zigler

2      in, as far as requirement for the application or

3      not.

4            Q      But under that scenario, under your

5      assumption, wouldn't you have to wait until you

6      had the actual building plans laid out on the

7      parcel of land?

8            A      No.  Because again, if we retreat a

9      little bit, we thought that if we developed plans

10     that had precise locations of the disturbance of

11     the home, that we would bypass that application.

12           Q      That's for this subdivision though?

13           A      That's the one we're talking about.

14           Q      Right.  My question though was

15     another subdivision, and I thought the assumption

16     was that this subdivision is unique, which you

17     said, and you stated the reasons why.

18           A      (Nod)

19           Q      Now I said, assuming that you don't

20     have a unique situation, such as you addressed

21     here.

22           A      Right.

23           Q      If you had preliminary approval for

24     a subdivision, and I'm not talking about the

25     Halley Estates II subdivision, would it be

David Zigler 30(b)(6)                                               May 2, 2008
New City, NY

1                        David Zigler

2      typical for the person moving towards final

3      approval to also apply for steep slope approval

4      or permit?

5            A      No, you can't, by the regulations of

6      Pomona.

7            Q      Where does it say you cannot do

8      that?

9            A      It's stated in the regulations that

10     you cannot apply for a building permit until all

11     improvements are in, satisfactory to the town or

12     village engineer.

13           Q      Well, I know that it may say that

14     with respect to a building permit.  But what

15     about with respect to the steep slope permit?

16           A      Steep slopes, as far as I

17     understand, are a part of the application for a

18     building permit.

19           Q      So your assumption, then, is that

20     you can't apply for a steep slope permit until

21     you have a building permit.

22              MR. HASPEL:  Well, until you have

23           a building permit or until you're

24           making application for a building

25           permit?

1                    David Zigler

2        A      Application.

3        Q      So until you make an application for

4   a building permit, it's your assumption that you

5   cannot apply for a steep slope permit; is that

6   correct?

7        A      That's the way Pomona has processed

8   the steep slope application since we have been

9   representing people.

10       Q      And that's from the inception of the

11  steep slope law?

12       A      Right.

13       Q      Which would have been when?

14       A      Maybe three years ago.  Time flies.

15  Maybe four years ago.

16       Q      Is there anything within the steep

17  slope ordinance that --

18       A      It would probably be early 2000,

19  thinking about that.

20              MR. HASPEL:  Eight years ago.

21       A      I'm thinking when Vic Scatassa was

22  here, and he's been retired for three years.

23       Q      I gave you an exhibit before,

24  Mr. Zigler, which says Chapter 119 of the Site

25  Development Plan Review?

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

Page 50

1                    David Zigler

2        A    Right.

3        Q    Is there anything in there, in that

4    document, which corroborates your assumption?

5        A    Without studying it, I wouldn't

6    know.  They actually have a steep slope law, I

7    believe.

8             MR. HASPEL:  Again you used the

9             word assumption.  I think he used his

10            experience.  They are two different

11            things.

12            MR. BENENATI:  Well he used his

13            firm's experience.

14            MR. HASPEL:  Whatever it may be,

15            it's just a different.

16            THE WITNESS:  As far as I know,

17            the steep slope is a village law and it

18            wouldn't be found in this regulation.

19            MR. HASPEL:  Anyway, to the

20            extent that counsel is asking for

21            interpretation of law, I would object.

22            But I'm not going to stop Mr. Zigler

23            from attempting to be a judge.

24            MR. BENENATI:  I just asked if

25            there was anything that supports his

Page 51

1                    David Zigler

2        conclusion within here.

3             MR. HASPEL:  I think again, his

4        testimony was his experience, not his

5        conclusion.

6             THE WITNESS:  Without having an

7        application for steep slopes in front

8        of me, I wouldn't know.  Usually a

9        description of the procedure is on the

10       application.

11       Q       Let me show you.

12       A       I believe the set of prints that I

13    gave both of you did have the stamps.

14            MR. HASPEL:  I think I looked at

15       them.

16       Q       I'm going to show you what has been

17    marked as Exhibit 4.  Take a look at that.  I

18    apologize about the copy, but that's the best we

19    have (handing).

20            (December 22, 2006 letter from

21       Toll Brothers to Briarwood Farms and

22       Isaac Shiner was marked as Exhibit 4

23       for identification.)

24       Q       Exhibit 4 is a copy of a letter

25    dated December 22nd, 2006 from Toll Brothers to

Page 52

1                      David Zigler

2    Briarwood Farms and Isaac Shiner.  Have you seen

3    that letter before, Mr. Zigler?

4         A    I've seen, I don't know if I've seen

5    this whole letter, but I've seen portions of it

6    because I responded to some of these items.

7         Q    Who asked you to respond to some of

8    those items?

9         A    That would be most likely

10   Mr. Hershkowitz, and it could be either one or

11   both.

12        Q    What specifically were you asked to

13   do?

14        A    Let me see, one, four, five, six,

15   seven, and I worked with somebody on three and

16   eight.

17        Q    Do you know when you had any

18   discussion or the first discussion with

19   Hershkowitz concerning the items in this letter?

20        A    Probably December 23rd, 2006, very

21   soon after that.  Sometime very recently after

22   that.

23        Q    Were you given a copy of this

24   letter?

25        A    I don't know.  You know, faxed to

Page 53

1                      David Zigler

2    me, I would probably say yes.

3         Q      You are on the second page of the

4    document, you're copied on it?

5         A      I would say yes, because I know I've

6    seen those items, so I must have had the entire

7    letter.

8         Q      Is that your fax number?

9         A      Yes.

10        Q      845-634-5543?

11        A      Yes.

12        Q      Can you tell me what was the

13   substance of the discussion that you had with

14   Mr. Hershkowitz in reference to this letter?  And

15   I know you said you didn't know if it was either

16   one, Israel or Joe.

17        A      Yes, I guess the questions of the

18   letter, why and how some of these questions or

19   some of these concerns come up within this

20   letter.

21        Q      Did you undertake any studies or,

22   you know, after you had this conversation with

23   Mr. Hershkowitz, to address the concerns raised

24   in the letter?

25        A      Yes, because some of the items that

David Zigler 30(b)(6)                                                          May 2, 2008

New City, NY

Page 54

1                          David Zigler

2      were concerns in this were just things that as

3      you process a subdivision you just do them a

4      certain way, and nobody questions the way you're

5      doing it.  And some of the concerns in this

6      letter, we could mitigate, you know, we could

7      address and do it different, you know, if the

8      owner or whoever was directing me to work on it,

9      wanted it.

10                    You know, you can skin a cat two

11     different ways basically, and some of these

12     questions we could have just addressed before

13     final and been finished with them.

14            Q      Okay.  Were you present at that

15     meeting on December 12, 2006 that's referenced

16     within Exhibit 4?

17            A      No, I don't think so.  We've had

18     meetings in here with Toll Brothers and sat down,

19     but I think this letter was before that.  I don't

20     remember.  But we've had meetings with Toll

21     Brothers in here.  So I don't know.

22            Q      In those meetings, would you

23     generally have meetings in your office or -- and

24     this is with Toll Brothers, would they generally

25     be here in your office?

Page 55

1                    David Zigler

2        A     Yes, they came down, at least as I

3    remember, twice, to discuss the process and some

4    of their concerns with the way the maps were

5    developed.

6        Q     What were their concerns with

7    respect to the maps as they were developed?

