UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

BRIARWOOD FARMS, INC.                    Index No. 07-civ-3657 (clb)

                Plaintiff,

- against -

TOLL BROS., INC.

                Defendant.

------------------------------X

**PRELIMINARY STATEMENT**

Plaintiff, Briarwood Farms, Inc. ("Briarwood") submits this Memorandum of Law in support of its motion for summary judgment.

This case presents a claim of breach of a written contract of the sale of a parcel of real property (the "Contract"). The Contract provided that defendant, Toll Bros. Inc. ("Toll") would purchase approved lots at the time Briarwood obtained final subdivision approval. There was no time frame set for closing in the Contract, and time was never made "of the essence." The purchase price was $325,000 per approved lot.

Briarwood's theory of this case is that Toll (NYSE: TOL), which is one of the nation's largest builders of luxury homes,[1] made an economic decision to unload real estate rights in markets where there were declining lot values. The real property which is the subject of the Contract is such property. Since the Contract provides for liquidated damages as the seller's (Briarwood's) only form of relief in the case of a breach, Toll anticipatorily beached the Contract knowing the limitations of its exposure. Given current market conditions, Briarwood understands Toll's economic decision. This lawsuit is about whether Toll should be permitted to

---

[1] See website of Toll, www.tollbrothers.com.

further minimize its losses on the back of Briarwood.

While the facts surrounding Toll's intent maybe an issue of fact, such facts are not material for determination of this case. The only issue presented is whether Toll anticipatorily breached the Contract. As will be shown below, based upon the indisputable and undisputed facts, coupled with the controlling law, the granting of summary judgment is warranted.

**FACTS**

The facts herein are set forth in the accompanying Statement Made Pursuant to Local Rule 56.1, the affirmation of Joseph J. Haspel, Esq. and the affidavit of David Zigler.

In summary, prior to November, 2005, Briarwood and defendant Toll Bros., Inc. ("Toll") engaged in negotiations concerning the sale of a parcel of real property located in the Village of Pomona, Town of Haverstraw, Rockland County. The subject real property and the project associated with it is commonly referred to as "Halley Estates II."

On or about November 7, 2005 (the "Contract Date"), Briarwood and Toll executed an "Agreement of Sale" relating to Halley Estates II (the "Contract"). A copy of which is provided as Exhibit A.

The Contract price was $325,000 per lot sold with an estimate of forty-one lots to be sold. Specifically, Paragraph 2 of the Contract provided:

> 2.   Purchase Price. The purchase price (the "Purchase Price") for the Property is Thirteen Million Three Hundred and Twenty-Five Thousand and no/100 Dollars ($13,325,000) based on a Property yield of 41 Lots. The Purchase Price shall be increased or decreased by $325,000 for each Lot more than or less than 41, respectively, which the Property yields. The Purchase Price shall be paid as follows ... :

Paragraph 2 of the Complaint, as set forth above, provided the parties flexibility should the site be unable to yield 41 unencumbered building lots, and required Toll to perform on the amount of unencumbered building lots approved by the local governing body - the Village of

Pomona ("Pomona"), with the purchase price being based upon the amount of building lots approved.

Paragraph 2 of the Contract also provided for a deposit of $1.3 Million (the "Deposit"), which, at Toll's option could take the form of an irrevocable letter of credit. In fact, the Deposit was done through a letter of credit. The $1.3 Million represented 10% ($32,500) for each approved building lot based upon 40 approved lots.

Under Paragraph 4 of the Contract:

> Closing ... shall be made at the offices of the Title Company and on or by the date which is thirty (30) days following the date upon which all conditions to Closing set forth in Section 16 hereunder have been satisfied.

