UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

BRIARWOOD FARMS, INC.,

                                                 07 CIV. 3657 (CLB)

                    Plaintiff,

    - against -

TOLL BROS., INC.,                                 ECF CASE

                    Defendant.

---------------------------------------------------------------------X

### DECLARATION IN OPPOSITION TO
### PLAINTIFF'S SUMMARY JUDGMENT MOTION
### AND IN SUPPORT OF TOLL BROS., INC.'S CROSS-MOTION
### FOR SUMMARY JUDGMENT

STATE OF NEW YORK         )
                             :SS.:
COUNTY OF DUTCHESS    )

       DANIEL ZALINSKY, declares the following under the penalties of perjury:

    1.     I am Division Senior V.P. with Toll Bros., Inc., the defendant in the above action (hereinafter referred to as "Toll"). I was a member of the Toll development team that worked on Toll's prospective purchase of the Halley Estates II Subdivision in Village of Pomona, New York (the "Property"). This Declaration is based upon personal knowledge and the sworn deposition testimony of Pomona Village Engineer P.J. Corless. I submit this Declaration in opposition to the plaintiff's summary judgment motion and in support of Toll's cross-motion for summary judgment on its counterclaim.

**A.**    **Toll Bros., Inc.**

    2.     Toll is a national home builder based in Horsham, Pennsylvania which specializes in the construction of custom luxury homes throughout the United States. Toll often contracts to

purchase from local developers tracts of vacant land which have received fully approved, *final* subdivision approval for a specific number of building lots. Akin to the contract in the instant action, the purchase price is typically pegged to the number of approved building lots in the subdivision. This allows Toll to avoid the uncertainty, potential delays and significant expense associated with the subdivision approval process. Once the final subdivision approvals are received, Toll acquires title to the fully approved subdivision, pays the requisite fees to receive the building permits necessary to construct the subdivision infrastructure (roads, sewers, utilities, etc.) and begins marketing the project for construction of single-family homes for individual families.

3.      Toll offers a variety of home designs which vary by project. Toll also offers home buyers the ability to customize their homes within a subdivision with various options. As a result, unless and until *final* subdivision approval is granted, Toll is not in a position to effectively market a project. As explained in more detail below, for that reason Toll requires in its purchase contracts that subdivision developers secure *final* subdivision approval.

**B.      The Subdivision Property**

4.      The proposed subdivision Property consists of 66.2 acres of vacant land in the Village of Pomona in Rockland County (the "Village"). The Property is owned by the plaintiff Briarwood Farms, Inc. (hereinafter "Briarwood" or "plaintiff"). At the time Toll began negotiations with Briarwood for the Property's acquisition in 2005, plaintiff had already initiated in or about 2001 the process of securing from the Village Planning Board subdivision approval for a 41-lot, single-family home subdivision. As discussed below, the Property is dominated by hills and steep slopes. As a result, to secure *final* subdivision approval, Briarwood must have obtained steep slope permits from the Village's Planning Board for 33 of the proposed building lots. It ultimately refused to do so.

C.    **The Contract To Acquire The Property**

5.    On November 7, 2005, the parties entered into a contract (the "Contract") whereby Toll would acquire from Briarwood the Property which was the subject of the subdivision application (Ex. "3"). The Contract price was $13,325,00 or $325,000 per approved lot, with the price to be adjusted by $325,000 for each building lot which received the Village's *final* subdivision approval. (*Id.* ¶ 2). The Contract contained a liquidated damage clause capping any damage award to Briarwood to the $1,325,000 deposit. (*Id.* p. 8).

6.    As noted above, at the time the parties executed the Contract, the Property had been the subject of an ongoing four-year preliminary subdivision review process before the Village's Planning Board which Briarwood had initiated in 2001. Toll had no interest in injecting itself into the preliminary subdivision review process or acquiring anything other than a fully approved, fully buildable *final* subdivision. Therefore, the Contract clearly provided that Briarwood was obligated to secure same at its exclusive expense and that absent same Toll could terminate the Contract. Consistent with this "Final Subdivision Approval" requirement, Section 14(i) obligated Briarwood to provide at closing ". . . a complete set of Seller's [Briarwood's] Plans . . . of the <u>Final Approvals</u> (as hereinafter defined), including all construction drawings, grading plans, and the like, all of which Seller's Plans shall be complete and accurate, free and clear of liens and *paid for in full by Seller*." (*Id.* ¶ 14(i), p. 6) (emphasis added).

