# EXHIBIT 3(a)

## AGREEMENT OF SALE

      THIS AGREEMENT (this "Agreement") is made this __7__ of November, 2005, between **BRIARWOOD FARMS, INC.**, 5 Eastview Road, Monsey, New York 10952, Attn: Joseph Herkowitz, ("Seller") and **TOLL BROS., INC.**, 250 Gibraltar Road, Horsham, PA 19044, or its nominee ("Buyer").

### WITNESSETH:

      In consideration of the covenants and provisions contained herein, and subject to the terms and conditions hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

1.    Sale. Seller hereby agrees to sell and convey to Buyer, who hereby agrees to purchase from Seller, unimproved market rate residential building lots (each a "Lot") along with the related rights of way within the project known as "Halley Estates II" (the "Project"), located on approximately 66.2697 acres in the Village of Pomona, Town of Haverstraw (the "Township"), Rockland County (the "County"), New York, depicted on the subdivision plat for the Project prepared by Atzl, Scatassa, and Zigler dated May 22, 2005 (the "Subdivision Plan"), which land is more particularly described on Exhibit "A" (the "Property"). The Property includes (i) all tenements, hereditaments, appurtenances, easements, covenants, permits, approvals, escrows and other rights arising from or appertaining to the land; (ii) all improvements, topsoil, trees, shrubbery and landscaping situated on, in or under or used in connection with the land; (iii) all agreements that are in force and effect and benefit the Property; (iv) all intangible property now or hereafter owned by Seller and used by Seller in the ownership or operation of the Property including all trademarks, logos and tradenames; and the right to use the name "Halley Estates II" and (v) all of Seller's right, title and interest in surveys, plans, specifications, reports and other engineering information relating to the Property, including, without limitation, the Subdivision Plan (together, "Seller's Plans"). Seller agrees to provide to Buyer copies of Seller's Plans in its possession or control within five (5) business days of the date of this Agreement.

2.    Purchase Price. The purchase price (the "Purchase Price") for the Property is Thirteen Million Three Hundred and Twenty-Five Thousand and no/100 Dollars ($13,325,000) based on a Property yield of 41 Lots. The Purchase Price shall be increased or decreased by $325,000 for each Lot more than or less than 41, respectively, which the Property yields. The Purchase Price shall be paid as follows:

    (a) Upon the date hereof, Buyer shall deliver to Isaac S. Scheiner, Esq. ("Escrow Agent"), Buyer's check in the amount of One Million Three Hundred Thousand and no/100 Dollars ($1,300,000) (such amount and any interest thereon, shall hereinafter be referred to as the "Deposit") to be held in escrow in accordance with the terms of this Agreement. At Buyer's option the Deposit may be an irrevocable letter of credit in form and substance reasonably acceptable to the Seller and issued by a bank reasonably

        acceptable to the Seller, all for the benefit of Seller, which letter of credit shall be held by the Escrow Agent, as escrow agent in accordance with Section 23 below. If the Deposit is in the form of a letter of credit, then Buyer will convert the same to cash in accordance with the terms of this Agreement when cash portions of the Deposit are to be released to the Seller (i.e., at Settlement). At any time during the term of this Agreement, Seller will cooperate in releasing the letter of credit if Buyer elects to replace the same with cash in lieu of having the letter of credit drawn upon.

    (b)    At Closing, the Deposit shall be paid to Seller and credited to Buyer and Buyer shall pay Seller the balance of the Purchase Price, subject to all adjustments as provided herein, by certified or title company check or by wire transfer of immediately available funds.

3.    <u>Title</u>.

    (a)    Seller hereby agrees that title to the Property shall be good and marketable and such as will be insured by a title company of the State of New York selected by Buyer (the "Title Company") at regular rates, subject only to such matters reflected on the Commitment (as hereinafter defined) issued by the Title Company which are not disapproved by Buyer in accordance with Section 3(b) below (together, the "Permitted Exceptions").

