# EXHIBIT 8(c)

Page 28

1                    P.J. Corless
2    does in their review, they specify steps to be
3    taken during the construction, or phases.
4          Q    Okay.  If we could look at 119-9 of
5    the ordinance, and under subsection (c) that
6    provides that a building inspector, the building
7    inspector, cannot issue a CO until the village
8    engineer has verified that all the work has been
9    completed under steep slope?
10         A    Correct.
11         Q    And under subsection (c) a stop work
12   order can be issued if the work isn't properly
13   completed?
14         A    That's correct.
15         Q    Now, when was this ordinance passed,
16   the steep slope ordinance?
17         A    Nineties, early nineties.  It's on a
18   while.
19         Q    That's good enough.  During your
20   tenure as the village engineer, have you been
21   involved in any subdivision applications that
22   have involved steep slope permits?
23         A    Yes, several.
24         Q    Okay.  Do you recall the names of
25   any of them?

P.J. Corless                                                  March 25, 2008
                              Pomona, NY

                                                                    Page 29

1                         P.J. Corless
2         A      High Gate Estates; Summit At Pomona;
3    the one we're calling Halley II.  So there are
4    several.
5         Q      Okay.
6         A      Other names I don't recall.
7         Q      Okay.
8         A      We're running out of land, so not
9    too much left.
10        Q      Can the severity of the slope of a
11   given lot disqualify it as a buildable lot, based
12   upon your experience with the planning board?
13        A      No, it has not, but I think the
14   ordinance goes in that direction, but that seems
15   to imply some sort of condemnation of land, which
16   I don't think the village trustees want to
17   accommodate.
18        Q      Okay.
19        A      In that manner.
20        Q      Now, based upon your experience, we
21   are going to talk about two distinct
22   hypotheticals here.  In a situation where the
23   steep slope permits are secured based upon the
24   hypothetical houses --
25        A      Yes.

Page 30

1                           P.J. Corless
2         Q      -- in conjunction with the final
3    subdivision plat approval, typically how long
4    does that process take, based upon your
5    experience?
6         A      From the day the application is
7    filed until the day it's --
8         Q      Yes, steep slopes.  Of course, I
9    imagine it's a function of the number of lots,
10   but basically how long does it take?
11               MR. HASPEL:  Can you rephrase
12         that, because I got confused?
13               MR. HARRINGTON:  Sure.
14               MR. HASPEL:  Hopefully, the
15         witness is smarter than me, but maybe
16         not.
17               MR. HARRINGTON:  Well, the
18         witnesses are usually smarter than all
19         the lawyers, but that's not here nor
20         there.
21        Q      Focusing on the first process where
22   the steep slope approvals are secured in
23   conjunction with the final subdivision approval,
24   based upon the hypothetical houses, typically how
25   long, based upon your experience with

Page 31

1              P.J. Corless
2  subdivisions that range from thirty to forty
3  lots, how long does that process take for the
4  steep slope permits?
5       A    At least twelve months and more
6  likely twenty-four months. The number of lots is
7  probably not the deciding factor, it's probably
8  the objections of community members.
9       Q    What kind of objections?
10      A    To environmental concerns, whether
11 real or perceived.
12      Q    Okay. In the second situation where
13 the developer comes back after securing final
14 subdivision approval and seeks to build a house
15 outside the parameters of the hypothetical box on
16 the lot, based upon your experience, typically
17 how long does it take to secure steep slope
18 approval in that scenario?
19      A    Three to six months.
20      Q    Again, is that per lot or does it
21 make a difference?
22      A    Each application. You could
23 technically do four lots in one night, but they
24 have a public hearing procedure which there is
25 some notice required and then there is a

Page 32

1                         P.J. Corless
2      landscape plan that comes after that, so that's
3      another process.
4                  So it could technically go in three
5      months, but it usually takes six or eight months
6      because there's turnaround times between getting
7      an action from a board on a Thursday night and
8      then the deadline to submit the next round of
9      papers is Monday, so you can't do it fast enough
10     usually.
11          Q      Again, focusing on the scenario
12     where a developer comes back and wants to build a
13     bigger house?
14          A      Yes.
15          Q      In that scenario, it's fair to say
16     that the steep slope law as we discussed it today
17     has to be complied with again, correct?
18          A      Correct.
19          Q      There has to be a new public
20     hearing?
21          A      Correct.
22          Q      SEQR has to be triggered, if
23     appropriate?
24          A      As appropriate.  Usually it's
25     reaffirmed, but it could be triggered for more

