# EXHIBIT 8(d)

Page 43

1              P.J. Corless
2    respect to the proposed driveway?
3         A     Yes, there are.
4         Q     And that would require a permit as
5    well?
6         A     That's correct.
7         Q     How about lot 15?
8         A     The house is in steep slope on 15,
9    on 16, a portion on 17, a portion on 18, a
10   portion on 19, a portion on 20, a portion on 21.
11   22 and 23 are without disturbance of steep
12   slopes.
13        Q     Lot 24?
14        A     Twenty-four yes, disturbance; 25
15   disturbance; 26 disturbance; 27 disturbance; 29
16   disturbance; 29 disturbance; 30 there is no
17   disturbance; 31 there is disturbance; 32 there is
18   disturbance; 33 there is disturbances just for
19   driveway; 34 there is disturbance; 35 disturbance
20   driveway only; 36 there is disturbance, driveway
21   only; 37; 38; 39; and 40 are without disturbance.
22        Q     With respect to each of the lots
23   that you identified as there being a disturbance,
24   since it involved the planning board, a steep
25   slope permit would be required from the planning

Page 44

1                       P.J. Corless
2    board?
3         A    Yes.  And what the planning board
4    has done is given a steep slope permit for the
5    project based upon these forty lots, and then
6    individual houses will come back as they exceed
7    their footprint.
8         Q    Let me take a step back.  Has there
9    been final subdivision approval yet?
10        A    No.
11        Q    So there has been no steep slope
12   approval for this subdivision yet?
13        A    Not yet.
14        Q    Presuming that final subdivision
15   approval is granted, it will be granted for these
16   hypothetical, steep slope approvals will be
17   granted for the hypothetical houses that are
18   depicted?
19        A    In those locations.
20        Q    In those locations, right.
21        A    Yes.
22        Q    And if the developer or homeowner,
23   as the case may be, ultimately wants to vary the
24   location of the house or the driveway, then they
25   would have to come back and go through the steep

Page 45

1                       P.J. Corless
2    slopes process again, correct?
3         A    Correct, if he or she is going to
4    disturb the slopes.
5         Q    To your knowledge, and this is the
6    last time I will ask this question, I promise;
7    I've asked it twice.  To date, has any steep
8    slope permits been issued for this particular
9    project?
10        A    No.
11        Q    Before any building permits can be
12   issued with respect to any individual lot, a
13   steep slope permit would be necessary for those
14   impacted lots that we just discussed?
15        A    That's correct.  But as of now no
16   lots exist.  It is one parcel.
17        Q    Right.
18        A    That's not until the final plat.
19        Q    Right.  Now, in a situation where
20   you have very steep slopes on a particular lot --
21        A    Right.
22        Q    -- what impact, if any, does that
23   have on the construction of a home on that lot?
24   And let's use for example --
25        A    Use this one, we moved the house

Page 46

1                    P.J. Corless
2    over here (indicating).
3         Q    Okay, that's lot number seven.
4         A    Yes.
5         Q    That's extremely steep slopes,
6    correct?
7         A    Yes, so what the applicant's
8    surveyor or engineer would do is try to
9    construct, configure a lot that would allow him
10   room outside of that steeped area and build a
11   house outside of it, so he wouldn't have to
12   impact it.  But there are some times when he has
13   no choice.
14        Q    And that's under the category of
15   very steep slope?
16        A    Yes, very steep.
17        Q    I appreciate that the quality of
18   this map is not completely clear, because it's
19   been copied a number of times.  But using as an
20   example, lot number nine.
21        A    Yes, well, in lot number nine's case
22   they have identified some area in the building
23   envelope, and the house has been sited to the
24   front of the envelope.  It looks like it's the
25   same size as the other homes, but it has been

Page 47

1                        P.J. Corless
2      tilted and turned so that it doesn't have to be
3      built within that steep slope area, although I
4      suspect that some of the backyard, when the
5      homeowner gets in there, may be impacted. But
6      that's a different issue.
7              Q    Well this dark area, number nine, is
8      an extremely steep slope, right?
9              A    That's correct.
10             Q    The balance is either a very steep
11     slope or a moderately steep slope, right?
12             A    Moderately steep slope, correct.
13             Q    We can't tell?
14             A    We can't tell.
15                  MR. HARRINGTON: Okay. Mark this
16     as the last exhibit, documents that my
17     office received pursuant to a FOIL
18     request from Carolyn LaChiana. It's a
19     packet of document in response to a
20     FOIL request, the first page is a card
21     entitled Village of Pomona, High Gate
22     Estates. If we could just mark that as
23     Exhibit E.
24                  (Documents received pursuant to
25     FOIL request were marked as Defendant's

Page 48

1                      P.J. Corless
2        Exhibit E for identification.)
3        Q    I represent to you, Mr. Corless,
4   these are copies of minutes relating to the High
5   Gate Estates subdivision application.  You
6   testified earlier that this was one of the
7   subdivision applications that you were involved
8   with as engineer that involved steep slope
9   permits, correct?
10       A    Yes.
11       Q    And rather than have you go through
12  the minutes, I just want to -- is it typical
13  protocol for the planning board to review minutes
14  from the prior meeting?
15       A    Usually at the next meeting.
16       Q    Okay.  And is it typical protocol
17  that they review them and approve them as
18  accurate.
19       A    Their practice is that they review
20  them at the next meeting.  They do not always get
21  consensus and sometimes the vote is taken the
22  following month.  But they do try to do it each
23  month, for the last month.
24       Q    I'm just trying to save some time.
25       A    Yes, their practice, yes.

