# EXHIBIT 8(e)

Page 54

1                       P.J. Corless
2     pretty much what happens in this process, a
3     tweaking, rather than a massive relook?
4               MR. HARRINGTON:  Objection.
5          Q    You can answer.
6          A    Yes, in general the applicants come
7     in for much bigger houses in this village, during
8     the upsurge in the economy, and they generally
9     are allowed to build as large as they want, but
10    they have trade-offs with more extensive
11    landscaping or some retaining walls and that kind
12    of stuff.  But if that's tweaking, that's what
13    they do.
14              But they are generally not denied
15    the right to build.
16         Q    When you say much larger houses, are
17    we talking about houses twice the size of the
18    mythological footprint?
19         A    Yes.
20         Q    Three times the size?
21         A    Yes.
22         Q    Four times the size?
23         A    Most of these houses are shown at
24    3,000 footprint at the most, maybe 2800, and
25    we're getting 6,000 and 8,000 very routinely as

P.J. Corless                                          March 25, 2008
Pomona, NY

Page 55

1                    P.J. Corless
2  of last year.  I don't know this year.
3       Q    So it's your testimony that you go
4  back to the planning board, you tweak it, you
5  have different landscaping, you may have to do a
6  little bit more excavation for a driveway or
7  something like that; that's what it will take to
8  get the approval?
9            MR. HARRINGTON:  Object to the
10       form.
11       A    You may have to do all those things,
12  and all those things are obviously money.
13  Usually those changes are in the hundreds of
14  thousands of dollars, not in the neighborhood of
15  $5,000.
16       Q    That's when you are talking about
17  creating something larger than the footprint?
18       A    Yes, bigger driveways, bigger walls.
19       Q    I assume it would be proportional to
20  a smaller change?
21       A    Sure.
22       Q    So you are not talking a hundred
23  thousand dollars worth of changes on a
24  ten-percent growth of the footprint?
25            MR. HARRINGTON:  Objection.

Alderson Reporting Company
1-800-FOR-DEPO

Page 56

1                         P.J. Corless
2        A    Not generally, no.
3        Q    Now, you testified earlier as to
4   intent of the ordinance?
5        A    Yes.
6        Q    Did you participate in the drafting
7   of the ordinances?
8        A    Yes.
9        Q    Could you describe how you
10  participated?
11       A    More in a technical aspect of what
12  the slopes are and what percentages, et cetera,
13  but not in the legislative intent of the elected
14  board of trustees, that was their decision.
15       Q    As they were going through making
16  their decision, were you consulting the
17  legislators, or were they asking to consult with
18  you?
19       A    The legislators asked that the
20  planning board and engineer participated in
21  workshops about the intent of this steep slope
22  law and what was practical and what was
23  reasonable expense?
24       Q    Do you have any personal knowledge
25  of the discussions of intent outside the

P.J. Corless                                March 25, 2008
Pomona, NY

Page 57

1              P.J. Corless
2  ordinance's statements of intent?
3       A    No, I do not.  The discussion of
4  this law went on for a couple of years.  It
5  didn't happen in one round, and I do know that
6  they sought guidance from other municipalities,
7  from California to North Carolina to wherever.
8       Q    You indicated you were at the TAC
9  meeting this morning?
10      A    I was, yes.
11      Q    The map that's before you or the
12 group of maps, do these drawings represent
13 substantial similarity to what is still being
14 presented?
15      A    Yes.
16      Q    Was there any specific purpose of
17 this morning's TAC meeting?
18      A    Well, the senior partner here was
19 sent in by his client to request a public hearing
20 and we spent most of the discussion on procedural
21 issues.
22      Q    Getting it on to the agenda?
23      A    Getting it on to the public hearing,
24 what maps are required, if he needed additional
25 one thing or another.  But we were not at

Page 58

1                       P.J. Corless
2    substantive issues this morning.
3         Q    When you view these maps and the
4    planning board, if you have any knowledge of how
5    they view it, and you look at them with these
6    mythical footprints?
7         A    Right.
8         Q    What is the purpose of even putting
9    the mythical footprint?  Is it your working
10   assumption that these footprints are not going to
11   be the end-of-the-day planned houses?
12             MR. HARRINGTON:  Objection.
13        Q    Do you understand the question?
14        A    Yes, I understand the question.
15             MR. HARRINGTON:  Same objection.
16        A    The planning board wants assurances
17   that a house can be built on the lot that's going
18   to be created.  So to do that, the engineer has
19   to create the size of the lot, show it, show a
20   building and show a driveway, show the drainage.
21   And a lot of that information then is filtered
22   down to the amount of run-off for drainage.  The
23   water and sewer connections are shown on other
24   sheets.
25        Q    But you are doing this with the

