UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BRIARWOOD FARMS, INC.,

                      07 CIV. 3657 (CLB)

             Plaintiff,

   - against -

TOLL BROS., INC.,                     ECF CASE

             Defendant.

-----------------------------------------------------------------X

**TOLL BROS., INC.'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S RULE 56 MOTION**

**A.**    **<u>Toll's Cross-Motion</u>**

    1.     On November 7, 2005, Toll Broths., Inc. ("Toll") and Briarwood Farms, Inc.

("Briarwood") entered into an Agreement of Sale (the "Contract") whereby Toll would acquire from

Briarwood the Property which was the subject of the subdivision application.  Exhibit "3".[1]

    2.     The Contract, at Section 16(a)(iii), expressly conditioned Toll's obligation to purchase

the Property upon Briarwood securing and delivering to Toll *final, unappealable* subdivision

approval, defined in the Contract as follows:

> . . . the receipt by Seller for Buyer, *at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the 'Final Approval'), and the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits.*

(*Id.*)(emphasis added).

    3.     The Contract further provided that the "Final Approval," as defined above, "shall be

---

[1]    All Exhibits referenced herein are attached to the Declaration of William P. Harrington of Bleakley Platt & Schmidt, LLP, counsel of record for Toll Bros., Inc.

*final and unappealable at the time of Closing and shall be subject only to such conditions as Buyer [Toll] may approve at [Toll's] sole discretion, which approval shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development.*"  (*Id.*)(emphasis added).

4.      Toll is in the business of building homes and time is critical in this process.  In order to avoid potential extensive delays and the attendant expense associated with securing final subdivision approval and/or litigation concerning same, the Contract expressly provided that Toll was to receive "*final, unappealable*" subdivision approval, with all the requisite permits, to enable Toll "upon posting of customary inspection fees . . . [to] file the plat and commence infrastructure improvements and apply for and obtain building permits."  Zalinsky Dec.; Exhibit "3", ¶ 16(a)(iii), p. 7.

5.      Chapter 118 of the Village Code sets forth the procedures for subdivision approval and requires (i) preliminary subdivision approval, (ii) final subdivision approval, and (iii) SEQRA approval in conjunction with the subdivision review process.  (*Id.*)

6.      Chapter 118 of the Village's Code also governs subdivision design requirements and specifically directs applicants to design a subdivision ". . . in reasonable conformity to existing topography to minimize grading, cut and fill to retain, insofar as possible, the natural contours, to limit storm water runoff and to conserve the natural vegetative cover and soil."  *Id.* Section 118-22(A)(1).  Chapter 118 of the Village Code further provides that steep slope preservation and the Steep Slope Ordinance (Chapter 119), "shall be followed where applicable" by the Planning Board in the subdivision review process.  *Id.* Section 118-22(B)(3).

7.      Chapter 119 of the Village Code, entitled "Site Development Plan Review," governs the development of land which contains steep slopes.[2]  Exhibit "7".  Pursuant to Section 119-2(A), a

---

[2]      Briarwood has ignored the Village's Steep Slope Ordinance and its obvious significance.  We submit its silence in this regard speaks volumes.

property owner cannot disturb a steep slope area without having first obtained a "site development plan permit", commonly referred to as a steep slope permit. *Id.*. Where steep slope permits are required in conjunction with subdivision approval under Village Code Chapter 118, the Planning Board is the "approving authority" for issuance of all steep slope permits. *Id.* Section 119-4(B).

8.      Chapter 119 specifically encourages the *simultaneous* review and approval of steep slope permits by the Planning Board in conjunction with the Planning Board's subdivision approval review process and attendant SEQRA review:

### § 119-7. Procedures for review and decision making.

A.      It is the intent of this chapter to incorporate the consideration of steep slope protection into the Village's existing land use and development approval procedures in conjunction with the procedures of the New York State Environmental Quality Review Act. ***To the maximum extent possible, the review, hearings and decisions upon any application processed under this chapter will run concurrently with similar procedures that the approving authority may undertake in connection with the other applications that are directly related.***

*Id.* Section 119-7(A) (emphasis added).

