UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BRIARWOOD FARMS, INC.,

                        Plaintiff,

    - against -

TOLL BROS., INC.,

                        Defendant.

------------------------------------------------------------------X

07 CIV. 3657 (CLB)

ECF CASE

# DEFENDANT'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT
# AND IN OPPOSITION TO PLAINTIFF'S RULE 56 MOTION

BLEAKLEY PLATT & SCHMIDT, LLP
*ATTORNEYS FOR DEFENDANT*
ONE NORTH LEXINGTON AVENUE
P.O. BOX 5056
WHITE PLAINS, NY 10602-5056
(914) 949-2700

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF MATERIAL FACTS ...................................................... 1

    A.    THE CONTRACT ............................................................... 1

    B.    BRIARWOOD REPUDIATED THE CONTRACT
           BY REFUSING TO CURE MATERIALLY
           ADVERSE CONTRACT BREACHES ...................................... 3

           (i)    BRIARWOOD REFUSED TO SECURE
                  THE STEEP SLOPE PERMITS REQUIRED
                  FOR FINAL SUBDIVISION APPROVAL ................................. 4

           (ii)   THE REMAINING BREACHES OF
                  CONTRACT BY BRIARWOOD .............................................. 7

POINT I

    PLAINTIFF BREACHED AND/OR REPUDIATED
    THE CONTRACT ENTITLING TOLL TO TERMINATE SAME ................... 9

    A.    LEGAL STANDARD ........................................................... 9

    B.    BRIARWOOD'S REFUSAL TO SECURE THE STEEP
           SLOPE PERMITS NECESSARY TO OBTAIN FINAL,
           UNAPPEALABLE SUBDIVISION APPROVAL
           BREACHED THE CONTRACT ............................................. 10

    C.    BRIARWOOD'S REPUDIATION OF ITS CONTRACTUAL
           REQUIREMENTS PERMITTED TOLL TO TERMINATE
           THE CONTRACT ............................................................. 17

POINT II

    BRIARWOOD'S WAIVER CLAIM HAS NO MERIT ..................................... 18

CONCLUSION ................................................................................ 22

## PRELIMINARY STATEMENT

This case is spawned by plaintiff Briarwood Farms, Inc.'s ("Briarwood") refusal to fulfill its contractual obligation to provide Toll Bros., Inc. ("Toll") with *final, unappealable subdivision* approval of a proposed project in the Village of Pomona, New York.  Rather than secure final subdivision approval, and the steep slope permits required for 33 of the subdivision's 41 lots, or cure significant other contract breaches, Briarwood insisted that Toll should incur the delays, uncertainties and exorbitant costs associated with these tasks – all of which were a fundamental prerequisite to final, unappealable subdivision approval.  Faced with significantly less than it bargained for, and as required by the contract, Toll outlined these issues to Briarwood and requested that Briarwood revise the subdivision application to remove the unacceptable conditions.  Briarwood refused.  Toll then properly and lawfully terminated the contract and demanded the return of the contract deposit.  Instead of doing so, Briarwood commenced this litigation.

## STATEMENT OF MATERIAL FACTS

### A.    <u>The Contract</u>

On November 7, 2005, the parties entered into an Agreement of Sale (the "Contract") whereby Toll would acquire from Briarwood 66.2 acres known as Halley Estates II (the "Property") located in the Village of Pomona, Rockland County (the "Village") that was the subject of the subdivision application.  (Ex. "3").[1]  The Contract price was $13,325,000 based upon a "*final, unappealable subdivision approval.*"  (Ex. "3," p. 1).  The Purchase Price would be increased or decreased by $325,000 for each lot more or less than 41 which received final

---

[1]    Since plaintiff's motion papers designate exhibits by letter, to avoid confusion Toll has designated its exhibits by number.

subdivision approval.  (*Id.* ¶ 2).

Toll's obligation to purchase the Property was expressly conditioned upon Briarwood securing and delivering to Toll *final, unappealable* subdivision approval, defined in the Contract as follows:

> . . . the receipt by Seller for Buyer, ***at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the 'Final Approval'), and the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits***.

*Id.* Section 16(a)(iii), p. 7 (emphasis added).

The Contract further provided that the "Final Approval," as defined above,

> "shall be ***final and unappealable at the time of Closing and shall be subject only to such conditions as Buyer [Toll] may approve at [Toll's] sole discretion, which approval shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development***." *Id.* ¶ 16(b), pp. 7-8 (emphasis added).

In other words, Briarwood was required to secure all approvals necessary for Toll to actually start building.

Consistent with this "Final Approval" requirement, Section 14(i) obligated Briarwood to provide at closing ". . . a complete set of Seller's [Briarwood's] Plans . . . of the <u>Final Approvals</u> (as hereinafter defined), including all construction drawings, grading plans, and the like, all of which Seller's Plans shall be complete and accurate, free and clear of liens and *paid for in full by Seller*."  (Ex. "3," ¶ 14(i), p. 5))(emphasis added).