8        A     I think they wanted to give us site

9    specific homes to plot on the map, and there were

10   some engineering concerns that they were

11   interested in changing.  I think we had a meeting

12   in the office to make those changes, if they

13   wanted to make them.

14       Q     Did they have any concerns about

15   getting final approval with respect to the

16   subdivision?

17       A     Concerns, what do you mean?

18       Q     In terms of timing or the length if

19   time it's taking?

20       A     Everybody does, I mean, but

21   unfortunately we're drug around by the planning

22   board.  Usually it doesn't take two years to get

23   final approval from preliminary, but in this case

24   you have to acquire permits.  Everybody wants it

25   tomorrow, but unfortunately permitting agents

Page 56

1                    David Zigler

2    don't move that fast.

3         Q      During your discussion with

4    Mr. Hershkowitz in reference to the December 22nd

5    letter, did he talk about that prior meeting on

6    December 12, 2006 at all?

7         A      I guess you would have to say yes

8    because we discussed this and it must have been

9    what they discussed the 12th, I don't know.  I

10   didn't ask them.  I would imagine if it's in a

11   letter from the 22nd and from the discussion the

12   12th, we did discuss it, yes.

13              MR. HASPEL:  I think he's asking

14         did you discuss your meeting, not the

15         elements of the meeting.

16              THE WITNESS:  You mean the

17         elements when Toll Brothers were here?

18              MR. HASPEL:  I'm just trying to

19         interpret.  If I'm going astray.  I

20         think his question is did you discuss

21         the meeting.

22              THE WITNESS:  Toll

23         Brothers meeting --

24              MR. HASPEL:  The one mentioned in

25         here.

Page 57

1                    David Zigler

2            THE WITNESS:  I guess other than

3       discuss this memo from the meeting I

4       would say no, we didn't precisely

5       discuss December 12th.

6       Q     And after the discussion with

7   Mr. Hershkowitz, what, if anything, did you do in

8   reference to the items raised in this December

9   26th letter?

10      A     Item one; item four, which we had

11  already asked for a waiver; item five, which

12  depicted on a map a fence around it; item six,

13  we regraded the cul-de-sac; and item seven, we

14  revised the drainage to what the Toll Brothers

15  had discussed when they were here.

16            And item eight was, is a continuing

17  fluctuating factor here.  I mean, Pomona changes

18  their mind about landscaping about once a month,

19  and I think now we finally understand what they

20  want.

21      Q     Did you make any notes in respect to

22  what you did with those items that you just

23  mentioned?

24      A     That would be referenced in these

25  maps, most of them, the maps that I just showed

Page 58

1                    David Zigler

2    you.

3        Q      The ones that we marked as Exhibit

4    Number 8?

5        A      Right.

6        Q      And how long did it take you to

7    implement those various things, with the

8    exception of the number eight, the continuing

9    fluctuating factor that you --

10       A      A week or so, not long.

11       Q      And how did you convey that those

12   items were addressed to Mr. Hershkowitz, if at

13   all?

14       A      I think I sent a copy to Toll

15   Brothers of the changes, and whenever I do that I

16   always copy the client, meaning not with the

17   maps, but with the memo transmitting the maps.

18       Q      And the copies you're referring to

19   are copies of the maps?

20       A      Right.

21       Q      Are the maps identified -- are there

22   changes identified in each map?  I know each map

23   has a numbered sequence, so if you change

24   something, for example, on Exhibit 7, is that

25   change indicated?

David Zigler 30(b)(6)                                                    May 2, 2008

New City, NY

Page 59

1                     David Zigler

2        A      No, that's a good question, but

3    unfortunately the process has become so confused

4    that you really can't do that on the maps.  But I

5    understand it.  The process just takes so long

6    and you change maps so many times that you would

7    end up with all these footnotes.  So we don't.

8    When we change one page, we change the date on

9    all sheets.  So they are referenced, because when

10   the planning board references a set of plans,

11   they represent by reference the date on the front

12   sheet?

13       Q      So basically, if you go to the

14   planning board, you give them the current plans,

15   the plans that are current?

16       A      Right.

17       Q      After you sent those copies to Toll

18   Brothers, did you get any response?

19       A      I don't know, we had several

20   questions back and forth and I don't know if that

21   was the last or not.  I thought there was other

22   questions.  We always got a response from them,

23   to tell you the truth, yes.

24       Q      Was that a written response or

25   something else?

```
 1                    David Zigler

 2          A      I believe there was another memo

 3     after this.  I'm not too sure.

 4          Q      Would the memo have been addressed

 5     to you specifically or --

 6          A      No, I might have been copied on a

 7     memo.

 8          Q      Do you have a file with respect to

 9     all correspondence that you received from Toll

10     Brothers?

11          A      I would say yes.  Because I just

12     remember a few things that this one doesn't

13     detail, so I would have to say there might be

14     another memo after this.

15          Q      I know that we came to your office

16     and left copies.  Was that your entire file with

17     respect to the subdivision?

18          A      Yes.

19          Q      Generally, how do you keep that

20     file?

21          A      I try to keep it by date, and it

22     just doesn't work.  Sometimes now we try to keep

23     them by process, in other words, preliminary,

24     final, off-site permits, so on and so forth.

25     Unfortunately, like everything else, the one with
```

New City, NY

1                          David Zigler

2       the least experience files documents, so you

3       could find them anywhere.

4              Q     With respect to like for example

5       your preliminary file, would that be all the

6       documents up to preliminary approval or anything

7       relating to preliminary approval or preliminary

8       approval as of the date and after, or what?

9              A     No, the preliminary would be after

10      preliminary approval, because that's when you

11      start for permits, and that's like the most

12      important process for the step towards final.  So

13      the preliminary approval folder would have things

14      after preliminary.

15             Q     Okay.  And when would it become the

16      final?

17             A     Whenever that planning board votes

18      for it, the application.

19             Q     So is there a file marked "Final

20      Approval?"

21             A     Yes, because I like to think --

22             Q     You're optimistic?

23             A     Yes.  It's turning very yellow.

24             Q     Is there anything in it?

25             A     Yes, it probably has my submission

David Zigler 30(b)(6)                                         May 2, 2008
New City, NY

Page 62

1                           David Zigler

2     for final and other letters that were misfiled.

3          Q      With respect to any written

4     correspondence that Toll Brothers may have sent,

5     with respect to you sending them the copies of

6     the map implementing the changes, where do you

7     think you would have filed that?

8          A      I don't know, because they actually

9     came down, their engineer, their project planner,

10    and we discussed a few things and then they sent

11.   us.  So it would be one of the files, any letters

12    we would get.

13         Q     So did they come after you had this

14    conversation with Mr. Hershkowitz --

15         A     Sometime during that -- I know I

16    just stepped on you -- but sometime during that

17    process, yes, I don't remember.  That's two years

18    ago.

19         Q      Right.  So sometime after you had

20    your discussion with Mr. Hershkowitz up to the

21    time you sent him the copies of the revised maps,

22    Toll Brothers came down and you had a meeting

23    with them?

24         A     Yes.

25         Q     Do you recall who came down from

Page 63

1                    David Zigler

2    Toll Brothers?

3         A    No.  I don't remember your name and

4    you just came in.  No, it was three different

5    fellows.  One was a vice president, one was a

6    project manager, and another one was just almost

7    like a map reviewer.

8         Q    Can you tell me what you guys

9    discussed at that meeting?