Paragraph 16 of the Contract provided:

> 16. Conditions to Buyer's Obligations
>
> (a) Buyer's obligation to complete Closing under this Agreement is expressly conditioned upon the following, and Buyer shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Buyer's other rights, conditions or obligations:
>
> (i) all representations and warranties of Seller herein being true and correct at the time of Closing;
>
> (ii) Seller having performed all of its covenants and obligations hereunder;
>
> (iii) the receipt by Seller for Buyer, at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the "Final Approval"), and, the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits;
>
> (iv) the receipt by Seller for Buyer, at Seller's sole cost and expense, of all written agreements, arrangements and other evidence satisfactory to Buyer to the effect that (a) there is immediately available at the Property adequate public sewer treatment and capacity on a permanent basis for the effluent from the Property as intended to be developed, (b) sufficient public water is

immediately available at the Property to adequately service the homes intended to be developed on the Property, and (c) electric, cable, gas and telephone are available at the Property, all at connecting fees and expenses that are not greater than those which are customary and ordinary for similar developments in the County in effect on the date of this Agreement;

(v)  Intentionally Omitted; and

(vi) the installation by Seller of off-site sewer and water to the edge of the Property.

(b)  The conditions set forth in Section 16(a)(iii) and (iv) shall be final and unappealable at the time of Closing and shall be subject only to such conditions as Buyer may approve at Buyer's sole discretion, which approval shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such condition shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed condition.

(c)  If on or before the date of Closing all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer shall have the option of (i) completing Closing hereunder if it so chooses at the Purchase Price, or (ii) canceling this Agreement in which case this Agreement shall become null and void and the Deposit shall be paid to Buyer. In the event such failure constitutes a failure of the condition set forth in Section 16(a)(i) or 16(a)(ii), Buyer shall be entitled to treat such failure as Seller's Default entitling Buyer to exercise the remedies set forth in Section 9 above.

(d) Seller agrees that no substantial modifications to the Subdivision Plan may be made without the Buyer's prior written consent, which shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such modification shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed modification.

Paragraph 8 of the Contract provided that upon Toll's default, the Deposit shall be retained as Briarwood's sole and exclusive remedy as liquidated damages.

The Contract provided at Paragraph 13 for Toll to have a forty-five day "Due Diligence Period" in which Toll could terminate the agreement without default. Specifically, the Contract provided:

13. <u>Due Diligence Period</u>. Between the time of execution of this Agreement and Closing, Seller agrees that Buyer, its representatives and consultants shall have the right to enter upon the Property to perform engineering, environmental and such other feasibility studies as Buyer determines in its sole discretion. Buyer and Seller further agree that within forty-five (45) days of the date of this Agreement (the "Due Diligence Period"), should Buyer desire not to purchase the Property as a result of such studies, or as a result of Buyer's dissatisfaction with the Property based upon Buyer's review of Seller's Plans or for any other reason whatsoever, Buyer shall have the right to terminate this Agreement upon written notice to Seller in which case the Deposit shall be returned to Buyer and there shall be no further liability of the parties hereunder. Failure to notify Seller prior to the expiration of the Due Diligence Period shall act as Buyer's election to waive this contingency. If Buyer causes any damage to the Property as a result of its studies performed pursuant to this Section, and Buyer elects not to purchase the Property, Buyer shall reasonably repair such damage. If Buyer terminates this Agreement pursuant to this Section 13, Buyer shall deliver, to Seller, without representation, warranty or recourse, copies of any materials (excluding any proprietary or confidential materials or information) developed by third parties for Buyer in connection with the Property.

Pursuant to the Contract, Toll's obligation to close the transaction was conditioned upon Briarwood obtaining "Final Approval" of a proposed subdivision plan, "such that upon posting of customary security and payment of application and inspection fees by [Toll], [Toll] may file the plat and commence infrastructure improvements and apply for and obtain building permits."

By letter dated December 22, 2005, the Contract was modified through a letter agreement, which, *inter alia*, extended Toll's due diligence period through January 6, 2006. A copy of this letter agreement is provided as Exhibit B.