7.    Furthermore, Section 16(a)(iii) expressly conditioned Toll's obligation to purchase the Property upon Briarwood securing and delivering to Toll *final, unappealable* subdivision approval, defined in the Contract as follows:

> . . . the receipt by Seller for Buyer, *at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the 'Final Approval'), and the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer*

3

> *may file the plat and commence infrastructure improvements and*
> *apply for and obtain building permits.*

(*Id.* ¶ 16(a)(iii), p. 7)(emphasis added).

8.     The Contract further provided that the "Final Approval," as defined above, "shall be

*final and unappealable at the time of Closing and shall be subject only to such conditions as*

*Buyer [Toll] may approve at [Toll's] sole discretion, which approval shall not be unreasonably*

*withheld with respect to those modifications which do not have a material adverse effect on the*

*proposed development*." (*Id.* ¶ 16(b), pp. 7-8)(emphasis added).

9.     The Contract further provided that in the event Briarwood failed to secure and deliver

such Final Approval, Toll could cancel the Contract and recover its $1,325,000 deposit.  (*Id.* ¶

16(c)(ii), p. 8).[1]

10.     The need to receive "*final, unappealable* subdivision approval" was critical to Toll.

Toll is in the business of building homes.  Time is critical in this process.  Therefore, to avoid

potential extensive delays and the attendant expense associated with securing final subdivision

approval and/or litigation concerning same, the Contract expressly provided that Toll was to receive

"*final, unappealable*" subdivision approval, with all the requisite permits, to enable Toll "upon

posting of customary inspection fees . . . [to] file the plat and commence infrastructure improvements

and apply for and obtain building permits." (*Id.* ¶ 16(a)(iii), p. 7).  Toll never received such final

approval from Briarwood.  As discussed below, Briarwood's legal counsel unequivocally advised

Toll in writing that his client would not secure the multiple steep slope permits required for *final,*

*unappealable* subdivision approval.  Indeed, I understand that to this day Briarwood has still not

received final subdivision approval.

---

[1]          "If on or before the date of closing all contingencies and conditions specified herein are not or cannot be
satisfied, then Buyer shall have the option of . . . (ii) canceling this Agreement in which case this Agreement shall
become null and void and the Deposit paid to Buyer [Toll]."

**D.    The Due Diligence Process**

11.    Section 13 of the Contract provided Toll with a 45-day due diligence period to ". . . perform engineering, environmental and such other feasibility studies as [Toll] determines in its sole discretion." (*Id.*, ¶ 13). Toll had the unilateral right to cancel the Contract during this period which was thereafter extended for an additional 45 days. (*Id.*). Section 13 further provided that if Toll failed to exercise its discretionary right to unilaterally terminate the Contract during the due diligence period, Toll would "waive this contingency." The purpose of the due diligence process was to allow Toll to conduct engineering and environmental reviews to ascertain potential latent defects. Toll did so and chose to continue with the Contract, thereby waiving its unilateral right to terminate the Contract under the due diligence clause.

12.    However, by deciding to continue with the Contract following the due diligence period, Toll did not, as now argued by plaintiff, waive its contractual right to receive *final, unappealable* subdivision approval, including the requisite steep slope permits. Indeed, as discussed more fully below (*infra.* ¶ ¶ 17 to 19), the Village Ordinance expressly contemplated that the steep slope permits would be reviewed and secured by Briarwood during the Planning Board's final subdivision review and approval process.

**E.    The Subdivision Review Process**

13.    Following the Contract's execution, a Toll development team (of which I was a member) monitored Briarwood's progress in the subdivision review process. Representatives of Toll and Briarwood would periodically meet to discuss the progress of the subdivision application. From the inception, Village Engineer P.J. Corless, who acted as the Planning Board's engineer and technical consultant, identified potential storm water erosion and steep slope permits as significant issues. In memos dated December 30 and 31, 2005 (Exs. "4" and "5"), Mr. Corless identified eight pages of comments and required revisions to the 17-sheet (i.e. page) proposed preliminary

subdivision plan.  In the December 30, 2005 memo, Mr. Corless specifically identified the steep

slope issue, noting the following:  "Sheet No. 7 – the disturbed slope map: there are several lots (7)

shown which will have disturbances in the 35% slopes.  Will these lots require steep slope

variances?"  (Ex. "5," p. 5).[2]