    (b)    Buyer shall at its expense obtain from the Title Company a commitment for title insurance in an amount not less than the Purchase Price (the "Commitment"), and may, at its option, obtain from a licensed land surveyor or registered civil engineer acceptable to Buyer a survey of the Property (the "Survey"). Promptly upon receipt, Buyer shall furnish to Seller a copy of the Commitment, including copies or abstracts of all documents referred to therein to the extent made available to Buyer by the Title Company, and a copy of the Survey (if obtained by Buyer). Prior to the expiration of the Due Diligence Period, Buyer shall give specific written notice to Seller of any matters affecting title to the Property and disclosed in the Commitment and/or the Survey (if obtained) which are disapproved by Buyer. The failure of Buyer to deliver any such written notice of disapproval within the aforesaid period shall be deemed to constitute Buyer's approval of the condition of title of the Property as shown in the Commitment and the Survey (if obtained), excepting any matter(s) susceptible of satisfaction and removal at or prior to Closing by the payment of money (as specifically described in the documents supporting said title exceptions), including without limitation unpaid mortgages, judgments, taxes, sewer and water charges, and assessments (each a "Liquidated Lien"; collectively, the "Liquidated Liens"), which Liquidated Liens Seller shall satisfy at or prior to Closing. If Buyer disapproves of any matter shown in the Commitment and/or the Survey by delivering timely written notice of such disapproval to Seller, as provided above, Seller shall, for a period of thirty (30) days after receiving the specific written notice of Buyer's disapproval, attempt in good faith and using its commercially reasonable efforts to

TB 0082

correct all such matters, provided that Seller shall have the right to postpone satisfaction of any Liquidated Lien until the Closing if Seller shall, within such 30-day period, undertake in writing to do so. If Seller shall be unable to eliminate any such matter or matters within the aforesaid time periods Buyer shall elect, by written notice to Seller delivered within seven (7) days after the expiration of the aforesaid period of thirty (30) days (or within seven (7) days after Seller notifies Buyer of Seller's inability to correct any such matter, as the case may be), either:

(i) to waive such disapproval and to accept title to the Property subject to such title matters disclosed by the Commitment and/or Survey which Seller shall be unable to correct, provided that Seller shall pay or satisfy all Liquidated Liens at Closing; or

(ii) to terminate this Agreement, in which event the Deposit with all interest earned therein shall immediately be returned to Buyer. In the event of such termination, this Agreement shall be null and void and the parties shall have no further liability or obligation hereunder.

(c) Seller shall execute and deliver to the Title Company such releases, documents, indemnities and affidavits (including an affidavit of title) as shall be necessary for the elimination of any standard or printed exceptions in Buyer's final title policy, the exception for filed and unfiled mechanics' liens and the satisfaction of any Internal Revenue Service disclosure and reporting requirements (i.e., "form 1099").

4. Closing. Closing ("Closing" or "Closing") shall be made at the offices of the Title Company and on or by the date which is thirty (30) days following the date upon which all conditions to Closing set forth in Section 16 hereunder have been satisfied.

5. Possession. Possession is to be given at the time of Closing, free of all leases and other occupancy, by bargain and sale deed with covenants against grantor's acts.

6. Apportionments. Taxes shall be apportioned pro-rata as of the date of Closing. For purposes of making such apportionments, Seller shall be responsible for producing on or prior to Closing copies of all tax bills and receipts of payment or tax searches from the taxing authority. Any transfer taxes (state, county, city and local), any "roll-back" taxes, and all interest thereon, shall be the responsibility of Seller.

7. Formal Tender Waived. Formal tender of an executed deed and purchase money is hereby waived in order to declare default.

8. Buyer's Default. Should Buyer default under this Agreement and such default is not cured within ten (10) days written notice from Seller, then the Deposit shall be retained by Seller as Seller's sole and exclusive remedy for such breach as liquidated damages.

9.  <u>Seller's Default</u>. Should Seller default under this Agreement and such default is not cured within ten (10) days written notice from Buyer, then Buyer shall be entitled to pursue any right, power or remedy available to Buyer at law or in equity, including, without limitation, the right to specifically enforce this Agreement against Seller.

10. <u>Condemnation</u>.

    (a)  All risk of loss or damage to the Property by casualty of any nature prior to Closing shall be borne by Seller.