Page 33

                    P.J. Corless

1  investigation.  Certainly opens it up.
2  Everything is for sale.
3       Q    It's a new process?
4       A    It's a new process.
5       Q    And then the planning board has to
6  go through the criteria and the protocol that's
7  mentioned in the law?
8       A    Correct.
9       Q    And that's with respect to each lot?
10      A    Yes.
11      Q    Now, did there come a time that as
12 the village engineer you became involved in the
13 planning board's review of a single-family
14 subdivision application known as Halley Estates
15 II?
16      A    Yes.
17      Q    Do you recall when that was?
18      A    I think it's five or six or seven
19 years ago.  It's a few years ago.
20      Q    Is there a Halley Estates I?
21      A    There is.
22      Q    Is that where you live?
23      A    No, I live on Halley Drive, which is
24 the street parallel to where Halley I Estates

P.J. Corless                                          March 25, 2008
                            Pomona, NY

Page 34

1                       P.J. Corless
2  is.  That's just a short little stub street that
3  was developed by the same Briarwood Farms people.
4       Q    And do you know the attorney who
5  represented Halley Estates II in the subdivision
6  process?
7       A    Yes, Martin Cornell, he's
8  deceased.  He was their attorney.  Their attorney
9  now is Tracy & Edwards, John Edwards.
10           MR. HARRINGTON:  Off the record.
11           (Brief recess)
12           MR. HARRINGTON:  I would like to
13  mark as Exhibit C what is styled Cover
14  Sheet Preliminary Subdivision Halley
15  Estates II, prepared by the firm of
16  Atzl, Scatassa and Zigler, which was
17  last revised August 2, 2006.
18           THE WITNESS:  What is the
19  original date way down on the bottom
20  there?
21           MR. HARRINGTON:  The original
22  date is January 25th, 2002.
23           THE WITNESS:  Six years ago.
24           MR. HARRINGTON:  And it's
25  comprised of a total of 21

Page 35

1           P.J. Corless
2  drawings.  We will mark that C.
3           (Cover Sheet Preliminary
4  Subdivision Halley Estates II was
5  marked as Defendant's Exhibit C for
6  identification.)
7      Q    Can I ask you, Mr. Corless, just for
8  a second, I'll represent to you that we obtained
9  this from Briarwood Farm, but if you could look
10 at Exhibit C and if that refreshes your
11 recollection that's a true and accurate copy of a
12 set of subdivision drawings that were submitted
13 to the planning board which you reviewed in your
14 capacity as village engineer?
15     A    I've seen a later one than this but
16 this is reasonably representative of what they
17 have.
18     Q    When you say you've seen a later
19 one?
20     A    There is a water easement that's
21 been added somewhere along.
22     Q    Since when?
23     A    I don't know, last couple of months,
24 water supply.
25     Q    I noticed when I got here a little

Page 36

1                         P.J. Corless
2    early, I noticed that there is a planning board
3    meeting here tonight, correct?
4         A    No, there was a TAC meeting this
5    morning.  There is a planning board meeting April
6    10th.  Do you want to know for sure?
7              MR. HARRINGTON:  Can I mark this
8         as the next exhibit?
9              (One-page village calendar was
10        marked as Defendant's Exhibit D for
11        identification.)
12        Q    Let me just show you what I marked
13   as Exhibit D for identification, the TAC calendar
14   for the Village of Pomona scheduled for this
15   evening?
16             THE WITNESS:  Today, this
17        morning.
18        Q    This morning, I'm sorry.
19        A    Isn't there a time on it?
20        Q    Yes, there is, today, 10:00 a.m.
21   And did you attend that meeting?
22        A    I did.
23        Q    Was the Halley Estates II
24   Subdivision on?
25        A    Yes, it was.

P.J. Corless                                      March 25, 2008
                         Pomona, NY

                                                          Page 37

1                       P.J. Corless
2          Q     It says on Exhibit D that it was on
3    for the purpose of final subdivision plan
4    approval?
5          A     Yes.
6          Q     Forty-lot subdivision.
7          A     That's correct.
8          Q     Today, has the applicant for Halley
9    Estates II secured final subdivision approval?
10         A     No, they have not.  John at silver
11   first name was here on behalf of the applicant
12   and he requested that a public hearing be set for
13   the April planning board meeting, to give final
14   approval that would be a planning board action,
15   and that requires a public hearing and
16   discussion, et cetera.
17         Q     When is that scheduled for?
18         A     April 10th.
19         Q     That's the public hearing, correct?
20         A     That's the public hearing.
21         Q     And what are the odds, based upon
22   your experience, that there will be approval
23   granted that evening?
24               MR. HASPEL:  We're bookmakers
25         now?