P.J. Corless                                      March 25, 2008
                        Pomona, NY

Page 49

1                    P.J. Corless
2        Q    These minutes say what they
3   say. They have been approved, rather than drag
4   you through?
5        A    What they are, they are, yes.
6        Q    So my question to you is, do you
7   recall the approval process for the steep slopes
8   in this --
9        A    Sure.
10       Q    And how would you characterize it
11  with respect to its length? Was it short and
12  sweet, was it typical, was it long?
13       A    High Gate was typically long.
14       Q    Okay.
15       A    Long being defined as several
16  meetings, more than two.
17       Q    And how many months between the
18  application for the steep slope permits and the
19  issuance of them?
20       A    Six months or more.
21       Q    And this involved the latter
22  scenario that you described where the applicant
23  actually came back after final subdivision
24  approval and asked for --
25       A    Correct.

Page 50

1                       P.J. Corless
2         Q     -- permits because they wanted to
3    move the houses around?
4         A     Correct.
5               MR. HARRINGTON:  I have no
6    further questions.  Thank you.
7               THE WITNESS:  That's it?
8               MR. HARRINGTON:  That's it.
9               MR. HASPEL:  I have a couple.
10              MR. HARRINGTON:  I may have some
11   more but --
12              MR. HASPEL:  I just want to make
13   sure I understand.
14   EXAMINATION
15   BY MR. HASPEL:
16        Q     These I'm showing the witness C-1
17   for identification, which is the page, disturbed
18   slope map, that Mr. Harrington was questioning
19   about.  Each of these lots have what we have now
20   defined as a mythical footprint of a house?
21        A     Correct.
22        Q     Was it your testimony that unless
23   the ultimately designed house fits into that
24   footprint -- let's go one step back.  Let's
25   assume for one second that this map receives

P.J. Corless  March 25, 2008
Pomona, NY

Page 51

1  P.J. Corless
2  final subdivision approval, okay.  Under that
3  assumption, was it your testimony that unless the
4  proposed house at the time that a house is being
5  planned fits within the footprint that's
6  designated as the mythical footprint on this map,
7  a new process would have to take place?
8           MR. HARRINGTON:  Objection to
9       form.
10      A    Yes, that's correct.  If an
11 applicant came in with a building that was
12 slightly less than the approved one, and had an
13 adjusted driveway to accommodate it or something
14 like that, on my action I would send it back to
15 the planning board for approval.
16           If it complied with it completely as
17 approved by the planning board, we would process
18 without going further to the planning board.
19      Q    I'm even more confused now.  If the
20 footprint of the proposed house fits within the
21 box, do you have to go back?
22      A    No.
23      Q    Okay.  If the footprint of the house
24 was going to move a nominal amount, would you
25 have to go back?

Page 52

1                          P.J. Corless
2        A      It's my practice to send it back if
3   there is any change.
4        Q      Any change whatsoever?
5        A      The planning board chairman prefers,
6   and it's not in the law, she prefers to see any
7   change, so I have complied with that request.
8        Q      How long did you say we had this
9   steep slope ordinance in place?
10       A      '98.
11       Q      In your experience, what percentage
12  of steep slope applications after a subdivision
13  approval is done, after final plat is filed, what
14  percentage of steep slope applications, in your
15  experience, have been declined?
16              MR. HARRINGTON:  Objection.  You
17       can answer.
18       A      I need to understand the question.
19  After the map is filed.
20       Q      Let me take you through it.  Let's
21  say this map is the final plat?
22       A      Okay.
23       Q      And at that point in time, every one
24  of these lots came in?
25       A      Approved.

P.J. Corless	March 25, 2008
Pomona, NY

Page 53

1        P.J. Corless
2    Q    In your experience, throughout the
3  Village of Pomona, what percentage of steep slope
4  applications are denied?
5    A    None would be denied but more than
6  90 percent of them would be sent back to the
7  planning board as a practical matter.
8    Q    When you say, "sent back to the
9  planning board," once it gets sent back to the
10 planning board, in your experience, how many
11 times has a builder been denied the opportunity
12 to build on that lot?
13   A    Never been denied.  There may be
14 changes, but never has been denied.
15   Q    When you say changes, can you
16 describe what kind of changes you are referring
17 to?
18   A    He might be asked to flatten the
19 slope of the driveway or not make the length of
20 the house as long as it's proposed, or perhaps
21 change the imperviousness of one of the surfaces,
22 of a driveway.  I mean there are lots of more
23 tweaking of details rather than an approval being
24 denied.
25   Q    You used the word tweaking.  Is that