1                   P.J. Corless
2    working assumption that you've going to be doing
3    it again at a later date, or may be doing it
4    again at a later date?
5              MR. HARRINGTON:  Objection.
6         A    With various lots.
7              MR. HARRINGTON:  Same objection.
8         A    My advice to the planning board is
9    that if this shape of the house was originally
10   presented to us in the year 2000, by the time it
11   gets built, and that might be normally three or
12   four years later, the shape of the house will
13   probably have changed.
14             We used to submit houses with 24 by
15   42 as the standard Rockland County bilevel.  Now
16   they're showing these shapes.  If you'll notice,
17   this shape is the same for every lot.  That's
18   probably highly unlikely that everybody will
19   build the same house with side-load garages, et
20   cetera.
21             So what the applicant's engineer
22   does is represent a reasonably sized house for
23   this subdivision that might sell for X dollars,
24   whatever it is, and that could be built.  But as
25   individual buyers come in they will make changes

Page 60

                        P.J. Corless

1
2  and the builder will accommodate him to the best
3  of his ability, and sometimes that requires going
4  back to change it.
5           It doesn't make it easy for a track
6  builder, but it's easy for a custom builder, who
7  is more used to a longer process time.
8       Q    I think I understand.  So let me try
9  to repeat it in a condensed form.  You want the
10 mythological houses so you can do your standard
11 drainage analysis, water analysis, road analysis
12 and that kind of stuff?
13      A    Utilities, yes, right.
14           MR. HARRINGTON:  Objection.
15      Q    And at that point in time if there
16 is going to be a steep slope issue on another
17 design, you deal with all those issues within the
18 context of that particular lot?
19           MR. HARRINGTON:  Objection.
20      Q    Is that correct?
21      A    That's correct.  You'll notice that
22 all these homes have very small areas indicated
23 for a deck, and obviously no, quote, in-ground
24 swimming pools.  We get many applications a year
25 afterwards, someone, the homeowner is in there

Page 61

1                    P.J. Corless
2  now, they're going to put the pool in here or
3  they're going to put a detached garage up or
4  they're going to put up a hobby shop.  People do
5  lots of things with these.
6        Q     If you put in a pool, would that
7  require you to go back and do a steep slope
8  analysis?
9        A     You take the original analysis and
10 that application will be placed against this.  If
11 they are fortunate enough to hire the firm that
12 has that information, he just puts it on that --
13       Q     But it would have to go through the
14 same process?
15       A     Same process, just as if he is
16 building a house.
17       Q     Same thing for a detached garage?
18       A     Yes.
19       Q     Workshop?
20       A     Yes.  It's a very rigorous
21 ordinance.
22             MR. HASPEL:  I have nothing
23       further.
24             MR. HARRINGTON:  I just have one
25       follow up.

Page 62

```
 1                     P.J. Corless
 2   CONTINUED EXAMINATION
 3   BY MR. HARRINGTON:
 4        Q    Mr. Corless, regardless of whether
 5   an applicant comes back when final subdivision
 6   approval is granted, say for example in Halley
 7   Estates, if and when it's granted, when that
 8   final plat is approved, the planning board will
 9   have considered, evaluated, all the criteria
10   under the steep slope law, correct?
11        A    Correct.
12        Q    And will have issued for those
13   hypothetical houses a permit for those houses,
14   correct?
15        A    Correct.
16        Q    And in the event an individual or a
17   developer subsequently decides, for whatever
18   reason, to exceed the size of that hypothetical
19   house, then he, she or it has to go back to the
20   planning board for a new steep slope permit?
21        A    Modified steep slope permit.
22        Q    And they will have to go through the
23   process that's articulated in the statute?
24        A    Yes.
25        Q    And the length of that process
```

Page 63

1              P.J. Corless
2   depends on the nature of the change, correct?
3       A    Yes.
4            MR. HARRINGTON:  Thank you.
5            THE WITNESS:  You're welcome.
6            (Whereupon, at 2:24 p.m., the
7   deposition was concluded.)
8
9
10   _____
11                P. J. CORLESS
12
13
14   Subscribed and sworn to before me
15   this_____day of_____, 2008.
16
17   _____
18   NOTARY PUBLIC
19
20
21
22
23
24
25

P.J. Corless                                              March 25, 2008
                              Pomona, NY

Page 64

1                           CERTIFICATION
2
3        I, Nancy Anne Flynn, Registered Professional
4   reporter and a Notary Public in and for the State
5   of New York, do hereby certify:
6        THAT the testimony hereinbefore set forth of
7   said witness, duly sworn, was recorded by me; and
8        THAT the within transcript is a true record
9   of the testimony given by P.J. CORLESS.
10       I further certify that I am not related,
11  either by blood or marriage, to any of the parties
12  to this action; and
13       THAT I am in no way interested in the outcome
14  of this matter.
15       IN WITNESS WHEREOF, I have hereunto set my
16  hand this 4th day of April 2008.
17
18
19
20  _____
21       Nancy Anne Flynn, RPR
22
23
24
25