9.      On March 25, 2008, the Village of Pomona's Engineer P.J. Corless, who has been the Village Engineer for 31 years and was actively involved in the Village's review of the subdivision application which is the subject of this litigation, was deposed. Exhibit "8." Consistent with the aforesaid provisions of the Village Code, Mr. Corless confirmed the following:

- The purpose of the Steep Slope Ordinance "was to control land disturbance on areas that would result in water pollution . . ." (Ex. "8," p. 10, l. 5-10);

- The law prohibits the disturbance of any steep slope without the issuance of a steep slope permit. (*Id.* p. 10, l. 15 to p. 11, l. 9);

- Under Section 119-4, any steep slope permits required in conjunction with a subdivision application are referred to and issued by the Planning Board. (*Id.* p. 12, l. 15 to p. 13,

3

l. 7);

- Steep slope permits under the Steep Slope Ordinance are issued by the Planning Board as part of the final subdivision review process. (*Id.* p. 23, l. 11 to p. 24, l. 19);

- In order to secure final subdivision approval, a developer must obtain from the Planning Board during the final subdivision plat review process steep slope permits for houses designated on building lots impacted by steep slopes. (*Id.* p. 25, l. 13-23);

- Steep slope permits are the type of final details which must be resolved by an applicant to progress from preliminary subdivision approval to receive final subdivision approval from the Planning Board. (*Id.* p. 26, l. 2-6);

- Under Section 119-7, the information required to be submitted to Planning Board to secure steep slope permits is rather elaborate, requires additional public hearings, the posting of letters of credit and may involve a phased site plan review if desired by the Planning Board. (*Id.* p. 26, l. 7 to p. 27, l. 3);

- No building permit can be issued for the construction of a single-family home on a steep slope area until the Planning Board issues *final* subdivision approval. (*Id.* p. 14, l. 8-13 and p. 28, l. 4-14);

- Based upon Village Engineer Corless' experience, its takes 12 to 24 months to secure steep slope permits between the time of preliminary subdivision approval and final subdivision approval. (*Id.* p. 30, l. 21 to p. 31, l. 11);

- After issuance of final subdivision approval with steep slope permits, a new steep slope permit must be secured from the Planning Board only if the owner of the lot wants to build a house that exceeds the parameters of the "hypothetical" home depicted on the final approved subdivision plat for which the steep slope permit was issued. This approval process typically takes three to six months. (*Id.* p. 31, l. 12-19);

- The Halley Estates II proposed preliminary subdivision plat included a Disturbed Slope Map (Ex. "9") which depicted (i) the hypothetical house locations on each building lot and (ii) those areas within the subdivision impacted by steep slopes which required a steep slope permit. (Ex. "8," p. 39,

l. 14 to p. 40, l. 15);

- Thirty-three (33) of the 40 single-family lots depicted on the Halley Estates II proposed preliminary subdivision map required steep slope permits from the Planning Board before final subdivision approval could be granted. (*Id.* p. 41, l. 19 to p. 43, l. 23);[3]

- Each of the 33 building lots with steep slopes required a steep slope permits to be issued by the Planning Board. (*Id.* p. 43, l. 22 to p. 44, l. 7);

- To date no steep slope permits have been issued for those 33 lots and the Planning Board has not granted final subdivision approval for the land which is the subject of this litigation. (*Id.* p. 44, l. 8-13);

- Until final subdivision approval and the requisite steep slope permits are granted, no building permit for the building lots can be issued to enable construction of single-family homes thereon. (*Id.* p. 45, l. 5-16);

- When final subdivision approval is granted, the Planning Board will have considered all the criteria under the steep slope law. (*Id.* p. 62, l. 4-15). To the extent a lot owner seeks to construct a home or improvement (e.g. pool) which exceeds the size of the hypothetical house depicted on the approved final plat, the owner must go back before the Planning Board to secure a modified steep slope permit. (*Id.* p. 62, l. 16-24); and

- The process of securing a modified steep slope permit is not merely a matter of "tweaking" but an extensive process which involves costs ranging "in the hundreds of thousands of dollars." (*Id.* p. 55, l. 3-15).