The Contract also provided that in the event Briarwood failed to secure and deliver such Final Approval, Toll could cancel the Contract and recover its $1,325,000 deposit. *Id.* Section 16(c)(ii), p. 8.[2]

**B.      Briarwood Repudiated the Contract by Refusing to
          Cure Materially Adverse Contract Breaches**

In November 2006, representatives of Toll and Briarwood began meeting to discuss the various requirements which the Village Planning Board and Village Engineer had identified as conditions to preliminary subdivision approval.[3] (Ex. "10"). Despite efforts to resolve the conditions, as of the December 2006, significant issues remained which had a material adverse impact on the proposed development which were objected to by Toll, and if left unsolved, constituted grounds to terminate the Contract under Sections 16(a)(iii) and (b).

As required by the Contract and in an effort to resolve those issues, on December 22, 2006, Toll forwarded a letter to Briarwood identifying and objecting to eight conditions which materially affected the viability of the proposed development. Toll advised in the letter that such conditions were unacceptable and would not be waived. *Id.* Pursuant to Section 15(f) of the Contract, Toll requested that Briarwood diligently perform the work needed to resolve and remove the conditions for approval of the subdivision. *Id.* Absent same, Toll reserved the right to terminate the Contract under Section 16(c). *Id.*

Thereafter, Briarwood cured three of the eight unacceptable conditions identified by Toll but refused to cure the remaining five. In response, by letter dated January 22, 2007, Toll advised Briarwood that given its refusal to cure the five outstanding adverse conditions Toll

---

[2]      "If on or before the date of closing all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer shall have the option of . . . (ii) canceling this Agreement in which case this Agreement shall become null and void and the Deposit paid to Buyer [Toll]."

[3]      Such issues were identified in Mr. Corless' December 30 and 31, 2005 memorandums (Exs. "4" and "5"), as well as the Planning Board's January 12, 2006 resolution granting preliminary subdivision approval (Ex. "11").

3

elected to terminate the Contract pursuant to Section 16(c).  (Zalinsky Dec., ¶ 22).  The five

outstanding adverse conditions were (1) Briarwood's failure to secure required steep slope

permits; (2) the repaving of Klinger Court; (3) the Village's mandate to decrease the slope of a

certain cul-de-sac street from 10% to 4%; (4) the mandated diversion of a stream; and (5) the

Village's enhanced landscaping requirements.  (Ex. "12").

     **(i)**     **Briarwood Refused to Secure the Steep Slope**
              **Permits Required for Final Subdivision Approval**

While all five conditions identified in Toll's January 22, 2007 letter were significant, the

most troublesome was the condition contained in the then draft Planning Board resolution

granting preliminary subdivision approval which stated in pertinent part:  "Lots that are subject

to steep slope requirements will be subject to Planning Board site plan review."  (Ex. "11," p. 2,

¶ 7).  As previously stated, 33 out of the 41 proposed building lots (or  80.5% of the project)

required steep slope permits <u>before</u> "final, unappealable subdivision approval" could be granted

– an approval process which Village Engineer Corless estimated could last 12 to 24 months.

(Ex. "8").  The impacted lots are reflected on the "Disturbed Slope Map" which was part of the

Briarwood preliminary subdivision plat approved by the Planning Board.  (Ex. "9").

The Contract required, and Toll expected, Briarwood to secure the required steep slope

permits in conjunction with obtaining *final* subdivision approval.  (Zalinsky Dec., ¶ 24).

Section 16(a)(iii) of the Contract required such Final Approval and the Village's Steep Slope

Ordinance expressly contemplated that steep slope review and permits were to be secured in

conjunction with the final subdivision review process.  (Zalinsky Dec., ¶ 24, Exs. "3" and "7").

Moreover, Village Engineer Corless testified that Briarwood had to obtain steep slope permits *in*

*order to secure* final subdivision approval.  (Ex. "8," p. 25).  Therefore, Toll expected

Briarwood to take those steps necessary to secure steep slope permits for the "hypothetical"

houses on the 33 lots with steep slopes depicted on the approved preliminary subdivision plan.