10        A    They discussed concerns and how they

11   would like to change items that we had submitted,

12   which were, you know, this is not unusual.  And

13   how possibly could speed up the process as they

14   developed the property.

15        Q    And were maps reviewed during that

16   time?

17        A    Yes, a map equal to what I just

18   showed you.

19        Q    And then after that meeting you made

20   the revisions and submitted the revised map; is

21   that correct?

22        A    I made revisions, some of them just

23   an overdraw as we call it, and sent them copies

24   of it to see if that's what they wanted to do.

25   You know, if they are going to purchase the

David Zigler 30(b)(6)                                                      May 2, 2008

New City, NY

1                        David Zigler

2      property, I would really try to make them maps --

3      it's hard to explain, but you are trying to make

4      the maps work with the type of homes they were

5      going to build.  So it was very important that

6      they come down and discuss home types in case it

7      exceeded that footprint that we showed.

8              Q      Was there a discussion about home

9      types?

10             A      Yes, they told me that they had

11     several homes in mind for the project, several

12     styles, footprints.

13             Q      Were those footprints implemented on

14     any of the maps?

15             A      No.

16             Q      When would they have been

17     implemented, if at all?

18             A      Whenever they would send me

19     something, I would call up Mr. Hershkowitz and

20     say I have precise homes to put on this map, do

21     you want me to do it?  But I never received any

22     footprints from him that I remember.

23             Q      The footprints we saw in that map

24     identified as C-1, what is the size of that

25     footprint?

```
1                    David Zigler
2         A      I don't know, we just took a typical
3    home that the Herskowitzes build and we made it a
4    little bit bigger, to be safe.
5         Q      When you say a little bit bigger,
6    what would be the square foot or however you
7    would measure it?
8         A      I don't know.  I would have to
9    measure --
10             MR. HASPEL:  Just again for
11          clarity purposes, are you talking about
12          the square feet of the footprint or the
13          square feet of the home?  Because it
14          could be a --
15             MR. BENENATI:  I don't know how
16          it's measured, so.
17             MR. HASPEL:  That's why I'm
18          asking.
19         A      It's measured in footprint, because
20    we don't know what rooms, it could be a ranch,
21    whatever.
22         Q      Sure.
23         A      I think he was talking mid 3,000
24    footprint.
25         Q      Could that accommodate a certain
```

Page 66

1                          David Zigler

2      square foot size home?

3              A      Right.

4              Q      What?

5              A      I don't remember now.  That's a long

6      time ago.

7              Q      Was that in line with what Toll

8      Brothers had planned?

9              A      I don't know, I'd never seen it.

10     They showed me a picture.  I've never seen a set

11     of their plans.

12                    If you work with a large company

13     like Toll Brothers or Ginsberg now, I have three

14     or four different styles that they'll use within

15     that development.  They give it to you and then

16     you try to execute it on the plans.  You know, so

17     when they hang it up on the wall, they have the

18     styles of their homes that fit on the lots.  We

19     never got that far with this application.

20             Q      Okay.  What about item number three

21     on the letter, Exhibit 4?

22             A      Yes.

23             Q      Did you have any discussions with

24     Mr. Hershkowitz about that?

25             A      Absolutely, and with Toll Brothers

Page 67

1                   David Zigler

2    about it, just like we discussed today.

3        Q      Let's just stick with your

4    conversation with Mr. Hershkowitz, what did he

5    and you discuss?

6        A      Basically, the same things that we

7    just previously discussed.  I was under the

8    impression by the process that we had went

9    through, average density and detailing lot

10   disturbance far more descriptive than any project

11   in Pomona, that we would not be required to go

12   for steep slopes.

13              But I had not, you know, as this

14   memo says, Pomona is notorious for changing their

15   minds.  I still haven't seen proof we have to or

16   don't have to.

17       Q      With respect to item number three,

18   it says "Resolution of Preliminary Approval.

19   Condition number 7.  Lots that are subject to

20   steep slope requirements will be subject to

21   planning board site plan review."

22       A      Right.

23       Q      What did that mean to you?

24       A      It means to me that somebody is

25   thinking we have to go back to the planning board

Page 68

1                      David Zigler

2    for steep slopes.  But also, they gave me

3    permission to disturb steep slopes.  So at this

4    point I was a little confused.

5          Q      The "they" that gave you permission

6    was the planning board; is that right?

7          A      Right, through that preliminary, and

8    through that drawing number nine, I believe it

9    was, that I showed you.

10                MR. HASPEL:  Nine was the one

11              that had the disturbance notes.

12                THE WITNESS:  Right.

13          Q      Did you convey that statement to

14   Mr. Hershkowitz?

15          A      Yes, many discussions about it, and

16   with Mr. Edwards, the attorney.

17          Q      Mr. Edwards, is that the attorney

18   for whom?

19          A      Hershkowitz.

20          Q      Okay.  And what was their response

21   when you told them your assumption that you had

22   approval, preliminary approval, and that drawing

23   number nine referenced that?

24          A      He said, good, maybe we don't have

25   to go.

David Zigler 30(b)(6)                                          May 2, 2008

New City, NY

Page 69

1              David Zigler

2        Q      What about with respect to after

3    you've received this letter with respect to

4    number three, was that your assumption unchanged

5    with respect to the steep slope application?

6        A      My assumption of confusion has never

7    changed.

8        Q      Right.  So it hasn't been resolved?

9        A      Basically, no, it's still open.

10       Q      And what do you feel is going to

11   resolve the issue?

12       A      I think either some kind of letter

13   from Doris Ullman or sometimes we would apply for

14   steep slopes and they would say that we didn't

15   need the steep slope application, it could come

16   as easy as final resolution or it could come when

17   we apply for steep slopes.

18       Q      And you would do that when you apply

19   for the building permit, correct?

20       A      Right.

21       Q      And that would be after final

22   approval, correct?

23       A      After final approval and after all

24   the improvements are in the ground.

25       Q      Is there anything preventing you

David Zigler 30(b)(6)                                                May 2, 2008
                              New City, NY

                                                              Page 70
1                         David Zigler

2      from applying before that time, after the

3      improvements are in the ground?  For the steep

4      slope permits.

5           A     After the improvements are accepted

6      you could apply for a building permit on all the

7      lots, nothing stopping you.

8           Q     Could you also apply for the steep

9      slope permit?

10          A     Yes, at the same time, for all the

11     lots.

12               MR. HASPEL:  Could we take a

13               two-minute break?

14               MR. BENENATI:  Sure.

15               (Brief recess)

16               (January 22, 2007 letter to

17               Briarwood Farms and Donald Tirschwell

18               from Toll Brothers was marked as

19               Exhibit 5 for identification.)

20     BY MR. BENENATI:

21          Q     I'm going to show you what has been

22     marked as Exhibit Number 5 and it's a letter from

23     Toll Brothers dated January 22nd, 2007 to

24     Briarwood Farms and Donald Tirschwell.  And when

25     you are done looking at it, just let me know

David Zigler 30(b)(6)                                                        May 2, 2008
New City, NY

Page 71

1                          David Zigler

2    (handing).

3          A     Oh, I see, this is reflected back to

4    those items.  I need that letter.  All right,

5    I've seen this.

6          Q     Are you copied on this letter,

7    Mr. Zigler?

8          A     Yes.

9          Q     Did you have a conversation with

10   Israel Hershkowitz sometime after January 22nd or

11   thereabouts?