By letter dated December 22, 2006, Toll provided Briarwood with a letter which set forth its objections to certain conditions raised by Pomona. A copy of this letter is provided herewith as Exhibit C. By letter dated January 22, 2007, annexed as Exhibit D, Toll acknowledged that certain of its concerns set forth in its prior letter were "adequately addressed," but it nevertheless set forth that it was cancelling the Contract (the "Contract Termination") pursuant to Contract Section 16(c) based upon the following issues:

1. **The "Klinger Court Issue"** - Pomona's review of Briarwood's subdivision indicated that if Klinger Court, which would be an access road to the subdivision, was damaged: "the Developer shall install a 1-1/2" wearing course, curb to curb, for the entire length of Klinger Court." (See Dec. 22, 2006 letter). Toll's Contract Termination letter provided:

> The revised condition that the developer repaves Klingher Court is unacceptable, as it gives the village the unrestricted right to require a complete resurfacing rather than requiring repair for damage actually caused. If the condition cannot be omitted, we will agree only to repair any damage caused by construction traffic as required by the initial plans sent during due diligence. Seller must bear the cost of any complete resurfacing, if required.

After this issue was raised, Briarwood offered to bear the expense of repaving Klinger Court. Thus, this issue was obviated.

2. **The "Steep Slope Issue:** - Pomona's Village Code provides that any development of a lot which has a "steep slope" is subject to steep slope review by the Planning Board. This ordinance has been in place since 1998, and, obviously, a matter of public record during the period of time Toll was engaged in its due diligence. Notwithstanding, Toll's Contract Termination letter provided:

> As a general matter, Section I 6(a)(iii) of the Agreement requires "satisfaction by Seller of any conditions of Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and *obtain building permits*" (emphasis added). It is precisely this type of additional review and approval process which is intended to be addressed as part of the closing conditions, so that Buyer has comfort that all lots are fully developable without the need for further approvals.
>
> Further, specifically regarding the "steep slope" ordinance, we understand that the application process and review standards are extensive and time consuming and there is no guaranty that any given lot would be approved for development with acceptable conditions. As you know, the village has the right to require the phasing of construction of improvements on each lot, additional inspections, and certifications of completion of each phase of

development of each lot. In addition, the planning board has the right to relocate proposed improvements and/or to reduce building envelopes and may require issuance of letters of credit to secure completion of these lot improvements. Further, rock blasting might be prohibited and landscape mitigation might be required. We cannot evaluate whether any of these conditions would be acceptable until after the steep slope permits are issued.

As will be discussed in detail below, Toll's view of the steep slope ordinance is, at best, flawed. Regardless, there was a simple method to remove Toll's concerns altogether, and that was to provide the engineer who was prosecuting the subdivision approval with building plans for the improvements Toll intended to build on each lot. Toll did not do so, and thereby it created the condition for which it based its termination.

Moreover, any requirement by Pomona with regards to "steep slopes" was a matter of public record on the date the Contract was executed, and available for review during the due diligence period. Had Pomona's requirements been a material concern to Toll, it had the opportunity to cancel the contract during the due diligence period.

3. **The "Cul-de-sac Grade Issue"** - Pomona's review of Briarwood's subdivision indicated that the subdivision's proposed cul-de-sac should have a maximum grade of 4%. Toll's Contract Termination letter provided:

> This requirement poses significant economic impact as it affects premium cul de sac lots. In addition to additional site improvements, there will be a diminution of value to these lots.
>
> As indicated in Item 3 above, our Agreement requires issuance of full and final approvals. For information as to this requirement in particular, our due diligence indicated that these streets would be treated as a "local street" and a Maximum grade of 10% slope could be maintained. The 4% requirement is a new and unacceptable condition.

As will be discussed in detail below, Toll's view of the grading ordinance is also, at best, flawed. The ordinance clearly indicates that the allowed grading of roads is a matter determined

by the Village's engineers. This ordinance was also a matter of public record during Toll's due diligence period.

4. **The "Drainage Easement Issue"** - As the Plan existed at the time of the Contract Termination Letter (later modified to obviate this issue), two lots contained a drainage easement. Toll's Contract Termination letter provided:

> We do not believe omitting these lots from the purchase is an acceptable solution and we have not received any information or clarification on your other two proposals and cost estimates (for Seller's proposed reimbursement) to assess the merits. We are unclear as to who will be the beneficiary of any easements and who will be responsible for the maintenance of the drainage facilities.