     (i)     **The Subdivision Approval Process in New York**

     14.     In New York the securing subdivision approval is a multi-step approval process.

There are three core approval components.  First, a Planning Board reviews a proposed preliminary

subdivision "plat" or plan and must issue "preliminary subdivision approval" which provides

conceptual generic approval for the proposed subdivision (e.g. road, utilities, sewer infrastructure,

basic lot layout, etc.).  *See generally,* Village Law Sections 7-728 and 7-730.  Second, in conjunction

with the preliminary subdivision approval review, the reviewing municipal entity (typically a

Planning Board), triggers the environmental review required under New York's State Quality

Environmental Review Act ("SEQRA"), declaring itself lead agency, issuing a determination of

environmental significance ("negative declaration or positive declaration").  (*Id.*).  As the

preliminary approval process progresses, the applicant submits for review a draft environmental

impact statement ("DEIS") which is designed to identify and address all the significant

environmental issues posed by the proposed development.  Thereafter, a Planning Board will issue

"preliminary subdivision approval" which provides the applicant with general conceptual approval of

the proposed subdivision plan.  If preliminary subdivision approval is received, the project proceeds

to the next and third step of the approval process – final subdivision review and approval.  A

proposed "final subdivision plat" is prepared for the Planning Board's review reflecting the revisions

generated via the preliminary subdivision approval process.  During the final stage critical

engineering and planning details of the final plat are finalized to the satisfaction of the Planning

---

[2]     As discussed below (*infra.* p. 7), the Village Steep Slope Ordinance characterized steep slopes in excess of 35% as the most severe and as "Extremely Steep Slopes."

Board and all requisite ancillary permits and approvals issued.  Finally, the Planning Board issues a formal resolution providing for "final subdivision approval" which allows the applicant to file the approved final subdivision "plat" with the County Clerk.  Upon filing of the final plat, the vacant, multi-acre plat which was the subject of the application is legally "subdivided" into smaller individual building lots.  A developer is then able to apply for and receive building permits to build single-family homes on these individual building lots.

      **(ii)**      **<u>The Village's Subdivision Regulations</u>**

     15.      The Village's subdivision regulations mirror the process set forth in Village Law Section 7-728, *et seq.*  Chapter 118 of the Village Code sets forth the procedures for subdivision approval and requires (i) preliminary subdivision approval, (ii) final subdivision approval, and (iii) SEQRA approval in conjunction with the subdivision review process.  (Ex. "6," Sections 118-10(A) and (B)).  Village Code Section 118-11 sets forth the procedure for obtaining approval of a "preliminary plat application" and Section 118-28 specifies the requisite engineering and technical details for preliminary plats.  (*Id.* Sections 118-11 and 28).  Similarly, Village Code Section 118-12 sets forth the procedure for securing "final plat" approval and Section 118-30 the requisite details for the "final plat."  (*Id.* Sections 118-11 and 30).

     16.      Chapter 118 of the Village's Code also governs subdivision design requirements and specifically directs applicants to design a subdivision ". . . in reasonable conformity to existing topography to minimize grading, cut and fill to retain, insofar as possible, the natural contours, to limit storm water runoff and to conserve the natural vegetative cover and soil."  (*Id.* Section 118-22(A)(1)).  Chapter 118 of the Village Code further provides that steep slope preservation and the Steep Slope Ordinance (Chapter 119), "shall be followed where applicable" by the Planning Board in the subdivision review process.  (*Id.* Section 118-22(B)(3)).

**(iii)    The Village's Steep Slope Ordinance**

17.    Chapter 119 of the Village Code, entitled "Site Development Plan Review," governs

the development of land which contains steep slopes.[3] (Ex. "7").  The Ordinance defines and

separates "steep slopes" into three categories:

STEEP SLOPE

A.    Any geographical area proposed for disturbance, whether
on a single lot or not, having a topographical gradient of
15% or greater (ratio of vertical distance to horizontal
distance) with a minimum horizontal dimension of 10 feet,
whether man-made or natural, and whether created by a
retaining structure or not.  Steep slopes are further
categorized as: [Amended 2-28-2005 by L.L. No. 1-2005]

(1)    MODERATELY STEEP SLOPE – A slope equal to
or greater than 15% but less than 25%;

(2)    VERY STEEP SLOPE – A slope equal to or greater
than 25% but less than 35%;

(3)    EXTREMELY STEEP SLOPE – A slope equal to
or greater than 35%.