    (b)  If, prior to Closing, any portion of the Property is condemned, Buyer shall have the option of (i) terminating this Agreement, in which event this Agreement shall be null and void and Buyer shall be paid the Deposit, or (ii) proceeding with the Closing, in which event the entire condemnation proceeds shall be delivered to Buyer at Closing hereunder, or, if such proceeds have not yet been paid, the right to receive such proceeds shall be assigned to Buyer at Closing hereunder by instrument acceptable to Buyer. Buyer shall exercise its option within fifteen (15) days after it receives notice from Seller of any such condemnation.

11. <u>Compliance with Notices, Ordinances</u>. Seller shall comply with any notices given or ordinances enacted by any governing authority prior to the date of Closing for which a lien could be filed against the Property.

12. <u>Brokers</u>. Buyer and Seller mutually represent to each other that no brokers, agents or finders brought about this Agreement or the conveyance of the Property to Buyer pursuant hereto. Buyer and Seller each agree to indemnify and hold the other harmless from and against any liability arising from a breach of the above representation.

13. <u>Due Diligence Period</u>. Between the time of execution of this Agreement and Closing, Seller agrees that Buyer, its representatives and consultants shall have the right to enter upon the Property to perform engineering, environmental and such other feasibility studies as Buyer determines in its sole discretion. Buyer and Seller further agree that within forty-five (45) days of the date of this Agreement (the "Due Diligence Period"), should Buyer desire not to purchase the Property as a result of such studies, or as a result of Buyer's dissatisfaction with the Property based upon Buyer's review of Seller's Plans or for any other reason whatsoever, Buyer shall have the right to terminate this Agreement upon written notice to Seller in which case the Deposit shall be returned to Buyer and there shall be no further liability of the parties hereunder. Failure to notify Seller prior to the expiration of the Due Diligence Period shall act as Buyer's election to waive this contingency. If Buyer causes any damage to the Property as a result of its studies performed pursuant to this Section, and Buyer elects not to purchase the Property, Buyer shall reasonably repair such damage. If Buyer terminates this Agreement pursuant to this Section 13, Buyer shall deliver to Seller, without representation, warranty or recourse, copies of any materials (excluding any proprietary or confidential materials or information) developed by third parties for Buyer in connection with the Property.

14. **Seller's Representations, Warranties and Covenants.** Seller covenants, represents and warrants to Buyer as follows (each such representation and warranty being true and correct as of the date of the Agreement and shall be true and correct on the date of Closing):

    (a) Seller is the sole legal owner of the Property in fee simple and the Property is not subject to any lease, option, right of first refusal or agreement of sale. Seller has the full power and authority to execute, deliver and perform this Agreement and all agreements and documents referred to in this Agreement. The person who has executed this Agreement on behalf of Seller has the authority to do so.

    (b) To the best of Seller's knowledge, there is no action, suit or proceeding pending or threatened against or affecting Seller or the Property or relating to or arising out of the ownership of the Property, including without limitation, general or special assessment proceedings of any kind, or condemnation or eminent domain actions or proceedings of any kind.

    (c) Neither the entering into of this Agreement, the consummation of the sale, nor the conveyance of the Property to Buyer, has or will constitute a violation or breach of any of the terms of any contract or other instrument to which Seller is a party or to which Seller is subject.

    (d) To the best of Seller's knowledge, no portion of the Property contains any substance which may be classified as a hazardous, toxic, chemical or radioactive substance, or a contaminant or pollutant (together, "Hazardous Substances") under applicable federal, state or local law, ordinance, rule or regulation ("Applicable Laws") or which may require any cleanup, remediation or other corrective action pursuant to such Applicable Laws. Seller has not used any portion of the Property, nor permitted any other person or entity to use the Property for the purpose of storage, generation, manufacture, disposal, transportation or treatment of any such Hazardous Substances in violation of Applicable Laws. Further, no underground storage tanks are, or have in the past been, located at the Property. Notwithstanding the foregoing, Seller has removed underground heating oil tanks located near the two old structures facing Call Hollow Road, which work was performed by Ira Conklin & Sons, Newburgh, New York. Seller will deliver to Buyer evidence of the lawful removal of said tanks during the Due Diligence Period

    (e) There are no commitments or agreements which would require Buyer to pay any money or perform any obligation or which would otherwise affect the ownership or development of the Property by Buyer.