Page 38

1          P.J. Corless
2      MR. HARRINGTON: And I'm not
3  being a wise guy.
4      A   Very, very slim. Normally the
5  purpose of the public hearing is to allow the
6  neighbors and the residents an opportunity to
7  comment on the proposed action. Usually the
8  planning board does not close the hearing the
9  first night regardless of what the comments
10 are. So that would be carried over to May. And
11 then we would meet once a month. At the May
12 meeting if the comments are resolved to their
13 satisfaction, not to some technical satisfaction,
14 to their satisfaction, then they could close the
15 hearing and they have 45 days. They would not
16 vote that night either. There are five people,
17 and if they were in agreement, they would vote up
18 or down at the following meeting.
19     Q   So it's fair to say that at this
20 point in time, the Halley Estates II, the
21 applicant for the Halley Estates II subdivision
22 hasn't secured any steep slope approvals.
23     A   No.
24     Q   And you say that rather
25 emphatically?

Page 39

1                    P.J. Corless
2       A    There is nothing related to this
3  application until the final map is filed with the
4  county clerk.  That makes the subdivision of the
5  property.  They are very much along in the
6  process, 90 percent, but they are not there.
7            MR. HARRINGTON:  Okay.  Let me
8       have marked as Exhibit C-1 Drawing
9       number seven from Exhibit C, it's the
10      drawing entitled "Disturbed Slope Map."
11           (Disturbed Slope Map was marked
12      as Defendant's Exhibit C-1 for
13      identification.)
14      Q    Let me show you, Mr. Corless what we
15 have marked as Exhibit C-1.  I'll represent to
16 you it's an exact copy of drawing seven on
17 Exhibit C.  Do you recall having seen this on or
18 about August 2006 in conjunction with the
19 planning board's review of this application?
20      A    Yes.
21      Q    How long has this application been
22 pending before the planning board?
23      A    The initial application was March of
24 '01.  You see the date on the bottom.
25      Q    Yes.  And as a practical matter,

Page 40

                          P.J. Corless
they may have been in a couple of meetings before
that, just to chat about the project.
        A       Sure.
        Q       Based upon your experience, what was
the purpose of this disturbed slope map as it
related to the approval process?
        A       The purpose was to identify those
areas of this track of 66 acres and the relative
slopes, breaking them down into four categories,
up to 15 percent, 15 to 25, 25 to 35, and greater
than 35.
        Q       Okay. And this map depicts each of
the forty proposed lots, correct?
        A       Correct.
        Q       And it also depicts each of those
hypothetical houses that we talked about a moment
ago, correct?
        A       Right, just for accuracy, there will
be 41 lots platted. One lot will be a municipal
lot for the detention basin, so there are forty
building lots.
        Q       Thank you. And this map depicts --
let's go through each of the lots, because first
let's talk about the roads. The roads that are

                                                              Page 41

1                       P.J. Corless
2    proposed as it relates to this map before you, do
3    they go through areas that are designated as very
4    steep slopes?
5         A     Very steep?  I'm trying to match up
6    -- they go through moderately steep.  It does
7    appear that it goes through some very steep
8    areas, yes.
9         Q     And --
10        A     One little piece here.
11        Q     And that would be between lots seven
12   and eight?
13        A     Yes, seven and eight.
14        Q     And ultimately if and when final
15   subdivision approval is granted, that would
16   require a steep slope permit?
17        A     Yes, it would be given a steep slope
18   permit for constructing that road there.
19        Q     Let's look at each of the individual
20   building lots.  Looking at building lot number
21   one?
22        A     Okay.
23        Q     There is a hypothetical house
24   depicted on that, correct?
25        A     Correct.

P.J. Corless                                              March 25, 2008
                              Pomona, NY

Page 42

```
 1                         P.J. Corless
 2          Q    The drawing reflects that there are
 3   very steep slopes on this lot?
 4          A    Looks like very steep slopes, yes.
 5          Q    Based upon --
 6          A    Yes, looks like the cross-section is
 7   very steep slopes, there are some.
 8          Q    Okay.  And how about with respect to
 9   lot two?
10          A    Yes, right where the home is
11   proposed.
12          Q    And how about lot three, same thing?
13          A    Same thing.
14          Q    Both of those homes are located
15   right amidst very steep slopes?
16          A    Very steep or moderately steep.  I
17   can't tell the difference in the coloration.
18          Q    What about four.
19          A    Four is the same, five is the same,
20   six is the same.
21          Q    How about lot seven?
22          A    Yes, seven is the same.  Eight and
23   nine and ten and eleven, twelve, thirteen,
24   yes.  Fourteen, no.
25          Q    But there are steep slopes with
```