10.    Beginning in or about October 2006, representatives of Toll and Briarwood began meeting to discuss the various requirements which the Village Planning Board and Village Engineer had identified as conditions to preliminary subdivision approval.[4]  By late December 2006,

---

[3]      Mr. Corless testified, and Briarwood's Disturbed Slope Map reflects (Ex. "9"), that the following 33 building lots required steep slope permits – Lots 1 through 21, 24 through 29, 31 through 36. Only seven lots (22, 23, 30 and 37 through 40) did not require steep slope permits. (*Id.*).

[4]      Those issues were identified in Mr. Corless' December 30 and 31, 2005 memos Exhibits "4" and "5", as well as the Planning Board's January 12, 2006 resolution granting preliminary subdivision approval. Exhibit "11".

significant issues remained between Toll and Briarwood, which Toll claimed had a material adverse

impact on the proposed development which constituted grounds to terminate the Contract under

Sections 16(a)(iii) and (b). Zalinsky Dec; Exhibit "10".

11.    Of the issues raised by Toll, the most significant was Briarwood's failure to secure

the steep slope permits. The "Disturbed Slope Map" identified 33 out of the 41 proposed building

lots (or 80.5% of the project) required steep slope permits. Zalinsky Dec; Exhibit 9. The impacted

lots are reflected on the "Disturbed Slope Map" which was part of the preliminary subdivision plat

approved by the Planning Board. Exhibit "9". By letter dated December 22, 2006, Toll demanded

that in light of the Village Steep Slope Ordinance, the 33 affected lots and the requirements of the

Contract, Briarwood must secure the required steep slope permits in conjunction with obtaining *final*

subdivision approval. Exhibit "10". Such request is unequivocally supported by the deposition

testimony of Village Engineer Corless. Exhibit "8".

12.    By letter dated December 28, 2006, Briarwood responded to Toll's December 22,

2006 letter and adequately addressed three of the eight conditions identified by Toll as materially

adverse to the development. However, five objectionable conditions remained and by letter dated

January 22, 2007, Toll again reiterated its request that Briarwood resolve same and that, failing

same, Toll would terminate the Contract. (Ex. "12"). The five remaining objectionable items were

as follows:

- Repavement of Klinger Court

  Klinger Court was a road to be constructed within the
  subdivision. The original preliminary subdivision plans
  reviewed during the due diligence period provided that any
  road damage caused during construction had to be repaired
  before formal dedication of the road to the Village. This
  was a standard provision and not objectionable to Toll
  since most damage is modest and easily repaired.

  However, the revised preliminary subdivision plans which
  were the subject of the Planning Board's proposed

preliminary subdivision approval enhanced this repair
obligation significantly.  The revised plans provided that if
the road was damaged, the Village Engineer could, in his
discretion, require Toll to repave the entire roadway with a
1 ½ inch wearing course, curb to curb.  Repaving the
entirety of Klinger Court, which was 27,000 square feet,
would cost Toll an additional $30,000.

- The Steep Slope Issue

    As Toll reiterated its position that Section 16(a)(iii) of the
    Contract required "satisfaction by Seller of any conditions
    of Final Approval, such that upon posting of customary
    security and payment of application and inspection fees by
    Toll, Toll may file the plat and commence infrastructure
    improvements and apply for and *obtain building permits*"
    (emphasis added).  The steep slope permit review process
    was precisely the type of additional review and approval
    process which was intended to be addressed as part of the
    subdivision review process, so that Toll has comfort that all
    lots are fully developable without the need for further
    approvals.

- Decreasing the Grade of the Cul-de-Sac Road

    Village Engineer Corless conditioned final subdivision
    approval on the grade of the road servicing the cul-de-sac
    (which contained the premium subdivision lots) to have a
    maximum grade of no more than 4%, rather than the
    standard 10% provided under applicable Village Code
    provisions relating to roadways.  The cost of the grading,
    blasting and other associated work required to reduce the
    grade of the roadway from 10% to 4% was approximately
    $560,000.  In addition, this change significantly impacted
    the value of the 10 premium lots in the cul-de-sac area
    (Lots 9 through 18), resulting in a significant diminution of
    anticipated value.