(*Id.*; Zalinsky Dec., ¶ 24). Only then could Toll receive "final approval" and begin construction

upon payment of the appropriate fees and posting of required bonds.[4]

In response to Toll's demand to obtain the steep slope permits, Briarwood's counsel,

Donald Tirschwell, unequivocally advised Toll by letter dated January 30, 2007, that Briarwood

would not secure the multiple steep slope permits required for *final, unappealable* subdivision

approval:

> Item 3 – During the due diligence period, Toll Bros. had the obligation and the opportunity of reviewing the Village's Subdivision Regulations and Zoning Code. The Zoning Code and subdivision regulations have not changed since the date the Contract was signed or since the date that the due diligence period expired. ***In order for the Purchaser [Toll] to obtain building permits, Purchaser [Toll] must comply with the Village Codes.*** It is impossible to comprehend Toll Bros. claiming that 'they did not know that the gun was loaded'. ***The referenced requirement 'has been on the books' of the Village and if it was missed by Toll Bros., that is Toll Bros. fault and not an obligation of Seller [Briarwood] or a basis for Toll Bros. to claim cancellation of the Contract of Sale.***
>
> The Village's steep slope ordinance does not permit the Village to deny a building permit, however, the steep slope ordinance does permit the Village Planning Board to require certain conditions as to those lots which are subject to the steep slope ordinance. Again, the steep slope ordinance was 'on the books' when the Contract was signed and during a due diligence period.
>
> Toll Bros. has no right to cancel the Contract because they failed to take notice of the Village's steep slope requirements.

(Ex, "13," p. 3)(emphasis added).

---

[4]      In securing "final, unappealable subdivision approval," the Contract expressly required Briarwood to satisfy "… any conditions of Final Approval." (Ex. "3," Section 16(a)(iii), p. 7). At a minimum, the steep slope permits were a "condition of Final Approval."

Mr. Tirschwell's response confirmed Briarwood's Contract breach and is fatal to Briarwood's claim.

Consistent with the Village's Steep Slope Ordinance and the testimony of the Village Engineer, Toll was not concerned that the steep slope permits were for "hypothetical" house locations depicted on the subdivision map. (Zalinsky Dec., ¶ 26). This was standard procedure in the industry. *Id.* Indeed, as noted by Village Engineer Corless, the purpose of hypothetical house locations in the subdivision approval process is to assure a Planning Board that a house can actually be built on an approved lot. (Ex. "8," p. 58, l).

Had Briarwood complied with the Contract and secured *final, unappealable* subdivision approval (with the steep slope permits for the impacted 33 lots), Toll would have closed the transaction and paid the fees necessary to begin the construction of roadways and other requisite subdivision infrastructure. (Zalinsky Dec., ¶ 27). Moreover, Toll would have begun a formal marketing plan for the development, marketing individual lots based upon the approved hypothetical house locations. *Id.* In the event an individual purchaser chose to build a house on a steep slope lot that exceeded the parameters of hypothetical house location, Toll would have developed the appropriate site plan and returned to the Planning Board for a modified steep slope permit as described by Village Engineer Corless. (Ex. "8," p. 31, l. 12-29). Village Engineer Corless explained this was a three-month process. *Id.* The cost associated with this additional approval process would have been incorporated into the purchase price for the home. (Zalinsky Dec., ¶ 27). Therefore, the notion that Toll would not accept final subdivision approval and steep slope permits for *hypothetical house locations* contradicts both common sense and the Contract language.

**(ii)**    <u>**The Remaining Breaches of Contract by Briarwood**</u>

In addition to Briarwood's failure to obtain steep slope permits, Toll raised the following objections which it directed Briarwood to resolve: (1) Repaving of Klinger Court; (2) Slopes of certain streets from 10% to 4% affecting cul-de-sacs; (3) Diversion of a stream; and (4) Landscaping requirements. (Ex. "12").

- <u>Repaving of Klinger Court</u>

Relative to repaving of Klinger Court, Toll advised Briarwood that requiring Toll to repave the street was unacceptable as it gave the Village the unrestricted right to require a complete resurfacing rather than requiring repair for damage actually caused. (Ex. "10"; Zalinsky Dec., ¶ 29). As such, Toll advised Briarwood that it would only pay for repairs as was required in the original plans and that Briarwood had to bear the cost of resurfacing, if required. (Exs. "10" and "12"). In response, Briarwood's counsel rejected Toll's request and would not agree to bear the cost of any required resurfacing of Klinger Court. (Ex."12," p. 2).

- <u>Village Mandate to Decrease Grade of Cul-de-Sac Road</u>

Toll also cited the Village's requirement that the slope of the road servicing the subdivision's cul-de-sac be reduced from 10% to 4%. (Exs. "10" and "12"; Zalinsky Dec., ¶ 29). This work would force Toll to incur approximately $568,000 in blasting, grading and related costs, as well as significantly impact the value of the 10 premium cul-de-sac lots. (Zalinsky Dec., ¶ 29). Briarwood advised Toll that the 4% grade was a Village requirement and that if Toll missed such requirement during the due diligence period, it was Toll's fault and not Briarwood's. (Ex. "13"). However, this argument misses the point. The original plans called for a 10% grade which was consistent with the Village Code and acceptable to Toll. The Village Engineer, in the exercise of his statutory discretion, unilaterally altered the roadway slope to 4%, imposing at

least $560,000 in additional costs upon Toll. Toll advised Briarwood that its refusal to either

cure this problem or agree to accept the cost of same constituted an adverse material condition

under the Contract. Briarwood refused to accept these costs.