12         A     I would have to say yes.

13         Q     Do you recall a conversation with

14   him?

15         A     Yes.  And most likely Mr. Tirschwell

16   was involved.

17         Q     Did you have a meeting?  Was it a

18   meeting or a telephone conversation or something

19   else?

20         A     That would be hard, because with

21   Mr. T, Mr. Tirschwell, usually it's done over the

22   phone.  But he comes by, it could have been

23   either.

24         Q     Did you all three have a

25   conversation, like as a meeting, meaning you,

Page 72

```
 1                    David Zigler
 2    Mr. Hershkowitz and Mr. Tirschwell?
 3         A    Yes, absolutely.
 4         Q    Do you know what was discussed at
 5    that meeting?
 6         A    If I remember correctly, every item
 7    here, yes.
 8         Q    Okay.  And were you asked to do
 9    anything as a result of that meeting?
10         A    Item six, yes, and item seven.
11         Q    So item six refers to the --
12         A    Steep slope on the cul-de-sac, we
13    revised that.
14         Q    And item seven refers to existing
15    drainage swail along the rear property line of
16    lots 26 and 27?
17         A    Right, we revised that also.
18         Q    And you revised that on the plans,
19    correct?
20         A    Right.
21         Q    Did you take any other action as a
22    result of that meeting?
23         A    Not that I remember, no.
24         Q    Did you discuss each one of the
25    issues raised in the January 22nd, 2000 letter?
```

David Zigler 30(b)(6)                                                      May 2, 2008

New City, NY

Page 73

1                      David Zigler

2          A    Yes, I believe we did, yes.

3          Q    Do you recall what was said about

4     each item?  You can go down the line, if it's

5     helpful, in Exhibit 5.

6          A    Item two is the condition about

7     repairing Klingher Court.  And it was kind of

8     discussed back and forth with the Village

9     Engineer, and they just, the Village of Pomona

10    wanted security on it, meaning if it was

11    destroyed by the contractor, somebody would have

12    to fix it.

13         Q    Do you know how that resolved, if at

14    all?

15         A    I believe by the last discussion at

16    the workshop there was going to be security held

17    for a Klingher Court topping if it's destroyed by

18    inspection of the Village Engineer, if it's been

19    destroyed, that the contractor will have to

20    repave Klingher Court.  I think that's what's

21    going to happen, yes.  It seemed to solve that.

22         Q    What about after your meeting with

23    Mr. Hershkowitz and Mr. Tirschwell, were you

24    asked to do anything with respect to item number

25    two?

New City, NY

1           David Zigler

2       A    No, not really?

3       Q    Were you asked to give an opinion

4   about the issue in number two?

5       A    Opinion of what?

6       Q    Whether Toll Brothers' demand was

7   reasonable or unreasonable.

8       A    I just know of it, either way it's

9   not my decision, it's either the Village of

10  Pomona or Toll Brothers or somebody.

11      Q    But you were asked to comment on it,

12  correct?

13      A    They asked me to comment on it

14  because I'm the one that goes to the planning

15  board, and I said yes, we're aware that if

16  Klingher Court, something happens, construction

17  destroys the topping on Klingher Court, somebody

18  is going to have to fix it, yes.

19      Q    Did you offer an opinion as to

20  whether it should be Toll Brothers or somebody

21  else or?

22      A    No.

23      Q    What was your advice to

24  Mr. Hershkowitz and Mr. Tirschwell in reference

25  to item number two?

Page 75

1                    David Zigler

2          A     If you ever had a meeting with

3    Mr. Tirschwell, you don't offer any advice, you

4    listen.  So I didn't offer any advice.

5          Q     I never had a meeting with

6    Mr. Tirschwell.

7               MR. HASPEL:  I've had many

8          meetings with him.

9               THE WITNESS:  You're on the same

10         level.

11              MR. HASPEL:  He takes my advice.

12         Q     Did you agree or disagree with the

13   last two sentences within item two on the first

14   page?

15         A     I really, when things don't pertain

16   to me, I don't even give it a second thought.  So

17   I have nothing to do with that.

18         Q     So as far as you were concerned, it

19   was an item that --

20         A     I couldn't give a flying, you know

21   what.

22         Q     So that's something that had to be

23   resolved between Toll Brothers and others?

24         A     Yes.

25         Q     Okay.  What about with respect to

```
 1                    David Zigler

 2    item number three?

 3         A     It's of concern because of previous

 4    applications.  Always approved though.  The

 5    planning board can sometimes ask for things that

 6    you would not be aware of or you would not expect

 7    to be asked for.  So it is a concern, and that's,

 8    you know, but we're developing a set of plans

 9    that hopefully would mitigate the steep slope

10    concerns.

11         Q     And during the meeting with yourself

12    and Mr. Hershkowitz and Mr. Tirschwell, what did

13    you advise about item number three which pertains

14    to the steep slope ordinance?

15         A     As I explained here to you, our

16    entire set of plans had features in it that would

17    either speed the process up when you applied for

18    a steep slope law or we would not even have to do

19    it.  So we thought that, you know, we had

20    mitigated it to a point that if it became needed

21    to apply, that we would be a one-month process.

22         Q     Did you offer any advice about

23    actually applying for the steep slope permits?

24         A     Not any more than I gave you.  We

25    can't apply -- no.
```

David Zigler 30(b)(6)                                              May 2, 2008
New City, NY

Page 77

1                    David Zigler

2        Q    Was there any further discussion

3   between the three of you in reference to item

4   number three that you and I hadn't discussed

5   right now?

6        A    No.  I think we've discussed

7   everything that had gone on in that conversation,

8   definitely.

9        Q    Did you spend any more time on item

10  number three than any of the other items in the

11  letter or --

12       A    Absolutely, I believe I'm finished

13  with all the rest of the items.  Item three we're

14  still talking about, so I would say yes.

15       Q    What about then though?

16       A    Absolutely, I'm dealing with

17  Mr. Hershkowitz, and he definitely would not, you

18  know, once you get through a planning board you

19  don't want to go back to them because you could

20  have five different people sitting there.  So it

21  is a concern.

22       Q    What about with respect to item

23  number six?

24       A    I thought that was a little bit of a

25  stupid response from Toll Brothers.

David Zigler 30(b)(6)                                              May 2, 2008
New City, NY

Page 78

1                          David Zigler

2          Q      In what way?

3          A      Because they asked us to change the

4     grade and then after we changed the grade they

5     said it was an unacceptable condition, so don't

6     ask me, you know, that aggravates me.  Don't ask

7     me to change something and then tell me you don't

8     like it.

9          Q      Did you guys have a discussion, you

10    guys, Hershkowitz, Tirschwell and yourself, with

11    respect to item number six?

12         A      No, I had a condition from the

13    Village Engineer where I had to change the grade

14    and Toll Brothers knew that, so we changed it and

15    we actually, whether they think it's unacceptable

16    or not, I had to change the grade.  They wanted

17    the grade changed, Toll Brothers, and I did it

18    and they said it's unacceptable.  I think that's

19    unacceptable, in my view.

20         Q      Was that change discussed in your

21    meeting after receipt of the December 22nd

22    letter?

23         A      Several times after that, because it

24    changes the road, yes.  It changed our waterline,

25    yes.

Page 79

1                    David Zigler

2        Q      How many discussions or meetings did

3    you have about item number six after receipt of

4    the December 22nd letter?