Briarwood has maintained that this is another issue feigned by Toll. Initially, Briarwood consented to remove lots with easements from the sale. As noted above, this solution would have been entirely consistent with the Contract since it provided that the sale price would be based upon actual lots sold. Regardless, as is discussed in the accompany affidavit of David Zigler, when Toll voiced its concern the design of the subdivision was modified to remove the drainage easements. Accordingly, the final map filed does not have any drainage easement issue.

5. **The "Landscaping Issue"** - Pomona's review of Briarwood's subdivision indicated possible landscaping requirements. Toll's Contract Termination letter provided:

> Once again, as indicated in Item 3 above, the Agreement requires full and final approvals. Any landscaping requirements would need to be specified and reviewed and approved by us prior to Closing.

Landscaping requirements are part of any subdivision approval process. Toll's statement is not an objection, but a statement that it should prospectively be afforded the opportunity to review and approve Pomona's landscaping requirements. It is odd that such a statement would

be made within a letter purportedly cancelling the Contract. As will be argued below, this demonstrates that Toll was not interested in future participation, but that it had prematurely elected to cancel the Contract.

Toll's Cancellation Letter also provided that alternatively, the cancellation was pursuant to Section 15(f) of the Contract which provides:

> Seller shall, at its expense, in good faith diligently pursue the satisfaction of all conditions to Closing hereunder, including, without limitation, the completion any on or off-site improvements required in connection therewith. Buyer shall bear the cost of any inspection fees.

Toll has never indicated upon what facts, if any, it based its cancellation under this provision.

By letter dated January 30, 2007, Briarwood disputed Toll's purported reasons for Termination. A copy of this letter is annexed as Exhibit E. Toll did not retract its cancellation. This lawsuit followed.

The complaint in this case, a copy of which is annexed as Exhibit F, has only one cause of action for breach of contract. It alleges the facts set forth above and seeks damages in the contractually liquidated amount of $1.2 Million. This sum represents $30,000 per approved lot, which is less than 10% of the Contract price of $325,000 per lot.

In Toll's answer, a copy of which is annexed as Exhibit G, Toll presents one counterclaim seeking declaratory relief in the form of a judicial ratification of Toll's renunciation of the contract and a money judgment for the return of its Contract deposit.

In preparation for this Court's case management conference, counsel for the parties discussed the issues presented in this case. At the case management conference, Toll's counsel, without waiving any of the other issues raised in Toll's Termination Letter, asserted that the driving force behind Toll's cancellation of the Contract was the Steep Slope Issue. Accordingly, it was reported to the Court that discovery would proceed, with the principal focus being upon

Toll's renunciation of the Contract based upon the Steep Slope Issue.

To that end, Toll proceeded with two depositions. The first being Pomona's Village Engineer, P.J. Corless ("Corless" or "Village Engineer"), and the second being David Zigler ("Zigler"), of the Planning and Engineering firm Atzl, Scatassa & Zigler ("ASZ"). Zigler and ASZ were the professionals hired by Briarwood to design the subdivision and shepherd the approval process before the Pomona Planning Board (the "Planning Board").

The Village Engineer's deposition was taken on March 25, 2008. A copy of the transcript is annexed as Exhibit H. In his deposition, the Village Engineer confirmed:

1) That Pomona's Steep Slope Ordinance (the "Ordinance") has never resulted in a denial of a building permit;

2) That under the Ordinance, Steep Slope approval is generally an issue addressed after the filing of the subdivision plat ("Final Approval") as part of the building permit process, and that it is generally addressed only hypothetically during the subdivision approval process;

3) That it is possible to get Steep Slope approval during the subdivision application process only if proposed site improvements (*i.e.* house building plans) were submitted as part of the subdivision approval process.