(*Id.* Section 119-1(A)).

18.    Pursuant to Section 119-2(A), a property owner cannot disturb a steep slope area

without having first obtained a "site development plan permit", commonly referred to as a steep

slope permit.  (*Id.*).  Where, as here, steep slope permits are required in conjunction with subdivision

approval under Village Code Chapter 118, the Planning Board is the "approving authority" for

issuance of all steep slope permits.  (*Id.* Section 119-4(B)).  Chapter 119 goes on to describe the

phalanx of hearings, fees and submissions which must transpire in order to secure a steep slope

permit.  (*Id., see* Sections 119-5 through 119-7).

19.    Significantly, Chapter 119 specifically contemplates and encourages the *simultaneous*

review and approval of steep slope permits by the Planning Board in conjunction with the Planning

---

[3]    Briarwood has ignored the Village's Steep Slope Ordinance and its obvious significance.  We submit its silence
in this regard speaks volumes.

Board's subdivision approval review process and attendant SEQRA review:

### § 119-7.  Procedures for review and decision making.

A.    It is the intent of this chapter to incorporate the consideration of steep slope protection into the Village's existing land use and development approval procedures in conjunction with the procedures of the New York State Environmental Quality Review Act. ***To the maximum extent possible, the review, hearings and decisions upon any application processed under this chapter will run concurrently with similar procedures that the approving authority may undertake in connection with the other applications that are directly related***.

(*Id.* Section 119-7(A))(emphasis added).

**(iv)    The Deposition Testimony of Village Engineer Corless**

20.    Our attorneys deposed Village Engineer P.J. Corless who has been the Village Engineer for 31 years and was actively involved in the Village's review of the subdivision application which is the subject of this litigation. The transcript of his deposition testimony is annexed as Exhibit "8."

21.    Consistent with the aforesaid provisions of the Village Code, Mr. Corless confirmed that

- The purpose of the Steep Slope Ordinance "was to control land disturbance on areas that would result in water pollution . . ." (Ex. "8," p. 10, l. 5-10);

- The law prohibits the disturbance of any steep slope without the issuance of a steep slope permit. (*Id.* p. 10, l. 15 to p. 11, l. 9);

- Under Section 119-4, any steep slope permits required in conjunction with a subdivision application are referred to and issued by the Planning Board. (*Id.* p. 12, l. 15 to p. 13, l. 7);

- Steep slope permits under the Steep Slope Ordinance are issued by the Planning Board as part of the final subdivision review process. (*Id.* p. 23, l. 11 to p. 24, l. 19);

- In order to secure final subdivision approval, a developer must obtain from the Planning Board during the final subdivision plat review process steep slope permits for houses designated on building lots impacted by steep slopes. (*Id.* p. 25, l. 13-23);

- Steep slope permits are the type of final details which must be resolved by an applicant to progress from preliminary subdivision approval to receive final subdivision approval from the Planning Board. (*Id.* p. 26, l. 2-6);

- Under Section 119-7, the information required to be submitted to Planning Board to secure steep slope permits is rather elaborate, requires additional public hearings, the posting of letters of credit and may involve a phased site plan review if desired by the Planning Board. (*Id.* p. 26, l. 7 to p. 27, l. 3);

- No building permit can be issued for the construction of a single-family home on a steep slope area until the Planning Board issues *final* subdivision approval. (*Id.* p. 14, l. 8-13 and p. 28, l. 4-14);

- Based upon Village Engineer Corless' experience, its takes 12 to 24 months to secure steep slope permits between the time of preliminary subdivision approval and final subdivision approval. (*Id.* p. 30, l. 21 to p. 31, l. 11);

- After issuance of final subdivision approval with steep slope permits, a new steep slope permit must be secured from the Planning Board only if the owner of the lot wants to build a house that exceeds the parameters of the "hypothetical" home depicted on the final approved subdivision plat for which the steep slope permit was issued. This approval process typically takes three to six months. (*Id.* p. 31, l. 12-19);

- The Halley Estates II proposed preliminary subdivision plat included a Disturbed Slope Map (Ex. "9") which depicted (i) the hypothetical house locations on each building lot and (ii) those areas within the subdivision impacted by steep slopes which required a steep slope permit. (Ex. "8," p. 39, l. 14 to p. 40, l. 15);

- Thirty-three (33) of the 40 single-family lots depicted on the Halley Estates II proposed preliminary subdivision map required steep slope permits from the Planning Board before final subdivision approval could be granted. (*Id.* p.