    (f) No notice by any governmental or other public authority has been served upon Seller, or anyone on Seller's behalf, relating to violations of any applicable housing, building, safety, fire or other ordinances or any of the Applicable Laws.

(g) Seller's Plans have been provided to Buyer in accordance with Section 1 above and have been paid for in full by Seller. In addition to Seller's Plans, Seller agrees to provide to Buyer within ten (10) days of the date of this Agreement one complete set of reproducible mylars and one complete set of blueprints for the Property, all at no additional charge to Buyer. Seller represents that Seller's Plans are complete and accurate.

(i) At Closing, Seller shall deliver to Buyer a complete set of Seller's Plans, including, without limitation, one (1) complete CAD file of all drawings, two (2) complete set of reproducible blueprints and one complete set of blueprints of the Final Approvals (as hereinafter defined), including all construction drawings, grading plans, and the like, all of which Seller's Plans shall be complete and accurate, free and clear of liens and paid for in full by Seller. Further, at Closing, Seller shall assign to Buyer all of Seller's right, title and interest in and to Seller's Plans, evidenced by an assignment executed by Seller and by the engineer or consultant which prepared Seller's Plans evidencing said engineer's and/or consultant's approval of such assignment.

15. <u>Operations Pending Closing</u>. Between the date of execution of this Agreement and the date of Closing:

(a) Seller shall maintain the Property in its present state of repair and in substantially the same condition as on the date hereof.

(b) Seller shall not enter into any lease, agreement of sale, option, or any other agreement or contract affecting the Property, nor shall Seller grant any easements or further encumber the Property, without the prior written consent of Buyer.

(c) Seller shall comply with all covenants, conditions, restrictions, laws, statutes, rules, regulations and ordinances applicable to the Property.

(d) Seller shall not use, manufacture, store, generate, handle, or dispose of any Hazardous Substances, or use or permit the Property to be used for such purposes, or emit, release or discharge any such Hazardous Substances into the air, soil, surface water or groundwater comprising the Property.

(e) Seller shall not remove or damage any, standing trees, shrubbery, plants, landscaping or soil now in or on the Property during the term of this Agreement. Seller shall not dispose of any trash, debris, building materials or organic material (including without limitation trees and stumps) on the Property. In the event such disposal has occurred prior to the date hereof, Seller shall remove all such materials at Seller's expense prior to the Closing.

TB 0086

(f) Seller shall, at its expense, in good faith diligently pursue the satisfaction of all conditions to Closing hereunder, including, without limitation, the completion any on or off-site improvements required in connection therewith. Buyer shall bear the cost of any inspection fees.

16. <u>Conditions to Buyer's Obligations</u>.

(a) Buyer's obligation to complete Closing under this Agreement is expressly conditioned upon the following, and Buyer shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Buyer's other rights, conditions or obligations:

(i) all representations and warranties of Seller herein being true and correct at the time of Closing;

(ii) Seller having performed all of its covenants and obligations hereunder;

(iii) the receipt by Seller for Buyer, at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the "Final Approval"), and the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits;

(iv) the receipt by Seller for Buyer, at Seller's sole cost and expense, of all written agreements, arrangements and other evidence satisfactory to Buyer to the effect that (a) there is immediately available at the Property adequate public sewer treatment and capacity on a permanent basis for the effluent from the Property as intended to be developed, (b) sufficient public water is immediately available at the Property to adequately service the homes intended to be developed on the Property, and (c) electric, cable, gas and telephone are available at the Property, all at connecting fees and expenses that are not greater than those which are customary and ordinary for similar developments in the County in effect on the date of this Agreement;

(v) Intentionally Omitted; and

(vi) the installation by Seller of off-site sewer and water to the edge of the Property.

(b) The conditions set forth in Section 16(a)(iii) and (iv) shall be final and unappealable at the time of Closing and shall be subject only to such conditions as