- Easements Required for Existing Drainage Swale in Rear
    of Lots 25 through 28

    The preliminary subdivision plans Toll reviewed during the
    due diligence period did not require any drainage
    easements for the swale located in the rear of Lots 25
    through 28.  However, the revised preliminary subdivision
    plans which were the subject of the Planning Board's
    proposed preliminary approval resolution required (i) a new
    drainage system to be installed and (ii) drainage easements

7

to be created which would burden each of these four lots. Toll's cost of installing the additional drainage work would have been $85,000. In addition, burdening these lots with a drainage easement would have an adverse impact on their market value in an amount that would not be calculated with any certainty.

- Additional Landscaping Requirement

    The landscaping obligations were also dramatically changed by the revised preliminary subdivision plans which were the subject of the Planning Board's preliminary subdivision approval resolution. The original plans reviewed by Toll during the due diligence period provided for typical landscaping throughout the subdivision. However, the revised plans which were the subject of the Planning Board's preliminary approval resolution, required installation of decorative plantings far in excess of that initially required. Therefore, there was substantial confusion concerning the extent, nature and cost of the landscaping that had to be installed. The potential additional cost could easily have exceeded $100,000. Toll therefore requested that this issue be clarified.

13.    The aforesaid four additional material objections would have imposed on Toll additional costs of at least $775,000 and had a significant adverse impact on the market value of multiple building lots. As such, the five objectionable conditions cited by Toll collectively had a "material adverse effect" on the development as provided in Section 16(d), warranting the termination of the Contract as a result of Briarwood's refusal to cure same. Exhibit 10; Zalinsky Dec., ¶ 30.

14.    By letter dated January 30, 2007, Briarwood's counsel, Donald Tirschwell, Esq. rejected Toll's Contract termination notice. (Ex. "13"). His response with respect to the steep slope permit issue confirmed Briarwood's refusal to secure the steep slope permits, even for the hypothetical home sites depicted on Briarwood's preliminary subdivision plat.

15.    Tirschwell's letter never requested that Briarwood be provided with actual building plans. Exhibit 13. Moreover, Tirschwell's letter never advised that if Briarwood had received any

actual building plans that Briarwood would obtain steep slope approval in conjunction with final, unappealable subdivision approval. *Id.*

16.     Briarwood never secured from the Village Planning Board, nor tendered to Toll, either (i) final, unappealable subdivision approval or (ii) the steep slope permits required for such final approval.

17.     Through its January 22, 2007 letter, Toll formally terminated the Contract pursuant to Section 16(c) and provided Briarwood of notice of its Contract default in failing to diligently pursue in good faith the resolution of condition to closing under Section 15(f).  Exhibit 12.

**B.    Toll's Response to Briarwood's Local Rule 56.1 Statement**

18.     On or about November 7, 2005 (the "Contract Date"), Briarwood Farms, Inc. ("Briarwood" and Toll Bros., Inc. ("Toll") executed an "Agreement of Sale" relating to Halley Estates II (the "Contract").

**Toll admits this material fact.**

19.     The Contract Price was $325,000 per lot sold with an estimate of forty-one lots to be sold.  Specifically, Paragraph 2 of the Contract provided:

> 2. Purchase Price.  The purchase price (the "Purchase Price") for the Property is Thirteen Million Three Hundred and Twenty-Five Thousand and no/100 Dollars ($13,325,000) based on a Property yield of 41 Lots.  The Purchase Price shall be increased or decreased by $325,000 for each Lot  more than or less than 41, respectively, which the Property yields.  The Purchase Price shall be paid as follows …:

**Toll admits the parties entered into the contract, respectfully refers the Court to same to establish the terms thereof and otherwise denies this allegation.**

20.     Paragraph 2 of the Contract also provided for a deposit of $1.3 Million (the "Deposit"), which, at Toll's option could take the form of an irrevocable letter of credit.