- Easement Required for Drainage Swale in Rear of Lots 25 Through 28

The preliminary plan as approved by Toll did not require any drainage easements.

(Zalinsky Dec., ¶ 29; Ex. "10"). Storm water was to be addressed via a swale on the subdivision

periphery which would keep the water substantially off the subdivision site. Zalinsky Dec., ¶ 29;

Exhibit "10." However, during the Planning Board review, the Town Engineer rejected the

swale concept and required the storm water to be diverted via underground piping over and

through four subdivision lots (Lots 25-28) to a drainage basin within the subdivision. (Zalinsky

Dec., ¶ 29; Ex. "10"). This would require the creation of easements burdening each of the four

impacted lots, which would arguably adversely impact their value and marketability. *Id.* To

make matters worse, the underground piping which required the easements benefited adjacent,

existing single-family homes, not the proposed impacted lots.

- The Village's Enhanced Landscaping Requirements

The landscaping obligations were also dramatically changed. (Zalinsky Dec., ¶ 29; Ex.

"10"). The original plans reviewed by Toll during the due diligence period provided for typical

landscaping throughout the subdivision. Zalinsky Dec., ¶ 29; Exhibit "10." However, the revised

plans which were the subject of the Planning Board's preliminary approval resolution, required

installation of decorative plantings far in excess of that initially required. Zalinsky Dec., ¶ 29;

Exhibit "10." Therefore, there was substantial confusion concerning the extent, nature and cost

of the landscaping that had to be installed. Zalinsky Dec., ¶ 29; Exhibit "10." The potential

additional cost could easily have exceeded $100,000. Zalinsky Dec., ¶ 29; Exhibit "10." Toll

8

therefore required that this issue be clarified. (Ex. "12"). Briarwood refused to do so. (Ex. "13").

Collectively the four remaining adverse conditions would have imposed additional costs of at least $775,000, and if left unresolved, would have had a significant adverse impact on the market value of multiple building lots. Given Briarwood's refusal to address these adverse conditions, Toll was justified in terminating the Contract. (Zalinsky Dec., ¶ 30).

## POINT I

### PLAINTIFF BREACHED AND/OR REPUDIATED
### THE CONTRACT ENTITLING TOLL TO TERMINATE SAME

**A.**     **Legal Standard**

Summary judgment is permissible "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is genuine if the evidence is such that a jury could return a verdict for the nonmoving party. *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (*quoting Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A fact is material when "it might affect the outcome of the suit under the governing law." *Id.* (*quoting Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, such party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (*quoting Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (986)), and "may not rely on

conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Federal Express Corp.*,

247 F.3d 423, 428 (2d Cir. 2001) (*quoting Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

Rather, the non-moving party must produce admissible evidence that supports its pleadings. *See*

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968).

In determining whether a genuine issue of material fact exists, the court must construe the

evidence in the light most favorable to the non-moving party and draw all inferences in that

party's favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.

2003). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is therefore inappropriate "if there is any evidence in the record that could

reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (*citing*

*Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

**B.    Briarwood's Refusal to Secure the Steep Slope Permits Necessary to Obtain Final, Unappealable Subdivision Approval Breached the Contract**

Under New York law, "[a] condition precedent is an act or event, other than a lapse of

time, which, unless the condition is excused, must occur before a duty to perform a promise in

the agreement arises." *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34,

51 (2d Cir. 2004) (*citing Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d

685, 690 (1995)); *Merritt Hill Vineyards v. Windy Hgts Vineyard*, 61 N.Y.2d 106, 112-113

(1984); RESTATEMENT OF CONTRACTS 2D, § 224.[5]  Moreover, where--as here--the occurrence of

a condition is required by the agreement of the parties, a rule of strict compliance applies.

---

[5]    Pursuant to RESTATEMENT OF CONTRACTS 2D, § 224, a condition is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."

*Oppenheimer & Co.,* 86 N.Y.2d at 690.