5        A      I would just say a couple of times

6    because when you change something, a set of

7    plans, it might aggravate another situation and

8    then you have to say well, you know, I have this

9    situation now, so I would say a couple of times.

10       Q      Do you know how it resolved as a

11   result of those discussions with Toll Brothers

12   and yourself regarding item number six, do you

13   know how it resolved prior to January 22nd,

14   between you?

15       A      As far as I'm concerned, it's

16   resolved, because the Village Engineer accepted

17   it.  So that's the final stamp of approval.

18   Whether I like it, you like it, or anybody likes

19   it.

20       Q      When did the Village Engineer accept

21   it?

22       A      By not writing a comment, I believe

23   that I will receive a final, I will not receive

24   that comment again that the cul-de-sac is too

25   steep.  He verbally accepted it but I have to

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 80

1              David Zigler

2    wait until the final now.

3         Q    After receipt of the December 22nd,

4    letter, you said you revised the plans, correct?

5         A    Yes.

6         Q    Did you revise the cul-de-sac issue

7    that's raised in the January 22nd letter as item

8    number six?

9         A    Yes, we went from 10 percent to

10   4 percent.

11        Q    Okay.  Were those maps submitted to

12   the Village Engineer for his review before

13   January 22nd, 2007?

14        A    Before?  It's possible, I don't

15   know.  During the process of -- you have to

16   understand, during the process of dealing with

17   these Toll Brothers' letters, I'm going back and

18   forth with the engineer to try to solve all the

19   outstanding issues.

20             So did it happen between December

21   and January?  I don't know.  But within the span

22   of six months covering those two months I can

23   guarantee that he's seen them.  We've been back

24   for final, and since that preliminary resolution,

25   we've been back maybe three or four times.  So

David Zigler 30(b)(6)                                          May 2, 2008

New City, NY

Page 81

1                         David Zigler

2    yes, he's seen them.

3         Q      What about the item number seven as

4    raised in the January 22nd letter, did you have a

5    conversation with Mr. Tirschwell and Mr.

6    Hershkowitz regarding item number seven?

7         A      Yes, we made a significant change to

8    the plans to eliminate that easement.

9         Q      That's after you received the

10   January 22nd letter?

11        A      During that time from December to

12   January, actually, that process took a little bit

13   longer than that, because I had to go back to the

14   Village Engineer and ask him if our proposed

15   revision would be acceptable and he didn't have a

16   problem with it.  So I would have to say that it

17   went more than the two months that we're talking

18   about.

19        Q      On the revisions, did that

20   incorporate easement?

21        A      No, we eliminated easement in those

22   concerned lots.

23        Q      Okay.

24        A      We revised the drainage to eliminate

25   the easements and the area of concern.

Page 82

1                    David Zigler

2          Q    So I guess based on the item seven

3     as articulated in the January 22nd letter, it

4     says here, "We do not believe omitting these lots

5     from the purchase is an acceptable solution.  We

6     have not received any information nor

7     clarification on your other two proposals and

8     cost estimates (for sellers proposed

9     reimbursement) to assess the merits."  Did the

10    first --

11         A    We made several revisions, and what

12    they are saying here is the first couple of

13    revisions they did not like.  The final revision

14    which was after this date totally removed the

15    easements?

16         Q    Okay.

17         A    Then I had to go back to the Village

18    Engineer and say we're thinking about running the

19    drainage this way, and show him an alternate

20    plan.  He agreed and then I had to change the

21    map.

22              So this item number seven here does

23    not really reflect as the map stands today.

24         Q    So it's been since revised to --

25         A    -- eliminate the easements of their

Page 83

1                          David Zigler

2       concern.

3               Q       And that was resolved when?

4               A       I don't know.  Maybe a year ago.

5               Q       Okay.  Item number eight, did you

6       have a conversation with Mr. Tirschwell and

7       Mr. Hershkowitz concerning item eight?

8               A       Yes, and actually it had to do with

9       the landscaping, and we thought we had, let's

10      say, an approved landscaping generic plan for

11      each lot.  And I guess by our meeting of the

12      workshop of this April, they are still not

13      totally satisfied.  But this one is still open, I

14      guess.

15              Q       What about at the time of the

16      letter, what was the state of affairs with

17      respect to the landscaping issue?

18              A       It's exactly the same as today.  We

19      made no revisions.  But the board has not

20      committed to accepting that plan as a designated

21      generic landscaping plan.

22              Q       That generic landscaping plan was

23      contained on one of the drawings?

24              A       Yes.

25              Q       That comprises Exhibit 8?

Page 84

1                    David Zigler

2        A      Right.  One of the plans, yes.

3        Q      It says in item eight, "Any

4    landscaping requirements would need to be

5    specified and reviewed and approved by us prior

6    to closing."  Is that standard procedure and

7    practice with respect to the landscaping issue?

8        A      I wouldn't know that, I wouldn't

9    know anything about prior to closing.  I know

10   prior to final approval, and that's dealing with

11   the planning board.

12       Q      I'm sorry?

13       A      I deal with the planning board.  I

14   wouldn't be privy to what they discuss before

15   closing this contract.

16       Q      Did you have any advice as to

17   whether or not that condition was reasonable or

18   unreasonable under the circumstances?

19       A      No, it doesn't pertain to me.

20       Q      After that meeting, did

21   Mr. Hershkowitz or Mr. Tirschwell advise you to

22   do anything with respect to the items raised in

23   the January 22nd letter?

24       A      The only thing that continued for

25   any length of time had to be that drainage, item

David Zigler 30(b)(6)                                                                      May 2, 2008

New City, NY

Page 85

```
1                        David Zigler
2      seven.  And it just took us time to come up with
3      an alternate design, and it took time to have the
4      Village Engineer agree to it.  So I would say
5      yes.
6              Q     Anything else?
7              A     Not that I remember.
8                    (January 30th, 2007 letter from
9              Donald Tirschwell to Toll Brothers was
10             marked Exhibit 6 for identification.)
11             Q     I'm going to show you Exhibit Number
12     6 and ask you to take a look at that (handing).
13     Exhibit 6 is a letter from Donald Tirshwell to
14     Toll Brothers dated January 30th, 2007.
15             A     Right.
16             Q     When you are done, let me know.
17             A     Pretty much finished.
18             Q     Had you ever seen this letter
19     before?
20             A     Yes.
21             Q     When did you see it?
22             A     Probably around January 30th.
23             Q     Did you receive a copy of the
24     letter?
25             A     I think I did, yes.
```

Page 86

1                    David Zigler

2        Q    Do you know who sent it to you?

3        A    Mr. T., Tirschwell.

4        Q    Do you know why he sent it to you?

5        A    Because he likes to inundate our fax

6    machine with junk.  He sends everything, yes.  He

7    probably just sent it to me so I was aware of

8    some of the items on it.

9        Q    Did he direct you to do anything

10    with respect to any of the items raised in his

11    letter or any prior letters from Toll Brothers?

12        A    Yes, the drainage.  I think at that

13    time we were still working on the drainage, item

14    number seven.

15        Q    Okay.  You were asked to provide

16    input prior to Mr. Tirschwell preparing this

17    letter?

18        A    I would have to say yes, because it

19    became an objection to the way it was designed.

20    So I would have to say he did ask us to come up

21    with why we did it, you know, explain to him why

22    we designed it like that and try to do an

23    alternate design.  I would have to say yes.

24        Q    When you say design it, are you

25    referring to what?