The testimony of Zigler is annexed as Exhibit I. In addition, provided herewith is an affidavit of Zigler which encapsulates the deposition testimony. In summary, Zigler confirms that obtaining a Steep Slope permit is part of the building permit application process which only commences after final subdivision approval has been granted and improvements (*i.e.* roads) are in. Zigler confirms that Toll was given the opportunity to present building plans which would have obviated the need to return to the Planning Board after the subdivision was approved. However, Toll did not provide building plans, and the subdivision approval process went

forward based upon hypothetical footprints based upon Briarwood's standard house.

## ARGUMENT

### Toll's Repudiation Of The Contract Was Without Justification

Where a party totally repudiates his obligation to purchase real property pursuant to a contract of sale, such repudiation constitutes an anticipatory breach of the real property sale and the selling party is relieved of any duty to tender performance or wait for the time of performance to arrive before suing, *Bucciero v. Jian Sheng Li*, 191 A.D.2d 887, 594 N.Y.S.2d 876 (3rd Dep't 1993); *MK West Street Co. v. Meridien Hotels, Inc.*, 184 A.D.2d 312, 584 N.Y.S.2d 310 (1st Dep't 1992). "A repudiation occurs upon an 'overt communication of intention' not to perform' agreed-upon obligations." *Ryan v. Corbett*, 30 A.D.3d 1062, 815 N.Y.S.2d 855 (4th Dep't 2006). *See also, Knoff v. Johnson*, 5 Misc.3d 1003A, 798 N.Y.S.2d 710 (Sup.Ct. Kings Cty. 2004).

In the instant case, it is undisputed that on January 22, 2007, Toll informed Briarwood that it was cancelling the contract. Thus, the only issue is whether Toll's repudiation of the Contract was contractually justified. For the reasons set forth below, Toll's repudiation was not justified as a matter of law.

As noted above, Toll's Cancellation Letter set forth five purported justifications for its cancellation. None of these purported justifications survive scrutiny.

With respect to the first issue - The "Klinger Court Issue" - the Cancellation Letter provided: "Seller [Briarwood] must bear the cost of any complete resurfacing, if required." As shown above, Briarwood did agree to bear the cost of any complete resurfacing, if required. Thus, this cause for cancellation is no cause at all.

Since the Klinger Court Issue actually provided an ability to remedy Toll's concern, it is

not possibly one which could justify cancellation of the Contract. Yet, its inclusion indicates the internal contradictions within the Cancellation Letter. It has never been disputed that the Cancellation Letter was, in fact, a letter cancelling the Contract. This being so, why would it include language allowing Briarwood to remedy the condition by agreeing to pay for the resurfacing. Perhaps the answer lies in what was later reported to this Court, and that was that the Steep Slope Issue is the issue upon which Toll will rely in attempting to justify its repudiation of the Contract.

The Steep Slope Issue is the second purported justification contained in Toll's Cancellation Letter. As noted above, the Steep Slope Issue relates to Pomona's Ordinance requiring Planning Board approval of a building permit which would allow the building of a structure, or disturbance, on a steep slope. A copy of the Ordinance is annexed as Exhibit J. The provisions of the Steep Slope Ordinance are discussed in detail in the deposition of Pomona's Village Engineer, P. J. Corless ("Corless") as well as the Deposition of Briarwood's land use professional David Zigler ("Zigler") which depositions are annexed as Exhibits H and I respectively.

In summary, Pomona requires Planning Board approval as part of obtaining a building permit when steep slopes are disturbed by the construction of a house. Steep slope approval is generally not obtained during the subdivision approval process since the precise improvements to a lot are generally not known at the time subdivision approval is obtained. While obtaining steep slope is required, such approvals have never been used to preclude building on a lot.

The Steep Slope Ordinance was passed by Pomona in 1998, and thus it was a matter of public record during Toll's due diligence period.

Toll was informed that it could process steep slope approval during the subdivision

approval process if it provided building plans for each lot which is potentially subject to the ordinance, but it failed to provide such plans.

The lots were designed to minimize the number of lots which may be subject to steep slope approval. Without knowing the design of the prospective improvements (houses, etc.), one cannot determine whether any specific lot will require steep slope approval.