41, l. 19 to p. 43, l. 23);[4]

- Each of the 33 building lots with steep slopes required a steep slope permits to be issued by the Planning Board. (*Id.* p. 43, l. 22 to p. 44, l. 7);

- To date no steep slope permits have been issued for those 33 lots and the Planning Board has <u>not</u> granted final subdivision approval for the land which is the subject of this litigation. (*Id.* p. 44, l. 8-13);

- Until final subdivision approval and the requisite steep slope permits are granted, no building permit for the building lots can be issued to enable construction of single-family homes thereon. (*Id.* p. 45, l. 5-16);

- When final subdivision approval is granted, the Planning Board will have considered all the criteria under the steep slope law. (*Id.* p. 62, l. 4-15). To the extent a lot owner seeks to construct a home or improvement (e.g. pool) which exceeds the size of the hypothetical house depicted on the approved final plat, the owner must go back before the Planning Board to secure a modified steep slope permit. (*Id.* p. 62, l. 16-24); and

- The process of securing a modified steep slope permit is not merely a matter of "tweaking" but an extensive process which involves costs ranging "in the hundreds of thousands of dollars." (*Id.* p. 55, l. 3-15).

**F.    <u>Briarwood Refuses to Correct Material Defects in the Subdivision Plan Which Would Have a Materially Adverse Impact Upon the Subdivision</u>**

22.    Beginning in or about October 2006, representatives of Toll and Briarwood began meeting to discuss the various requirements which the Village Planning Board and Village Engineer had identified as conditions to preliminary subdivision approval.[5] We had an open dialogue with the Briarwood development team regarding these issues. Despite our best efforts, as of the end of December 2006, significant issues remained which had a material adverse impact on the proposed

---

[4]    Mr. Corless testified, and Briarwood's Disturbed Slope Map reflects (Ex. "9"), that the following 33 building lots required steep slope permits – Lots 1 through 21, 24 through 29, 31 through 36. Only seven lots (22, 23, 30 and 37 through 40) did not require steep slope permits. (*Id.*).

[5]    Those issues were identified in Mr. Corless' December 30 and 31, 2005 memos (Exs. "4" and "5"), as well as the Planning Board's January 12, 2006 resolution granting preliminary subdivision approval (Ex. "11").

development which constituted grounds to terminate the Contract under Sections 16(a)(iii) and (b)
(Ex. "10"). In an effort to resolve those issues, on December 22, 2006, Toll forwarded a letter to
Briarwood objecting and formally disapproving eight conditions which materially affected the
viability of the proposed development, as required under Sections 16(b), (c) and (d) of the Contract.
Toll requested that, pursuant to Section 15(f) of the Contract, Briarwood diligently perform the work
needed to resolve and remove the conditions for approval of the subdivision. (Ex. "3"). Absent
same, Toll reserved the right to terminate the Contract under Section 16(c). (*Id.*).

23.    While all eight conditions were significant, the most troublesome was the condition
contained in the then draft Planning Board resolution granting preliminary subdivision approval
which stated in pertinent part: "Lots that are subject to steep slope requirements will be subject to
Planning Board site plan review." (Ex. "11," p. 2, ¶ 7).

24.    As discussed above, 33 out of the 41 proposed building lots (or 80.5% of the project)
required steep slope permits – an approval process which Village Engineer Corless estimated could
last 12 to 24 months. (Ex. "8," p. 30, l. 22-33). The impacted lots are reflected on the "Disturbed
Slope Map" which was part of the preliminary subdivision plat approved by the Planning Board.
(Ex. "9"). The Contract required, and Toll expected, Briarwood to secure the required steep slope
permits in conjunction with obtaining *final* subdivision approval. Section 16(a)(iii) required such
Final Approval and the Village's Steep Slope Ordinance expressly contemplated that steep slope
review and permits were to be secured in conjunction with the final subdivision review process.
Indeed, Village Engineer Corless testified that a developer such as Briarwood had to obtain steep
slope permits *in order to secure* final subdivision approval. (Ex. "8," p. 25, l. 13-23). Therefore,
Toll expected Briarwood to take those steps necessary to secure steep slope permits for the
"hypothetical" houses on the 33 lots with steep slopes depicted on the approved preliminary
subdivision plan.