**Toll admits the parties entered into the Contract, respectfully refers the Court to**

9

**same to establish the terms thereof and otherwise denies this allegation.**

21.    The $1.3 Million deposit represented 10% ($32,500) for each approved building lot based upon 40 approved lots.

**Toll admits the parties entered into the Contract, respectfully refers the Court to same to establish the terms thereof and otherwise denies this allegation.**

22.    Paragraph 4 of the Contract provides:

Closing … shall be made at the offices of the Title Company and on or by the date which is thirty (30) days following the date upon which all conditions to Closing set forth in Section 16 hereunder have been satisfied.

**Toll admits the parties entered into the Contract, respectfully refers the Court to same to establish the terms thereof and otherwise denies this allegation.**

23.    Paragraph 16 of the Contract provided:

16.  Conditions to Buyer's Obligations
(a)  Buyer's obligation to complete Closing under this Agreement is expressly conditioned upon the following, and Buyer shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Buyer's other rights, conditions or obligations:

(i)    all representations and warranties of Seller herein being true and correct at the time of Closing;

(ii)   Seller having performed all of its covenants and obligations hereunder;

(iii)  the receipt by Seller for Buyer, at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the "Final Approval"), and, the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits;

(iv)   the receipt by Seller for Buyer, at Seller's sole cost and

expense, of all written agreements, arrangements and other evidence satisfactory to Buyer to the effect that (a) there is immediately available at the Property adequate public sewer treatment and capacity on a permanent basis for the effluent from the Property as intended to be developed, (b) sufficient public water is immediately available at the Property to adequately service the homes intended to be developed on the Property, and (c) electric, cable, gas and telephone are available at the Property, all at connecting fees and expenses that are not greater than those which are customary and ordinary for similar developments in the County in effect on the date of this Agreement;

(v)     Intentionally Omitted; and

(vi)    the installation by Seller of off-site sewer and water to the edge of the Property.

(b) The conditions set forth in Section 16(a)(iii) and (iv) shall be final and unappealable at the time of Closing and shall be subject only to such conditions as Buyer may approve at Buyer's sole discretion, which approval shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such condition shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed condition.

(c) If on or before the date of Closing all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer shall have the option of (i) completing Closing hereunder if it so chooses at the Purchase Price, or (ii) canceling this Agreement in which case this Agreement shall become null and void and the Deposit shall be paid to Buyer. In the event such failure constitutes a failure of the condition set forth in Section 16(a)(i) or 16(a)(ii), Buyer shall be entitled to treat such failure as Seller's Default entitling Buyer to exercise the remedies set forth in Section 9 above.

(d) Seller agrees that no substantial modifications to the Subdivision Plan may be made without the Buyer's prior written consent, which shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development. Buyer's consent to any such modification shall be deemed granted if no objection is delivered to Seller within 5 business days after Seller's delivery to Buyer of such proposed modification.

11

**Toll admits the parties entered into the Contract, respectfully refers the Court to**

**same to establish the terms thereof and otherwise denies this allegation.**

24.    Paragraph 8 of the Contract provided that upon Toll's default, the Deposit shall be

retained as Briarwood's sod and exclusive remedy as liquated damages.

**Toll admits the parties entered into the Contract, respectfully refers the Court to**

**same to establish the terms thereof and otherwise denies this allegation.**

25.    The contract provided at paragraph 13 for Toll to have a forty-five day "Due

Diligence Period" in which Toll could terminate the agreement without default.  Specifically, the

Contract provided:

> 13. Due Diligence Period:  Between the time of execution
> of this Agreement and Closing, Seller agrees that
> Buyer, its representatives and consultants shall have the
> right to enter upon the Property to perform engineering,
> environmental and such other feasibility studies as
> Buyer determines in its sole discretion.  Buyer and
> Seller further agree that within forty-five (45) days of
> the date of this Agreement (the "Due Diligence"
> Period"), should Buyer desire not to purchase the
> Property as a result of such studies, or as a result of
> Buyer's dissatisfaction with the Property based upon
> Buyer's review of Seller's Place or for any other reason
> whatsoever, Buyer shall have the right to terminate this
> Agreement upon written notice to Seller in which case
> the Deposit shall be returned to Buyer and there shall be
> no further liability of the parties hereunder.  Failure to
> notify Seller prior to the expiration of the Due
> Diligence Period shall act as Buyer's election to waive
> this contingency.  If Buyer causes any damages to the
> Property as a result of its studies performed pursuant to
> this Section, and Buyer elects not to purchase the
> Property, Buyer shall reasonably repair such damage.
> If Buyer terminates this Agreement pursuant to this
> Section 13, Buyer shall deliver, to Seller, without
> representation, warranty or recourse, copies of any
> materials (excluding any propriety or confidential
> materials or information) developed by third parties for

Buyer in connection with the Property.