 Paragraph 16 of the Contract unambiguously establishes an express condition precedent to Toll's contractual obligation to purchase the Property. Entitled "Conditions to Buyer's [Toll's] Obligations," (Ex. "3"), Toll's obligation to close under the Contract was "expressly conditioned" upon Briarwood obtaining, at Briarwood's sole cost and expense, *"final, unappealable"* subdivision approval, with all the requisite permits, to enable Toll "upon posting of customary inspection fees . . . [to] file the plat and commence infrastructure improvements and apply for and obtain building permits." (Ex. "3," Section 16(a)(iii), p. 7). Pursuant to the Village Code, and as confirmed by the deposition testimony of the Village Engineer, Briarwood was obligated to obtain the steep slope permits for the hypothetical home sites depicted upon the preliminary subdivision plat in order to secure such *"final, unappealable approval."* Briarwood refused to do so, warranting Toll's cancellation of the Contract.[6]

 Briarwood argues that (1) steep slope approval is generally addressed after the filing of the subdivision plat ("Final Approval") as part of the building permit process [Zigler Aff. ¶ 9], (2) that it is possible to obtain steep slope approval during the subdivision application process *only* if proposed site improvements (i.e., house building plans) are submitted as part of the subdivision approval process, and (3) Toll was given the opportunity to present building plans or actual house plans during the subdivision application process, but it failed to do so [Zigler Aff. ¶¶ 10-11]; Plaintiff's 56.1 Statement, ¶¶ 20-22; and Plaintiff's Memorandum of Law, pp. 7,

---

[6] Briarwood's refusal to secure the steep slope permits necessary for final, unappealable subdivision approval alone constituted a material contract default warranting termination of the Contract. In addition to refusing to obtain the steep slope permits, Toll advised Briarwood in writing of four additional material conditions imposed by the Village Planning Board and Village Engineer that if left unresolved would have an adverse impact on the proposed subdivision and which Briarwood ignored. (Exs. "10" and "12"). Collectively these four (4) additional conditions would have imposed additional costs of at least $775,000, and if left unresolved would have had a significant adverse impact on the market value of multiple building lots and thus, further justify Toll's termination of the Contract. (Zalinsky Dec., ¶ 30).

10-11. These arguments not only fly in the face of the Village Code, the deposition testimony of Village Engineer PJ Corless, and the unequivocal Contract language, they miss the point entirely.

The seminal dispositive fact is that Briarwood <u>never</u> secured final, unappealable subdivision approval. Briarwood can quibble that steep slope permits "could have" or "might be" secured after final subdivision approval. However, the conceded fact is that Briarwood <u>never</u> fulfilled its obligation to tender to Toll "final, unappealable subdivision approval." This fact alone is dispositive and warrants an award of summary judgment to Toll. Acceptance of Briarwood's contention that it was not under the obligation to obtain the steep slope permits would impermissibly nullify its contractual obligation to obtain final, unappealable subdivision approval. As noted by the Court in *IBM Credit Financing Corporation v. Mazda Motor Manufacturing (USA) Corporation*, 245 A.D.2d 78, *affd.* 92 N.Y.2d 989 (1998) – "[p]laintiff's proffered view of the transaction would have made no economic sense for defendant and would have frustrated defendant's explicit central purpose in entering into the transaction." The Court continued and observed that the construction of the contract advanced by the plaintiff would have rendered "meaningless" a specific provision of the contract.

Moreover, Briarwood's arguments directly contradict the express language of the Village Steep Slope Ordinance, the testimony of the Village Engineer and Briarwood's own actions after Toll demanded that Briarwood obtain the steep slope permits. Chapter 119 of the Village Steep Slope Ordinance expressly contemplates that the steep slope permits would be reviewed and <u>secured in conjunction with</u> the Planning Board's final subdivision review and approval process:

> **§ 119-7. Procedures for review and decision making.**
>
> A.     It is the intent of this chapter to incorporate the consideration of steep slope protection into the Village's

existing land use and development approval procedures in conjunction with the procedures of the New York State Environmental Quality Review Act. *To the maximum extent possible, the review, hearings and decisions upon any application processed under this chapter will run concurrently with similar procedures that the approving authority may undertake in connection with the other applications that are directly related.*

(Ex. "7," § 119-7(A))(emphasis added).

Village Engineer Corless confirmed that steep slope permits <u>must</u> be obtained as a condition of final subdivision approval. (Ex. "8," p. 25). Specifically, Corless testified as follows:

- The law prohibits the disturbance of any steep slope without the issuance of a steep slope permit. (*Id.* p. 10, l. 15 to p. 11, l. 9);

- Under Section 119-4, any steep slope permits required in conjunction with a subdivision application are referred to and issued by the Planning Board. (*Id.* p. 12, l. 15 to p. 13, l. 7);

- Steep slope permits under the Steep Slope Ordinance are issued by the Planning Board as part of the final subdivision review process. (*Id.* p. 23, l. 11 to p. 24, l. 19);

- In order to secure final subdivision approval, a developer must obtain from the Planning Board during the final subdivision plat review process steep slope permits for houses designated on building lots impacted by steep slopes. (*Id.* p. 25, l. 13-23);