Page 87

1                    David Zigler

2        A    The drainage line, Toll Brothers had

3    trouble with the drainage line.  Do you want me

4    to show you?

5        Q    No.  That's one item among several.

6    What about the others?

7        A    The easement was, the problem was

8    the easement covered a drain line, so if we could

9    move the drain line then we wouldn't have a

10   problem with easement.  So they are the same

11   thing.

12       Q    The input that you offered to

13   Mr. Tirschwell, was the that over the phone?

14       A    No, I had a plan, I might have faxed

15   it him, he could have stopped in, it could have

16   been either.  He is always in here so I would

17   have to say most likely he was here.

18       Q    Did you have any writing with

19   respect to --

20       A    Writing to him?

21       Q    Like a note, you know, memo or

22   something else?

23       A    No.  I probably faxed it to him and

24   I said stop by.  You know, I fax sketches out, so

25   I probably faxed him a sketch and another idea of

Page 88

1                          David Zigler

2       changing the drainage.  And he probably stopped

3       by when he went to drop off his mail, which he

4       usually does.

5           ·    Q    So is it fair to say your only

6       involvement with input to Mr. Tirschwell was with

7       respect to item seven?

8                A    I believe so.

9                Q ·  Do you want to take a look at the

10      letter to be sure?

11               A    Yes, after you ask me that question.

12               Q    Why don't we go down and identify

13      the items and I'll ask you whether you provided

14      any input.  With respect to item number two,

15      listed or contained in the January 30th letter

16      from Mr. Tirschwell, did you give Mr. Tirschwell

17      any information, advice, et cetera, relative to

18      item two?

19               A    Only as he states the note and the

20      concern on page one, of drawing number one was

21      the note, that was the only thing that we

22      offered.

23               Q    What note are you referring to,

24      Mr. Zigler?

25               A    Note number 31 that's described

David Zigler 30(b)(6)                                    May 2, 2008

New City, NY

Page 89

1                       David Zigler

2      here, "The existing driveway on lot 13 shall be

3      utilized for construction equipment, supplies and

4      workers from Carlyle Road into the site," meaning

5      Halley II.

6           Q      Um-hm.

7           A      "Project sign prohibiting delivery

8      at Klingher Court shall be posted at Klingher

9      Court and Call Hollow Road.  That's the only

10     discussion I had with him.

11          Q      And what is your understanding as to

12     why Mr. Tirschwell is citing note 31?

13          A      Well, because of the topic of

14     Klingher Court, if somebody happens to come

15     through Klingher Court and gouges it to the

16     degree that the Village Engineer found it to be

17     unacceptable, somebody who is a contractor on the

18     job would have to repave Klingher Court.  So

19     that's what the whole deal is.  If you come in,

20     per se, as the planning board wants you to on lot

21     13, you will not mess up Klingher Court.

22          Q      Um-hm.

23          A      And that's what the village wanted,

24     nobody traveling on Klingher Court.  But I'm not

25     the policeman and they're not the policeman, and

Page 90

```
 1                    David Zigler
 2    one person can mess up a road.
 3            Q      Was your plan unchanged?  Because
 4    this is referring to a plan which your firm --
 5            A      No, that note has been on there
 6    since the SEQR process and the FEIS, because I
 7    was part of the SEQR process.
 8            Q      What is the SEQR?
 9            A      State Environmental Quality Review,
10    and this has had a scoping and this went the full
11    nine yards of SEQR.
12            Q      What about item number three, did
13    you offer any advice with respect to item number
14    three?
15            A      No.  Mr. Tischwell is pretty much
16    aware of the steep slope law.
17            Q      Did he advise you at all as to how
18    he was going to address item number three in his
19    letter?
20            A      I don't think so, no.  I don't
21    remember, no.
22            Q      Did he ask you to comment on any
23    draft letter that he prepared?
24            A      Yes, he could have, he has done
25    that.  I don't remember this one, but yes, he
```

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 91

1                    David Zigler

2    could have.

3         Q    If he asked you to comment on a

4    draft letter, would you have a copy of the draft?

5         A    No, that would have been something I

6    discarded a long time ago.  Drafts are garbage.

7         Q    Is it your custom and practice if

8    you comment on a draft to discard it?

9         A    Absolutely.

10        Q    But you don't have a specific

11   recollection of offering comments to the draft

12   letter?

13        A    I would say that I probably did

14   because some of these items were outstanding,

15   even as he wrote that, like this drainage, so I

16   would imagine he fired it off to me as a draft

17   copy to look at, yes.

18        Q    Do you remember making any

19   recommendations relative to item number three in

20   the draft copy?

21        A    No.  It's just as he states here and

22   John Edwards told me, it's a village law, so if

23   it's required, it's required.  I'm trying to get

24   around it, but law is a law.  Working hard.

25        Q    Do you think you'll get around?

Page 92

1                    David Zigler

2         A    I believe that I'm going to have it

3    in such a form that if you're required to go for

4    a steep slope application it will be in a

5    different scope, because some of the process will

6    be eliminated by the description on our maps.

7         Q    And some of the problems you're

8    referring to is what, the grading?

9         A    Grading, public hearing.  If you own

10   all the lots, if whoever buys this, I would say,

11   listen, if the planning board states that there

12   is a steep slope on eight lots, let's go en masse

13   for the eight lots at one time while you control

14   the adjoiners.

15        Q    What about item number six, did you

16   offer any comment to item number six with respect

17   to Mr. Tirschwell's letter?

18        A    No, he can write anything he wants

19   on that.  If the Village Engineer wants a grade

20   change, I change a grade.

21        Q    Item number seven refers to the

22   drainage issue that we discussed at length?

23        A    Right.

24        Q    What about item number eight?

25        A    It's still open, I don't have any --

David Zigler 30(b)(6)                                                      May 2, 2008

New City, NY

Page 93

1                          David Zigler

2        unfortunately it's not very black and white, the

3        answer to that, so it's still open until we

4        receive final approval.

5              Q     With respect to the items raised in

6        both the January 22nd letter from Briarwood

7        Farms, which is Exhibit Number 5, and the items

8        in Mr. Tirschwell's letter, which is Exhibit 6,

9        which items are still open as of today?

10             A     Steep slopes and landscaping.

11             Q     So that would be items three and

12       eight?

13             A     Right.

14             Q     And when did item two no longer

15       become an issue?

16             A     I think when Mr. Edwards offered to

17       put security down for the topping of Klingher

18       Court?

19             Q     When was that, do you know?

20             A     I don't know, sometime after this

21       development of concern here.

22             Q     So sometime in 2007?

23             A     Yes, I would have to say.

24             Q     And that would be recorded

25       somewhere in the meeting minutes of the planning

Page 94

1                    David Zigler

2    board or --

3         A     No, because after we received

4    preliminary, we've been to the workshop more than

5    we have been to the planning board.  So I would

6    say that would be an item discussed with the

7    engineer.  Then if the engineer finds it and the

8    attorney at the workshop finds it acceptable,

9    then they would discuss it as a recommendation to

10   the planning board.

11        Q     So that's a recommendation at the

12   next planning board meeting or some other point

13   in time?

14        A     Right.

15        Q     How many workshops did you have?

16        A     Since preliminary?

17        Q     Yes.

18        A     I would have to say at least four or

19   five.

20        Q     And those workshops are generally

21   designed to do what?

22        A     Eliminate comments established

23   during preliminary.