In the first instance, the due diligence provisions of the Contract preclude Toll's ability to feign the Steep Slope Ordinance as a justification for cancellation. The contractual due diligence provision were quoted in full on page 5, *supra*. It contains the following language:

> Failure to notify Seller prior to the expiration of the Due Diligence Period
> shall act as Buyer's election to waive this contingency.

The Contract provided that Toll would have forty-five days (later extended) to investigate whatever they wished relating to the property, and during this period Toll could rescind the Contract for any reason whatsoever. If Toll were not satisfied with Pomona's regulations and ordinances it had the opportunity to cancel the deal prior to the expiration of the due diligence period. It did not cancel the Contract, and according waived its ability to cancel the Contract based upon Pomona's Ordinance. New York law provides that where termination clauses exist, they will be enforced as written. *See, New York Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 372-73, 26 N.E.2d 295 (1940).

The case of *Oppisso v. Commerce Bank*, 11 Misc.3d 1069A, 816 N.Y.S.2d 698 (Sup.Ct. 2006) is squarely on point. There, the Plaintiff sued for liquidated damages on a real estate contract after the buyer defaulted. In the contract between seller and buyer there existed both an expressed due diligence period and an express site plan approval period giving the buyer the absolute right to cancel the contract without penalty if done in a timely manner. After the due diligence period passed, and the approval period passed, the seller sought to close the

transaction. Knowing that the municipality was not looking favorably at the proposed site plan, the buyer refused to close. The Court awarded summary judgment in favor of plaintiff and awarded liquidated damages noting that the buyer's failure to act within either the due diligence period or the approval period rendered it in breach of contract and therefore liable to plaintiffs. In *Oppisso,* the Court held:

> "Defendant has, by its failure to exercise its rights to terminate this contract at every opportunity, forfeited the aforementioned downpayments to the Plaintiffs herein, and no triable issues of fact remain to be determined."

*Id.*

In the instant case, Toll's knowledge of the property's steep slopes is indisputable. Likewise, it is indisputable that it had access to the site division maps at the time of the execution of the Contract which maps addressed the terrain of the property. It must be noted that the Contract in Paragraph 1 references a proposed subdivision plat dated May 22, 2005 which was prepared by Atzl, Scatassa and Zigler. As was stated in Zigler's accompanying affidavit: "It was clear that Toll entered its agreement with Briarwood with its eyes wide open."

Parties are presumed to have contracted with knowledge of the law. *Flagg v. Yonkers Savings & Loan Ass'n*, 307 F.Supp.2d 565 (S.D.N.Y. 2004); *Alexander Muss & Sons v. Rozany*, 170 Misc.2d 890, 65 N.Y.S.2d 238 (App.Term 1996). *See also, Southside Estates, Inc. v. Board of Zoning Appeals*, 187 A.D.2d 515, 589 N.Y.S.2d 585 (2nd Dep't 1992).

Regardless, assuming *arguendo* that Toll executed the Contract in ignorance of the law, it had the opportunity and obligation to perform its due diligence, and if, at that time did not wish to proceed, it could have cancelled the Contract without penalty. The necessity to obtain steep slope approvals could not justify cancellation of the Contract at the time Toll anticipatorily breached.

Even if the Steep Slope Ordinance were unknown and unknowable to Toll during the due diligence period (an impossible scenario), Toll still had the ability to obtain steep slope approvals as part of the subdivision approval process. Thus, Toll could have resolved the foreseeable condition upon which it based its repudiation.

Even if the Steep Slope Issue were a legitimate issue, its potential impact was only upon certain limited lots. Accordingly, since the Contract was based upon lot count, with a purchase price of $325,000.00 per lot, any objectionable lot could have been carved out. While Briarwood does not believe that the Steep Slope Issue made any lot objectionable, it certainly would not have warranted cancellation of the Contract with respect to the lots which Toll could not fabricate an objection.

Therefore, for three distinct reasons, Toll's Steep Slope Issue cannot, as a matter of law, warrant repudiation of the Contract.