25.    Toll was not obligated to close under the Contract until the steep slope permits were secured, as part of *final* subdivision approval, for two fundamental reasons. First, without the steep slope permits Briarwood could not deliver to Toll the requisite *final, unappealable* approval which would allow Toll to pay customary fees, obtain building permits and begin the subdivision construction process. Therefore, the *final, unappealable* subdivision approval obligation of Section 16(a)(iii) was not satisfied. Second, and equally fundamental, without the steep slope permits and *final* subdivision approval, neither Toll nor Briarwood could ascertain the actual number of "approved" building lots upon which the purchase price was based. Stated simply, unless and until Briarwood secured the steep slope permits for the hypothetical house locations and *final* subdivision approval, the final purchase price under the Contract could not be calculated, rendering the Contract unenforceable.

26.    Despite Briarwood's assertions to the contrary, Toll was not concerned that the steep slope permits were for "hypothetical" house locations depicted on the subdivision map. This is standard procedure in the industry. Indeed, as noted by Village Engineer Corless, the purpose of hypothetical house locations in the subdivision approval process is to assure a Planning Board that a house can actually be built on an approved lot (Ex. "8," p. 58, l. 16-24).

27.    Had Briarwood secured *final, unappealable* subdivision approval (with the steep slope permits for the impacted 33 lots), Toll would have closed the transaction and paid the fees necessary to begin the construction of roadways and other requisite subdivision infrastructure. Thereafter, Toll would have begun a formal marketing plan for the development, marketing individual lots based upon the approved hypothetical house locations. In the event an individual purchaser chose to build a house on a steep slope lot that exceeded the parameters of hypothetical house location, Toll would have developed the appropriate site plan and returned to the Planning Board for a modified steep slope permit as described by Village Engineer Corless. (Ex. "8," p. 62, l.

16-24). However, the costs associated with this additional approval process would have been incorporated into the purchase price for the home. Therefore, the notion that Toll would not accept *final* subdivision approval and steep slope permits for *hypothetical house locations* (i) contradicts common sense, (ii) is simply not true, and (iii) was affirmatively rejected as an option by Briarwood's attorney. As discussed below (*infra.* ¶ 32), Briarwood's counsel, Donald Tirschwell, advised Toll that Briarwood would not secure any steep slope permits for hypothetical houses or otherwise.

28.    David Zigler, Briarwood's land use consultant, claims in his affidavit that Toll never provided individual lot plans to Briarwood – and asserts that if Toll had done so, Briarwood could have secured steep slope permits for those plans in conjunction with obtaining final subdivision approval. (Zigler Aff., ¶ 10). This assertion is not true nor is it germane since Briarwood never delivered the "*final, unappealable* subdivision approval" required under the Contract. Moreover, this self-serving assertion is counter-intuitive and emasculated by the position articulated at that time by Briarwood's own attorney. First, Briarwood <u>never</u> requested such plans for good reason. Until Toll had prospective buyers for individual lots, it could not provide with certainty building plans for those lots. Toll is a custom builder of luxury homes. Toll develops individual lot site plans depending upon the desires of our buyers. Toll could not (and would not) begin the process of drawing detailed site plans for a potential 41-lot subdivision until it secured the fundamental consideration to which it was entitled under the Contract – *final, unappealable* subdivision approval. It would have been a premature exercise in futility and fiscal waste to begin drafting individual house plans for 41 lots prior to knowing whether Toll was going to actually purchase and develop the project. Second, in forcefully rejecting Toll's request that Briarwood secure the steep slope permits, Briarwood's attorney did not request and/or demand that Toll provide home plans for the 33 steep slope lots; nor did he represent that his client would secure approval for same. We submit this

reality eviscerates Mr. Ziegler's belated, self-serving argument to the contrary.