**Toll admits the parties entered into the Contract, respectfully refers the Court to same to establish the terms thereof and otherwise denies this allegation**

26. Pursuant to the Contract, Toll's obligation to close the transaction was conditioned upon Briarwood obtaining "Final Approval" of a proposed subdivision plan "such that upon posting of customary security and payment of application and inspection fees by (Toll). (Toll may file the plat and commence infrastructure improvements and apply for and obtain building permits.")

**Toll admits this allegation.**

27. By letter dated December 22, 2005, the Contract was modified through letter agreement, which *inter alia*, extended Toll's due diligence period through January 6, 2006. (Ex. B)

**Toll admits this allegation.**

28. Toll performed its due diligence, and it did not cancel the Contract during the due diligence period.

**Toll admits this allegation.**

29. By letter dated December 22, 2006, Toll provided Briarwood with a letter which set forth its objections to certain conditions raised by Pomona, but did not cancel the Contract.

**Toll admits it transmitted a December 22, 2006 letter to plaintiff, respectfully refers the Court to same to establish the substance thereof, and denies the balance of the allegations.**

30. By letter dated January 22, 2007 (Ex. D) Toll acknowledged that certain of its concerns set forth in its prior letter were "adequately addressed," but it nevertheless set forth that it was canceling the Contract (the "Contract Termination") pursuant to Contract Section 16(c) based upon the following issues:

1. **The Klingher Court Issue** – Pomona's view of
Briarwood's subdivision indicated that if Klinger Court,

which would be an access road to the subdivision was
damaged: "the Developer shall install a 1 1/2" wearing
course, curb to curb, for the entire length of Klinger Court."
(See December 22, 2006 letter). Tolls Contract
Termination letter provided:

"The revised condition that the developer repaves Klinger
Court is unacceptable, as it gives the village the
unrestricted right to require a complete resurfacing rather
than requiring repair for damages actually caused. If the
condition cannot be omitted, we will agree only to repair
any damage caused by construction traffic as required by
the initial plans set during due diligence. Seller must bear
the cost of any complete resurfacing, if required."

2. The "**Steep Slope Issue**" – Pomona's Village Code
provides that any development of a lot which has a "steep
slope" is subject to steep slope review by the Planning
Board. This ordinance has been in place since 1998. Toll's
Contract Termination letter provided:

"As a general matter, Section 16(a)(iii) of the Agreement
requires "satisfaction by Seller of any conditions of Final
Approval, such that upon posting of customary security and
payment of application and inspection fees by Buyer,
Buyer may file the plate and commence infrastructure
improvements and apply and *obtain building permits*."
(emphasis added). It is precisely this type of additional
review and approval process which is intended to be
addressed as part of the closing conditions, so that Buyer
has comfort that all lots are fully developable without the
need for further approvals.

Further, specifically regarding the "steep slope" ordinance,
we understand that the application process and review
standards are extensive and time consuming and there is no
guaranty that any given lot would be approved for
development with acceptable conditions. As you know, the
village has the right to require the phasing of construction
of improvements on each lot, additional inspections, and
certifications of completion of each phase to development
of each lot. In addition, the planning board has the right to
relocate proposed improvements and/or to reduce building
envelopes and may require issuance of letters of credit to
secure completion of these lot improvements. Further, rock
blasting might be prohibited and, landscape mitigation
might be required. We cannot evaluate whether any of
these conditions would be acceptable until after the steep

14

slope permits are issued."