- Steep slope permits are the type of final details which must be resolved by an applicant to progress from preliminary subdivision approval to receive final subdivision approval from the Planning Board. (*Id.* p. 26, l. 2-6);

- Under Section 119-7, the information required to be submitted to Planning Board to secure steep slope permits is rather elaborate, requires additional public

hearings, the posting of letters of credit and may involve a phased site plan review if desired by the Planning Board. (*Id.* p. 26, l. 7 to p. 27, l. 3);

- No building permit can be issued for the construction of a single-family home on a steep slope area until the Planning Board issues *final* subdivision approval. (*Id.* p. 14, l. 8-13 and p. 28, l. 4-14);

- Based upon Village Engineer Corless' experience, its takes 12 to 24 months to secure steep slope permits between the time of preliminary subdivision approval and final subdivision approval. (*Id.* p. 30, l. 21 to p. 31, l. 11);

- After issuance of final subdivision approval with steep slope permits, a new steep slope permit must be secured from the Planning Board only if the owner of the lot wants to build a house that exceeds the parameters of the "hypothetical" home depicted on the final approved subdivision plat for which the steep slope permit was issued. This approval process typically takes three to six months. (*Id.* p. 31, l. 12-19);

- The Halley Estates II proposed preliminary subdivision plat included a Disturbed Slope Map (Ex. "9") which depicted (i) the hypothetical house locations on each building lot and (ii) those areas within the subdivision impacted by steep slopes which required a steep slope permit. (Ex. "8," p. 39, l. 14 to p. 40, l. 15);

- Thirty-three (33) of the 40 single-family lots depicted on the Halley Estates II proposed preliminary subdivision map required steep slope permits from the Planning Board before final subdivision approval could be granted. (*Id.* p. 41, l. 19 to p. 43, l. 23);[7]

- Each of the 33 building lots with steep slopes required a steep slope permit to be issued by the Planning Board. (*Id.* p. 43, l. 22 to p. 44, l. 7);

---

[7]    Mr. Corless testified, and Briarwood's Disturbed Slope Map reflects (Ex. "9"), that the following 33 building lots required steep slope permits – Lots 1 through 21, 24 through 29, 31 through 36. Only seven lots (22, 23, 30 and 37 through 40) did not require steep slope permits. (*Id.*).

- To date no steep slope permits have been issued for those 33 lots and the Planning Board has <u>not</u> granted final subdivision approval for the land which is the subject of this litigation. (*Id.* p. 44, l. 8-13);

- Until final subdivision approval and the requisite steep slope permits are granted, no building permit for the building lots can be issued to enable construction of single-family homes thereon. (*Id.* p. 45, l. 5-16);

- When final subdivision approval is granted, the Planning Board will have considered all the criteria under the steep slope law. (*Id.* p. 62, l. 4-15). To the extent a lot owner seeks to construct a home or improvement (e.g. pool) which exceeds the size of the hypothetical house depicted on the approved final plat, the owner must go back before the Planning Board to secure a modified steep slope permit. (*Id.* p. 62, l. 16-24); and

- The process of securing a modified steep slope permit is not merely a matter of "tweaking" but an extensive process which involves costs ranging "in the hundreds of thousands of dollars." (*Id.* p. 55, l. 3-15).

Toll expected, and the Contract required steep slope permits in conjunction with obtaining final subdivision approval. Section 16(a)(iii) of the Contract required such Final Approval and the Village Steep Slope Ordinance confirmed that steep slope permits were to be secured in conjunction with final approval. Moreover, the Village Engineer Corless testified that Briarwood had to obtain the steep slope permits in order to receive final approval. Therefore, Toll expected that Briarwood would secure the steep slope permits for the hypothetical house on the 33 lots with steep slopes on the approved preliminary subdivision plan.

Without the steep slope permits Briarwood could not deliver to Toll the requisite *final, unappealable* approval which would allow Toll to pay customary fees, obtain building permits and begin the subdivision construction process. Therefore, the *final, unappealable* subdivision approval obligation of Section 16(a)(iii) was not satisfied.

Equally important, without the steep slope permits and *final* subdivision approval, neither Toll nor Briarwood could ascertain the actual number of "approved" building lots upon which the purchase price was based. Stated otherwise, unless and until Briarwood secured the steep slope permits for the hypothetical house locations and *final* subdivision approval, the final purchase price under the Contract could not be calculated, rendering the Contract unenforceable. In *Joseph Martin Jr. Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105 (1981), the New York Court of Appeals observed that it is essential that the "amount to be paid for the sale or lease of real property" be agreed to by the parties before an enforceable contract can exist. *Id.* at 109-10.