24        Q     Prior --

25        A     Yes, and you just keep wearing them

Page 95

1                           David Zigler

2      out basically, changing the map and wearing them

3      out.

4              Q      So if you are at a planning board

5      meeting and they have concerns, all the concerns

6      are identified and then prior to the next

7      planning board meeting you have a workshop?  Or

8      there could be a workshop.

9              A      You revise the maps and you will

10     have a workshop.  But in this case we were going

11     for final, so we were revising the maps in some

12     slight form, or maybe the health department

13     wanted a revision, and I would go to a workshop

14     and say listen, the health department wants a

15     revision, this is what we're doing.

16             Q      How many times did you apply for

17     final approval?

18             A      You only apply once.

19             Q      Okay.  And that's when all the

20     issues are addressed?

21             A      In my light they are all addressed,

22     but the planning board, after they review it,

23     they could come up with a different issue.  It's

24     not unusual to have something crop up before

25     final approval.

Page 96

1                    David Zigler

2          Q     Or at the final approval they can

3    have conditions?

4          A     Absolutely.

5          Q     What about item number seven, when

6    did that resolve?

7          A     That's the drainage issue?

8          Q     Yes, with respect to lots 26 --

9          A     About three weeks ago.

10         Q     26, 27, 28?

11         A     Three weeks ago.

12         Q     Was that at a workshop that resolved

13   or something else?

14         A     Out in a field with our neighbors.

15         Q     Okay.

16         A     The question of the drainage and the

17   location within those lots was just solved three

18   to two weeks ago when we had a field meeting with

19   the neighbors.

20         Q     Neighbors, you mean from the

21   surrounding subdivisions?

22         A     Yes, our adjacent neighbors that are

23   contiguous to the property lines.

24         Q     So somebody raised an issue at the

25   planning board meeting or --

Page 97

1                    David Zigler

2          A    No, it had just been discussed that

3   everybody thought there was a better way of

4   addressing the drainage but nobody had the

5   answer.  And when we did come up with the answer,

6   the village thought it was important for us to go

7   out and meet with the neighbors, and we did that,

8   me and Mr. Corlis.

9          Q    How long did that process take?

10         A    Half an hour.

11         Q    Not to meet with the neighbors but

12  to get it all set up to whereby you would meet

13  with the neighbors to have it resolved?

14         A    Took over a year.  I notified them

15  by mail, I notified the village, and when we had

16  the public hearing for final, both neighbors came

17  and we set a time up then.

18         Q    Item eight you said is still open,

19  right?

20         A    Yes.

21         Q    And is that item, would that be

22  resolved at the final hearing or prior to the

23  final hearing or both?

24              MR. HASPEL:  Again, I will object

25         to form only because there may be

David Zigler 30(b)(6)                                          May 2, 2008

New City, NY

Page 98

1                     David Zigler

2          different concepts of resolved.  Just

3          to reinterpret what you said, something

4          may be resolved between engineers but

5          not officially resolved until signed

6          off.  So there are two resolveds.

7          A     He is right, until the planning

8     board votes, it's not resolved.

9          Q     I was going to say when would it be

10    a closed issue, but that's the same response?

11         A     Right.  Especially the landscaping,

12    because it's not defined.  If something is

13    defined and you answer in a defined manner,

14    everybody thinks it's over.  But the landscaping

15    is not a defined answer.

16         Q     When did you first become aware that

17    there was this dispute between Briarwood Farms

18    and Toll Brothers?

19         A     I guess when Toll Brothers came down

20    and sat down and told me that they would like to

21    make changes to the plans.

22         Q     Was that after they sent the

23    December 22nd, letter?

24         A     Yes, sometime in that term, yes.

25         Q     Were you ever advised from anyone

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 99

1           David Zigler

2    from Briarwood Farms or Mr. Tirschwell that there

3    was an issue between Briarwood Farms and Toll

4    Brothers?

5           A      Yeah, by that letter I received from

6    Toll Brothers there was an issue, yes.

7           Q      Did you ever speak to

8    Mr. Hershkowitz about what was going on between

9    Briarwood Farms and Toll Brothers?

10          A      Yes, because we discussed this I

11   would say yes, I did.

12          Q      What did he say?

13          A      He said "Answer these questions,

14   Dave, so we can solve it."

15          Q      Is that all he said?

16          A      Yes, get it done.   That's my mission

17   in life, just get it done.

18          Q      What about Mr. Tirschwell, did he

19   advise you of any dispute between Briarwood Farms

20   and --

21          A      Nothing other than these letters.   I

22   don't know if there was any other things

23   disputed, but I mean, this is pretty much of a

24   disagreement right here.   So I would say that I

25   was aware of it, yes.   And they both came in to

Page 100

1                      David Zigler

2      discuss it with me and set up meetings so I could

3      meet with Toll Brothers.  So I would say I was

4      aware of something, yes.

5           Q      What were those meetings designed to

6      do?

7           A      Solve these problems.

8           Q      And did they ever solve them?

9           A      No, because when I did solve them to

10     what I thought solved the problems, I never heard

11     again from Toll Brothers.  And I called them, I

12     actually called to go up there and meet with

13     them.  And I did once but that kind of just fell

14     through.

15          Q      You did go up to see Toll Brothers

16     you said once?

17          A      Yes.

18          Q      When was that?

19          A      If I had my calendar book, I could

20     look it up.

21          Q      Was that after --

22          A      During this process.

23          Q      During the process?

24          A      Yes.

25                 MR. HASPEL:  Off the record.

David Zigler 30(b)(6)                                             May 2, 2008

New City, NY

```
1                    David Zigler

2              (Brief recess)

3    BY MR. BENENATI:

4         Q    I'm going to show you what has

5    previously been marked as Exhibit B, and ask you

6    to take a look at that (handing).  This is

7    entitled Chapter 118, Subdivision of Land, and

8    this was taken from the Village of Pomona

9    website.

10        A    Right.

11        Q    Are you familiar with this chapter?

12        A    Yes.

13        Q    And when I say --

14        A    Generally familiar with it, yes.

15        Q    I'm just going to read, Section

16   118-1 says, "Authority of Planning Board to

17   Approve Plats.  Pursuant to provisions of

18   Section 7-728 of the Village Law, the Board of

19   Trustees authorizes the Planning Board to review

20   and approve or disapprove subdivision plats

21   showing lots, blocks, or sites with or without

22   roads within the area of the Village."

23             Now the subdivision that we're

24   talking about, Halley Estates II, is that within

25   the area of the village that's referenced in
```

Page 102

1                    David Zigler

2    Section 118-1?

3          A     Absolutely.

4          Q     Is it the planning board that

5    authorizes the final subdivision approval for the

6    Halley Estates II?

7          A     Yes.

8          Q     Have they authorized the final

9    approval for that subdivision?

10         A     Not yet, no.

11         Q     Okay.  This is not page numbered but

12   in the definition section it says, "Subdivision

13   plat or Final Plat, and it says, I quote, "A

14   drawing, in final form, showing a proposed

15   subdivision and containing all information or

16   detail required by law, and by these regulations,

17   to be presented to the planning board for

18   approval, and which if approved may be duly filed

19   or recorded by the applicant in the office of the

20   County Clerk."

21                With respect to the final plat, is

22   that what would be submitted to the village

23   planning board?

24         A     For final review you submit a map,

25   but then after you receive final approval,

Page 103

1                          David Zigler

2      usually you have revisions to that submission.