The third excuse for repudiation was the Cul-de-sac Grade Issue. Toll has taken the position that the Pomona Village Engineer's requirement for a 4% grade in the subdivision's cul-de-sac was unreasonable warranting its cancellation of the contract because. Toll argues such a requirement is inconsistent with Pomona's Ordinance which permits "local streets" to have a 10% grade. Interestingly, in proffering this position, Toll now recognizes its knowledge of Pomona's code. There can be no doubt that Toll reviewed Pomona's Code during the due diligence period, including the provision regarding street grades, as well as the Pomona Code's steep slope provisions.

With respect to road grading, Toll cites half the ordinance correctly. However, it's the other half which controls this case.

Chapter A134 of the Pomona Village Code governs Street Specifications. Section A134-

29(A), which was apparently read by Toll, states:

> Streets shall be so designed that finished tangent grades will not be less than one percent (1%) nor more than ten percent (10%).

Section A134-29(B) further provides:

> Every change in grade shall be effected with a vertical curve of sufficient length to ensure adequate stopping sight distance and to provide for smooth transition. These vertical curves shall be designed in accordance with the graph …

Apparently, Toll failed to continue reading Pomona's Code, as the following section, A134-30 provides:

> Final decision as to the interpretation of any part of these street specifications shall rest with the Village Engineer. He shall have the authority to modify the requirements of these specifications when, in his opinion, conditions make it impracticable to follow the strict letter of these specifications or when conditions make it unnecessary to do so, such as for example …

Thus, there is no right to a 10% grade on any street in Pomona. All street specifications are subject to the determination of the Village Engineer. It is clearly absurd for Toll to take the position that the Pomona Code gives a developer the right to build a cul-de-sac upon a 10% grade. Accordingly, the requirement of a 4% grade in the cul-de-sac cannot, as a matter of law, be justification to cancel the Contract. The question of why Toll would want to subject home owners to a 10% grade in a cul-de-sac is not presented herein. Yet, the notion of a 10% grade cul-de-sac is indicative of Toll's reaching to find any justification for its repudiation of the Contract, even absurd ones.

The fourth excuse for repudiation was the Drainage Easement Issue. As noted above, Briarwood first consented to remove the lots with easements from the sale. Then, it redesigned the subdivision to remove the drainage easements Toll considered objectionable. Simply stated, there is no issue.

Likewise, the fifth and final excuse for repudiation was the Landscaping Issue. Oddly, Toll in its Cancellation Letter wrote: "Any landscaping requirements would need to be specified and reviewed and approved by us prior to Closing." Initially, such language would indicate that the Cancellation Letter was not really a Cancellation Letter, but a posturing letter. Why else would it refer to Toll's future acts and needs. Yet, Toll never retreated from the cancellation nature of the Cancellation Letter.

It is respectfully submitted that the language Toll used is a concession that at the time it cancelled the Contract, the Landscaping Issue was, at best, premature. Since Toll's subsequent actions demonstrated that the Cancellation Letter was, in fact, a full repudiation of the Contract, this prospective sounding issue never ripened. Certainly, if Toll did not repudiate the Contract its input on landscaping would have been incorporated into the subdivision approval process. Toll never got that far.

Regardless, a municipality's landscaping requirements is not only a foreseeable event, but an item any developer, including Toll as one of the nation's largest developers, would be contemplating when it enters a contract to purchase land. Once again, it is respectfully submitted that including the unripened landscaping requirements of Pomona as a ground to repudiate the Contract does not meet the straight face test and demonstrates that Toll was digging deep to fabricate justification for anticipatorily breaching the Contract.

Based upon the foregoing, it is clear that there is no viable justification for Toll's repudiation of the Contract. Toll's counsel's concession to the Court that Pomona's Steep Slope was the principal focus of its defense was an acknowledgement that the other purported justifications for cancellation are transparently ludicrous.

**Conclusion**

For all the foregoing reasons, it is respectfully requested that summary judgment be granted in total.

Respectfully submitted,

_____
Joseph J. Haspel
*Attorney for Plaintiff*
40 Matthews Street
Suite 201
Goshen, New York 10924
845-294-8950