29.     By letter dated December 28, 2006, Briarwood responded to Toll's December 22, 2006 letter and adequately addressed three of the eight conditions identified by Toll as materially adverse to the development. However, five objectionable conditions remained and by letter dated January 22, 2007, Toll again reiterated its request that Briarwood resolve same and that, failing same, Toll would terminate the Contract. (Ex. "12"). The five remaining objectionable items were as follows:

- Repavement of Klinger Court

    Klinger Court was a road to be constructed within the subdivision. The original preliminary subdivision plans reviewed during the due diligence period provided that any road damage caused during construction had to be repaired before formal dedication of the road to the Village. This was a standard provision and not objectionable to Toll since most damage is modest and easily repaired.

    However, the revised preliminary subdivision plans which were the subject of the Planning Board's proposed preliminary subdivision approval enhanced this repair obligation significantly. The revised plans provided that if the road was damaged, the Village Engineer could, in his discretion, require Toll to repave the entire roadway with a 1 ½ inch wearing course, curb to curb. Repaving the entirety of Klinger Court, which was 27,000 square feet, would cost Toll an additional $30,000.

- The Steep Slope Issue

    As Toll reiterated its position that Section 16(a)(iii) of the Contract required "satisfaction by Seller of any conditions of Final Approval, such that upon posting of customary security and payment of application and inspection fees by Toll, Toll may file the plat and commence infrastructure improvements and apply for and *obtain building permits*" (emphasis added). The steep slope permit review process was precisely the type of additional review and approval process which was intended to be addressed as part of the subdivision review process, so that Toll has comfort that all lots are fully developable without the need for further approvals.

- Decreasing the Grade of the Cul-de-Sac Road

  Village Engineer Corless conditioned final subdivision approval on the grade of the road servicing the cul-de-sac (which contained the premium subdivision lots) to have a maximum grade of no more than 4%, rather than the standard 10% provided under applicable Village Code provisions relating to roadways. The cost of the grading, blasting and other associated work required to reduce the grade of the roadway from 10% to 4% was approximately $560,000. In addition, this change significantly impacted the value of the 10 premium lots in the cul-de-sac area (Lots 9 through 18), resulting in a significant diminution of anticipated value.

- Easements Required for Existing Drainage Swale in Rear of Lots 25 through 28

  The preliminary subdivision plans Toll reviewed during the due diligence period did not require any drainage easements for the swale located in the rear of Lots 25 through 28. However, the revised preliminary subdivision plans which were the subject of the Planning Board's proposed preliminary approval resolution required (i) a new drainage system to be installed and (ii) drainage easements to be created which would burden each of these four lots. Toll's cost of installing the additional drainage work would have been $85,000. In addition, burdening these lots with a drainage easement would have an adverse impact on their market value in an amount that would not be calculated with any certainty.

- Additional Landscaping Requirement

  The landscaping obligations were also dramatically changed by the revised preliminary subdivision plans which were the subject of the Planning Board's preliminary subdivision approval resolution. The original plans reviewed by Toll during the due diligence period provided for typical landscaping throughout the subdivision. However, the revised plans which were the subject of the Planning Board's preliminary approval resolution, required installation of decorative plantings far in excess of that initially required. Therefore, there was substantial confusion concerning the extent, nature and cost of the landscaping that had to be installed. The potential additional cost could easily have exceeded $100,000. Toll

therefore requested that this issue be clarified.

30.    Briarwood's refusal to secure the steep slope permits necessary for *final, unappealable* subdivision approval alone constituted a material adverse default warranting Contract termination under Section 16(d). Moreover, at a minimum, collectively the aforesaid five material objections would have imposed on Toll additional costs of at least $775,000 and had a significant adverse impact on the market value of multiple building lots. As such, the five objectionable conditions cited by Toll collectively had a "material adverse effect" on the development as provided in Section 16(d), warranting the termination of the Contract as a result of Briarwood's refusal to cure same.

31.    In light of the foregoing, through its January 22, 2007 letter, Toll formally terminated the Contract pursuant to Section 16(c) and provided Briarwood of notice of its Contract default in failing to diligently pursue in good faith the resolution of condition to closing under Section 15(f). (*Id.* p. 3).