3. **"The Cul-de-Sac Grade Issue"** – Pomona's review of Briarwood's subdivision indicated that the subdivision's proposed cul-de-sac should have a maximum grade of 4%. Toll's Contract Termination letter provided:

"This Requirement poses significant economic impact as it affects premium cul-de-sac lots. In addition to additional site improvements, there will be a diminution of value to these lots.

As indicated in Item 3 above, our Agreement requires issuance of full and final approvals. For information as to this requirement in particular, our due diligence indicated that these streets would be treated as a "local street" and a Maximum grade of 10% slope could be maintained. The 4% requirement is a new and unacceptable condition.

4. **The "Drainage Easement Issue"-** As the Plan existed at the time of the Contract Termination Letter (later modified to obviate this issue), two lots contained a drainage easement. Toll's Contract Termination Letter provided:

"We do not believe omitting these lots from the purchase is an acceptable solution and we have not received any information or clarification on your other two proposals and costs estimates (for Seller's proposed reimbursement) to assess the merits. We are unclear as to who will be the beneficiary of any easements and who will be responsible for maintenance of the drainage facilities.

5. The **"Landscape Issue"** – Pomona's review of Briarwood's subdivision indicated possible landscaping requirements. Toll's Contract Termination letter provided:

"Once again, as indicated in Item 3 above, the Agreement requires full and final approvals. Any landscaping requirements would need to be specified and reviewed and approved by us prior to Closing."

**Toll admits it transmitted a January 22, 2007 letter to plaintiff terminating the Contract, respectfully refers the Court to same to establish the substance thereof and otherwise denies the allegation.**

15

31.    After the "Klingher Court Issue" was raised, Briarwood offered to bear the expense of repaving Klingher Court to the extent Toll found its not its obligation.  (Ex. E, p. 2 Zigler Aff. ¶17.

**Toll denies this allegation.**

32.    After the Drainage Easement was raised, Briarwood redrew its plans removing the drainage easements which Toll found objectionable.  (Zigler Aff. ¶20).

**Toll denies this allegation.**

33.    Pomona's Village Engineer mandated a maximum 4% grade for the cul-de-sac.

**Toll admits this allegation but responds that plaintiff refused to bear the costs associated with this decision in violation of the contract.**

34.    By letter dated January 30, 2007, Briarwood disputed Toll's purported reasons for Termination. (Ex. E).

**Toll admits plaintiff's attorney transmitted a January 30, 2007 letter to Toll, respectfully refers the Court to same to establish the substance thereof and otherwise denies the allegation.**

35.    Toll did not retract its cancellation, and this lawsuit followed.

**Toll admits this allegation but denies Toll had any obligation to retract the Contract's cancellation.**

36.    Pomona's Steep Slope Ordinance (the "Ordinance") has never resulted in denial of a building permit.  (Village Engineer Corless Aff. p. 29, 53).

**Toll denies knowledge or information sufficient to respond to this allegation.  Toll also asserts that this allegation is irrelevant.**

37.    That under the Ordinance, Steep Slope approval is generally an issue addressed after the filing of the subdivision plat ("Final Approval") as part of the building permit process (Zigler Aff. ¶9).

**Toll denies this allegation**.

38.     It is possible to get Steep Slope approval during the subdivision application process only if proposed site improvements (i.e. house building plans) are submitted as part of the subdivision approval process.  (Village Engineer Corless Aff. pp. 25, 43, 50-51).

**Toll denies this allegation**.

39.     Toll was given the opportunity to present building plans during the subdivision application process, but it failed to do so.  (Zigler Aff. ¶10-11).

**Toll denies this allegation and also asserts it is irrelevant to Briarwood's contractual obligation to provide Toll with final, unappealable subdivision approval.**

Dated: White Plains, New York
        June 18, 2008

                                    BLEAKLEY PLATT & SCHMIDT, LLP
                                    *Attorneys for Defendant*


                        BY:     _____
                                    WILLIAM P. HARRINGTON (WH5262)
                                    ONE NORTH LEXINGTON AVENUE
                                    P.O. BOX 5056
                                    WHITE PLAINS, NY 10602-5056
                                    (914) 949-2700