Briarwood argues that Toll never provided individual building plans to Briarwood and asserts that if Toll had done so, Briarwood could have secured the steep slope permits for such plans in conjunction with obtaining final subdivision approval. This is untrue. This belated excuse rings hollow and defies common sense. Until Toll had prospective buyers for individual lots, it could not provide with certainty building plans for the lots. Toll is a custom builder of luxury homes and Toll develops individual site plans depending on the desires of its buyers. As such, Toll would not begin the process of drawing detailed site plans for a potential 41-lot subdivision until it had secured the fundamental consideration to which it was entitled under the Contract – final, unappealable subdivision approval. (Zalinsky Dec., ¶ 28). It would have been a premature exercise in futility and a fiscal waste to begin drafting individual house plans for 41 lots prior to knowing whether Toll was going to actually purchase and develop the Property. (*Id.*). In forcefully rejecting Toll's demand that Briarwood secure steep slope permits, Briarwood's counsel inexplicably failed to request and/or demand that Toll provide building plans for the 33 steep slope lots; nor did counsel ever represent that Briarwood would secure such approval had Toll done so. Briarwood's reliance on Toll's alleged failure to provide plans

is undermined given Briarwood's outright refusal to even get the steep slope permits. Toll submits this glaring omission speaks volumes and undermines Briarwood's position. In *Aimes v. Wesnofske,* 255 N.Y. 156, 162 (1931), the New York Court of Appeals declared that "[i]f a promissor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure."

## C.     Briarwood's Repudiation of its Contractual Requirements Permitted Toll to Terminate the Contract

Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. *See Franconia Assocs. v. United States,* 536 U.S. 12 (2002); *Norcon Power Partners v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458 (1998); John D. Calamari and Joseph M. Perillo, The Law of Contracts § 12-3 (3d ed. 1987). When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit. *Lucente v. IBM,* 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted).

Briarwood's refusal to obtain the steep slope permits constituted a clear and unequivocal repudiation of its performance obligations under the Contract. As stated above, Briarwood's counsel unequivocally advised Toll by letter dated January 30, 2007, that Briarwood would not secure the multiple steep slope permits required for *final, unappealable* subdivision approval. (Ex. "13"). This confirmed prior statements of Briarwood, which are repeated in its motion contending that the steep slope requirements were not their obligation under the Contract. There can be no doubt of the parties' intent and no occasion for interpreting the terms of the Contract

other than as written.  The Contract provides in the clearest of language that the parties did not intend to complete the contract unless and until Briarwood delivered to Toll final, unappealable subdivision approval.  When Briarwood agreed to obtain such approval, they necessarily assumed the obligation to comply with all of the Village's pertinent requirements.  As confirmed by Village Engineer Corless, steep slope permits were an obvious necessity due to the topography of the land.  By failing to deliver final approval and by refusing to secure the steep slope permits for 33 out of 41 lots, among other things, Briarwood unequivocally failed to perform the Contract requirements, entitling Toll to cancel the Contract and be refunded the $1,325,000 Contract deposit.  (Ex. "3," Section 16(c)(ii) p. 8).[8]

Similarly, Briarwood's failure to cure the remaining adverse deficiencies identified by Toll also constitutes an independent, equally dispositive repudiation of the Contract, warranting the award of summary judgment to Toll.

**POINT II**

**BRIARWOOD'S WAIVER CLAIM HAS NO MERIT**

Without the benefit of any legal citation, Briarwood argues that Toll "waived" Briarwood's obligation to obtain steep slope permits.  Briarwood contends that this "waiver" resulted from Toll's alleged failure to terminate the Contract because of the existence of the steep slope ordinance which Briarwood had agreed to comply with in the subject Contract.  This argument is frivolous.

Under New York law, a waiver "will not be inferred from mere silence or inaction." *Chapin v. Chapin*, 295 A.D.2d 389, 390 (1st Dept. 2002).  Indeed, "waiver requires that the party

---

[8]      Section 16(c)(ii) states "If on or before the date of closing all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer [Toll] shall have the option of …(ii) canceling this Agreement in which case this Agreement shall become null and void and the Deposit paid to Buyer."

to be estopped be aware of certain facts and, being aware of them, elect not to take advantage of them." *Chapin*, 295 A.D.2d at 390. In other words, waiver is the intentional relinquishment of a known right, and will lead to estoppel only when an individual or entity has accepted the benefits of an agreement. *Id.*

Despite the overwhelming evidence to the contrary, Briarwood argues that Toll waived and/or is estopped from invoking the termination provisions of the Contract (Ex. "3," Section 16, pp. 7-8) because it failed to object to the Village steep slope regulations during the initial due diligence period.[9] Once again, Briarwood's tortured contract construction misses the point entirely.