3      So then the planning board usually gives the

4      advisors, whoever has to review it, you know,

5      obligation to review those revisions before they

6      sign off.

7             Q     Is it stamped at all, the final map?

8             A     It has to be stamped to be filed in

9      the County Clerk's office.

10            Q     Who would stamp it?

11            A     Village of Pomona has to stamp it,

12     either the secretary in some cases or the

13     chairperson of the board has to sign it.

14            Q     Would that map have to show steep

15     slope approval?

16            A     Would it have --

17            Q     Or compliance with the steep slope

18     law?

19            A     No, not at all.

20            Q     Why do you say that?

21            A     Because you don't have to comply to

22     steep slopes until you apply for a building

23     permit.

24            Q     In conjunction with the final

25     approval of a subdivision, don't you have to show

Page 104

1                          David Zigler

2       that you're complying with the steep slope law?

3              A       I kind of agree with what you're

4       saying, but no, by the application you apply for

5       steep slope law when you apply for a building

6       permit, because it's a site-specific house.

7              Q       Would the final map show

8       hypothetical houses?

9              A       Yes, generic hypothetical houses,

10      yes.

11             Q       What if you built something within

12      the confines of the hypothetical house, would you

13      have to then get steep slope approval?

14             A       If the lot qualifies, yes.

15             Q       Qualifies as what?

16             A       Being subject to the steep slope.

17             Q       So whether or not you built within

18      the hypothetical footprint, is it your

19      understanding you would have to go back and get

20      the sleep slope approval if you built the house

21      within the envelope of the footprint or if you

22      exceeded the footprint?

23             A       That's what their interpretation was

24      two or three weeks ago, yes.

25             Q       Who are you referring to?

Page 105

1                    David Zigler

2          A    Planning board at the workshop.

3          Q    Who was at that workshop?

4          A    Just the advisors, the Village

5    Engineer, the Village Attorney and the Village

6    Planner.  The chairperson was not there.

7          Q    I don't know if I showed you this,

8    but this is a document that was marked Exhibit D

9    at a nonparty deposition dated 3/25/08.  I ask

10   you to take a look at that.

11         A    That's no.

12         Q    What is that document?

13         A    Agenda of the planning board.

14         Q    That's not a workshop, that's not

15   referencing a workshop meeting, correct?

16         A    No, this was a planning board

17   meeting.

18         Q    Did you participate at the meeting?

19         A    Absolutely.

20         Q    When was the meeting?

21         A    March 25th.

22         Q    Was that at 10 A.M.?

23         A    No, that was -- oh, this is a

24   workshop, yes, this was a workshop.

25         Q    Who was present at this workshop?

David Zigler 30(b)(6)                                                May 2, 2008

New City, NY

Page 106

```
1                    David Zigler

2          A     The same people I mentioned and John

3     Edwards.

4          Q     What does TAC stand for, T-A-C?

5          A     Technical Advisory Committee.

6          Q     Okay, meeting.  What was discussed

7     at that meeting, if you know?

8          A     Landscaping, because the planner

9     wanted to see two things; he wanted us to mark

10    the tree map which is part of that map set that

11    I -- and we had to mark each tree that was going

12    to be removed, and they wanted to see a planting

13    for the street trees.  And the other thing that

14    had to do that came up was discussion of the

15    steep slopes and the access off of lot 13 from

16    Call Holler Road.  Three basic things, it was a

17    very quick meeting.

18         Q     Was the agenda for final approval on

19    subdivision discussed at that TAC meeting, or not

20    agenda but plans for submitting?

21         A     Yes, the plans had been submitted

22    and we had a public hearing for final.  At this

23    workshop was -- no, I'm sorry, this is March,

24    we're in April, right?  Yes, this was for the

25    public hearing in April.
```

Page 107

```
 1                    David Zigler

 2        Q     Was that public hearing held?

 3        A     Yes.

 4        Q     Did you participate at that public

 5   hearing?

 6        A     Yes, very little.  John Edwards did

 7   most of the speaking.

 8        Q     As a result of the public hearing,

 9   what, if anything, happened?

10        A     They probably would have voted for

11   final if we requested them, but the Chairman of

12   the Board wasn't there and we didn't think it was

13   appropriate, so we asked to continue the public

14   hearing until the next month, meaning May.

15        Q     When is the next planning board

16   meeting?

17        A     I think May 8th.

18        Q     At that May 8th planning board

19   meeting, do you or Briarwood Farms plan on asking

20   the planning board to make final approval of the

21   subdivision?

22        A     No, probably John Edwards would ask

23   for that, but we have been led to believe that

24   they are prepared and they have a document, a

25   resolution, and they are prepared to vote on it,
```

Page 108

```
1                     David Zigler
2    final.
3         Q     The planning board is prepared?
4         A     Yes.
5         Q     Where did you obtain that
6    understanding?
7         A     During the workshop, from the last
8    meeting and --
9               (Phone interruption)
10        Q     During any of the conversations that
11   you had with Mr. Hershkowitz, Mr. Tirschwell,
12   after Toll Brothers raised issues in its December
13   22nd letter, did Mr. Tirschwell and Mr.
14   Hershkowitz ever refer to the agreement of sale
15   in any of those discussions with you?
16        A     Absolutely.
17        Q     What I mean by the agreement of
18   sale, I meant the contract between Briarwood
19   Farms and Toll Brothers?
20        A     Just to say that Toll Brothers was
21   trying to get out of the contract, yes.
22        Q     What was specifically said to you in
23   that regard, if you recall?
24        A     That would be it.  I mean, just
25   basically discussed the concerns that were in the
```

1                      David Zigler

2    letters, and why there are concerns, you know,

3    not going smooth.  That's about it, pretty

4    generic.

5          Q     Did you have a copy of the contract

6    between Toll Brothers and Briarwood Farms at the

7    time?

8          A     No.

9          Q     Did you ask to see a copy of the

10   contract?

11         A     No.  As a matter of fact, when

12   people send me contracts in single home sales, we

13   just throw them out.  It's not my business.

14         Q     Did you ask to see any provisions of

15   the contract?

16         A     No.

17         Q     Were any provisions sent to you?

18         A     No, other than what was discussed

19   with them as provisions in the contract, that was

20   it.  You know, whatever was in them letters,

21   that's the only thing I ever discussed.

22         Q     So is it fair to say, other than

23   that which was contained in the letters between

24   Toll Brothers and Briarwood Farms, you have no

25   knowledge of the contract or terms?

David Zigler 30(b)(6)

New City, NY

May 2, 2008

Page 110

```
 1              David Zigler

 2        A     No.

 3              MR. BENENATI:  I don't have any

 4        further questions.

 5              MR. HASPEL:  We are done.

 6              (Whereupon, at 1:51 P.M., the

 7        deposition was concluded.)

 8

 9

10              _____

11                   David ZIGLER

12

13

14   Subscribed and sworn to before me

15   this_____day of_____, 2008.

16

17   _____

18   NOTARY PUBLIC

19

20

21

22

23

24

25
```

1
2
3
4       REPORTER'S CERTIFICATE OF CERTIFIED COPY
5
6
7            I, NANCY ANNE FLYNN, a Registered
8    Professional Reporter, certify that the foregoing
9    pages constitute a true and correct copy of the
10   original deposition of
11            I declare under penalty of perjury that
12   the foregoing is true and correct.
13            Dated this      day of
14
15
16
17   _____
18       NANCY ANNE FLYNN, RPR
19
20
21
22
23
24
25