**(i)    Briarwood's Response Confirmed its Refusal to Cure the Steep Slope and Other Materially Adverse Objections**

32.    By letter dated January 30, 2007, Briarwood's counsel, Donald Tirschwell, Esq. rejected Toll's Contract termination notice. (Ex. "13"). He purported to defend Briarwood's failure to cure each of the five materially adverse objections. His response with respect to the steep slope permit issue is particularly germane to and reflective of Briarwood's Contract breach in steadfastly refusing to secure such permits, even for the hypothetical home sites depicted on Briarwood's preliminary subdivision plat. Mr. Tirschwell's letter stated in pertinent part:

> • Item 3 – During the due diligence period, Toll Bros. had the obligation and the opportunity of reviewing the Village's Subdivision Regulations and Zoning Code. The Zoning Code and subdivision regulations have not changed since the date the Contract was signed or since the date that the due diligence period expired. ***In order for the Purchaser [Toll] to obtain building permits, Purchaser***

17

>*[Toll] must comply with the Village Codes*. It is
>impossible to comprehend Toll Bros. claiming that 'they
>did not know that the gun was loaded'. *The referenced
>requirement 'has been on the books' of the Village and if
>it was missed by Toll Bros., that is Toll Bros. fault and not
>an obligation of Seller [Briarwood] or a basis for Toll
>Bros. to claim cancellation of the Contract of Sale.*
>
>The Village's steep slope ordinance does not permit the
>Village to deny a building permit, however, the steep slope
>ordinance does permit the Village Planning Board to
>require certain conditions as to those lots which are subject
>to the steep slope ordinance. Again, the steep slope
>ordinance was 'on the books' when the Contract was
>signed and during a due diligence period.
>
>Toll Bros. has no right to cancel the Contract because they
>failed to take notice of the Village's steep slope
>requirements.

(Ex. "13," p. 3)(emphasis added).

33.    Stated simply, Mr. Tirschwell confirmed what Toll already knew – Briarwood was

not willing to spend the time (estimated by Village Engineer Corless to be 12 to 24 months) or

money necessary to secure steep slope permits for 80.5% (33 out of 41) of the subdivision lots – a

fundamental requirement for *final, unappealable* subdivision approval. Depriving Toll of the

requisite approvals for 33 out of 41 potential building lots constituted a flagrant violation of the

Contract, constituted an obvious adverse material impact on the development, and warranted

cancellation by Toll under Sections 16(a)(iii), (b) and (d) of the Contract.

34.    Moreover, Mr. Tirschwell's rantings aside, he is simply wrong about Toll's alleged

ignorance of the Village Ordinance and the substance of the Ordinance itself. Toll was aware of (i)

Chapter 119 and the need for steep slope permits; (ii) that Chapter 119-7 specifically contemplated

that those very permits would be secured by Briarwood in conjunction with the SEQRA review and

final subdivision approval, and (iii) the lengthy and costly process involved in securing same.

Similarly, Mr. Tirschwell's assertion that it was Toll's "obligation" to secure such permits flies in

the face of the clear and unequivocal *final, unappealable* approval standard in Section 16(a)(iii) which clearly provided that Briarwood, not Toll, was obligated to secure *final, unappealable* subdivision approval.

35.     Moreover, Mr. Tirschwell is equally mistaken when he argues that Toll somehow "waived" any objection to Briarwood's compliance with the Village's steep slope regulations by not objecting to same during the due diligence period. This argument, which is repeated in the Ziegler Affidavit and in Briarwood's brief (Plaintiff Br. at pp. 13-14) is simply silly. Toll could not (and did not) waive this fundamental contractual obligation of Briarwood, anymore than Briarwood could or would "waive" Toll's obligation to pay the purchase price. The Contract expressly obligated Briarwood "at [Briarwood's] sole cost and expense" to obtain "final, unappealable subdivision approval in accordance with the Subdivision Plan, and the satisfaction by [Briarwood] of any conditions of Final Approval, such that upon posting of customary security and payment of application and inspection fees by [Toll], [Toll] may file the plat and commence infrastructure improvements and apply for and obtain building permits." (Ex. "3," Section 16(a)(iii)). By refusing to secure the steep slope permits for 33 out of 41 lots, Briarwood unequivocally breached this Contract provision, entitling Toll to cancel the Contract and the return of the $1,325,000 Contract deposit.

36.    Accordingly, for the foregoing reasons and those discussed more fully in Toll's accompanying memorandum of law, Briarwood's motion should be denied, Toll's cross-motion granted, the complaint dismissed, and Toll granted a judgment on its counterclaim for the return of the Contract deposit.

Dated: June 17, 2008

DANIEL ZALINSKY