Section 13 of the Contract provided Toll with a 45-day due diligence period to ". . . perform engineering, environmental and such other feasibility studies as [Toll] determines in its sole discretion." (Ex. "3"). Toll had the unilateral right to cancel the Contract during this period which was thereafter extended for an additional 45 days. *Id.* Section 13 also provided that if Toll failed to exercise its discretionary right to unilaterally terminate the Contract during the due diligence period, Toll would "waive this contingency." The purpose of the due diligence process was to allow Toll to conduct engineering and environmental reviews to ascertain potential latent defects. Toll did so and chose to continue with the Contract, thereby waiving its unilateral right to terminate the Contract under the due diligence clause.

However, by electing to continue with the Contract following the due diligence period, Toll did not, as now argued by Briarwood, waive its contractual right to receive final, unappealable subdivision approval, including the requisite steep slope permits. Briarwood cites

---

[9]     Under section 13, Toll had 45 days to ". . . perform engineering, environmental and such other feasibility studies [as Toll] determines in its sole discretion." Toll had the absolute right to cancel the Contract during this period which was thereafter extended for an additional 45 days.

no credible evidence or law to support this position because none exists. Indeed, it is preposterous to argue, as Briarwood does, that Toll "waived" the fundamental consideration for which it bargained under the Contract – *"final, unappealable subdivision approval"* – by not canceling the Contract during the due diligence period due to Briarwood's obligation to obtain the steep slope permits.

Toll timely advised Briarwood in writing of its objections to certain unacceptable conditions, including Briarwood's failure to obtain steep slope permits, which needed to be resolved before final subdivision approval could be granted. Toll specifically advised that such conditions "...*will not be waived*." (Ex. "10"). Toll also requested that, pursuant to Section 15(f) of the Contract, Briarwood diligently perform the work needed to resolve and remove the conditions for approval of the subdivision and absent same, Toll reserved the right to terminate the Contract under Section 16(c). *Id.* When Briarwood unequivocally refused to obtain, among other things, the steep slope permits, Toll exercised its right to terminate the Contract.

In addition, at the time of execution of the Contract with Briarwood, Toll was aware of (i) Chapter 119 and the need for steep slope permits; (ii) that Chapter 119-7 specifically contemplated that those very permits would be secured by Briarwood in conjunction with the SEQRA review and final subdivision approval, and (iii) the lengthy and costly process involved in securing same. (Zalinsky Dec., ¶ 34). It was precisely these reasons why Toll bargained for the clear and unequivocal final, unappealable approval standard in Section 16(a)(iii), which clearly required Briarwood, not Toll, to secure at Briarwood's expense the required steep slope permits in conjunction with obtaining final subdivision approval. *Id.* Moreover, Section 16(a)(iii) of the Contract required such Final Approval and the Village's Steep Slope Ordinance

20

expressly contemplated that steep slope review and permits were to be secured in conjunction with the final subdivision review process.[10]

Briarwood cites *Oppisso v. Commerce Bank, N.A.,* 11 Misc.3d 1069A as authority for the proposition that Toll was required to cancel during the due diligence period because of the steep slope requirements. This case does not support Briarwood and actually provides additional authority to grant summary judgment to Toll. In that case, the buyer learned during a due diligence period and thereafter that municipal approval could not be secured for the proposed project. The buyer, however, did not exercise its option to cancel the contract resulting in a forfeiture of the down payment. Here, Toll was never advised that municipal approvals (i.e. the steep slope permits) could not be secured. Indeed, such permits were available and necessary to secure *final, unappealable subdivision approval*. However, Briarwood refused to secure them. Toll then promptly exercised its right to terminate the agreement when Briarwood repudiated its obligation to obtain the steep slope permits. Consequently, under *Oppisso* and fundamental principles of contract law, Toll properly notified Briarwood that the Contract was at an end. Briarwood, as the defaulting party, was then required to refund the down payment. Otherwise, Briarwood would be in the unjustifiable position of benefiting from its own wrong.

In light of the foregoing, the evidence developed to date fails to suggest even an inference of waiver by Toll of Briarwood's obligation to obtain the steep slope permits in conjunction of final, unappealable subdivision approval.

---

[10]    As previously stated, the Village Engineer confirmed that in order to obtain final subdivision approval, Briarwood was required to secure the steep slope permits. (Ex. "8," p. 25).

## CONCLUSION

For the foregoing reasons, Briarwood's summary judgment motion should be denied,

Toll's cross-motion granted, Briarwood's complaint dismissed, and Toll granted a judgment on

its counterclaim for the return of the Contract deposit.

Dated:  White Plains, New York
          June 18, 2008

BLEAKLEY PLATT & SCHMIDT, LLP
*Attorneys for Defendant*

BY:  _____
      WILLIAM P. HARRINGTON (WH5262)
      MICHAEL P. BENENATI (MPB9669)
      ONE NORTH LEXINGTON AVENUE
      P.O. BOX 5056
      WHITE PLAINS, NY 10602-5056
      (914) 949-2700