UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC,                        Index No. 07-civ-3657 (CLB)

                    Plaintiff,              **REPLY AFFIRMATION
                                            IN FURTHER SUPPORT
        - against -                         OF PLAINTIFF'S MOTION
                                            FOR SUMMARY JUDGMENT
TOLL BROS., INC.                            AND IN OPPOSITION TO
                                            CROSS-MOTION FOR
                    Defendant,              SUMMARY JUDGMENT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Joseph J. Haspel, an attorney, duly admitted to practice before this Court, affirms under

penalty of perjury:

        1.      I am the attorney for Plaintiff, Briarwood Farms, Inc. ("Briarwood"), and as such

I am fully familiar with the facts and circumstances contained herein.

        2.      I submit this affirmation in opposition to the cross-motion of defendant, Toll

Bros., Inc. ("Toll") for summary judgment and in further support of Briarwood's motion for

summary judgment. Toll has failed to present any evidence demonstrating any issue of material

fact warranting a trial on the issue of its anticipatory breach of the contract. In the moving

papers, Briarwood indicated that the principal issue of this case was Toll's repudiation of the

parties' Contract based upon Briarwood's purported unwillingness to obtain site specific "steep

slope approvals" for the building lots being sold. Upon a review of Toll's opposition and cross-

motion, it remains clear that the focus of these proceedings is the application of Village of

Pomona's ("Pomona") steep slope ordinance.

        3.      While utterly failing to present any evidence of material factual disputes requiring

trial, Toll's opposition papers do have the virtue of narrowing the issue for this court to resolve.

Toll admits that it was "not concerned that the steep slope permits were for 'hypothetical' house

locations depicted on the subdivision map" but contends that Briarwood "refused" to obtain

steep slope permits for such hypothetical houses and thereby failed to obtain final subdivision

approval. Toll now claims that it would have closed on the Contract with final subdivision

approval and generic steep slope permits for hypothetical houses and, in the event a customer

wanted to build a house that exceeded the hypothetical one listed on the map, Toll would gladly

have returned to the Planning Board to obtain a modified steep slope permit. Def. Mem., p. 8.

      4.      As demonstrated below, Toll has utterly failed to present any evidence in support

of its claim that Briarwood "refused" to obtain steep slope permits for the hypothetical houses

indicated on the subdivision map. Indeed, as will be discussed below, such a "refusal" is

factually impossible. Briarwood has always remained ready willing and able to obtain final

subdivision approval, which necessarily includes a steep slope approval for the hypothetical

homes designated on the filed map. Accordingly, Toll unjustifiably repudiated the contract and

Briarwood is entitled to summary judgment as a matter of law.

**Toll's Failure to Present Evidence of**
**Briarwood's Refusal to Obtain Steep Slope Permits**

      5.      The law is well settled that in opposing a motion for summary judgment a party

"may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143

F.3d 105, 114 (2d Cir.1998). See also *Davis v. State of New York,* 316 F.3d 93, 100 (2d

Cir.2002) (conclusory statements or mere allegations [are] not sufficient to defeat a summary

judgment motion."). To defeat a motion for summary judgment a party must present admissible

evidence demonstrating disputed material facts requiring a trial. *See, e.g. Uddin v. City of New*

*York*, 427 F. supp.2d 414 (S.D.N.Y. 2006)(conclusory allegations without admissible evidence

are insufficient to defeat summary judgment).

6.       Despite Toll's repeated assertion that Briarwood "refused" to obtain steep slope permits for the hypothetical houses listed in the subdivision map and thereby "breached" its contractual obligations, Toll has failed to present any evidence of such refusal. The only "evidence" relied upon by Toll, other than repetitious, but unsupported conclusory statements, is a letter from Briarwood's counsel, Donald Tirschwell, Esq. dated January 30, 2007. This letter fails to support Toll's claim for several compelling reasons. First, the Tirschwell letter is dated eight days *after* Toll's January 22, 2008 letter repudiating the Contract. Logic dictates that Toll cannot rely upon communications *received after* repudiation to *justify* the repudiation.

7.       Second, even if Toll could rely upon Tirschwell's letter, which it can't, that letter merely responds to Toll's specious reasons for repudiating the contract. The Tirschwell letter cannot be considered outside the context of Toll's January 22, 2007 repudiating the contract. In that letter Toll complained about various aspects of its understanding of the steep slope permit process:

> As a general matter, Section 1 6(a)(iii) of the Agreement requires
> "satisfaction by Seller of any conditions of Final Approval, such that upon
> posting of customary security and payment of application and inspection
> fees by Buyer, Buyer may file the plat and commence infrastructure
> improvements and apply for and *obtain building permits*" (emphasis added).
> It is precisely this type of additional review and approval process which is
> intended to be addressed as part of the closing conditions, so that Buyer has
> comfort that all lots are fully developable without the need for further
> approvals.

> Further, specifically regarding the "steep slope" ordinance, we understand
> that the application process and review standards are extensive and time
> consuming and there is no guaranty that any given lot would be approved
> for development with acceptable conditions. As you know, the village has
> the right to require the phasing of construction of improvements on each lot,
> additional inspections, and certifications of completion of each phase of
> development of each lot. In addition, the planning board has the right to
> relocate proposed improvements and/or reduce building envelopes and
> may require issuance of letters of credit to secure completion of these lot
> improvements. Further, rock blasting might be prohibited and landscape

> mitigation might be required. We cannot evaluate whether any of these
> conditions would be acceptable until after the steep slope permits are
> issued.

8.     In his January 30th letter, Mr. Tirschwell merely responded that the steep slope

requirements of which Toll complained had been in place for some time and it was Toll's

responsibility to be aware of its requirements. Mr. Tirschwell also argued in his letter that Toll

did not have the right to terminate the Contract simply because it belatedly found Pomona's

steep slope requirements no longer acceptable. As for the building permit issue referenced by

Toll, Mr. Tirschwell merely noted the unremarkable fact that in order to obtain a building permit,

Toll would have to comply with building codes. There is nothing in Mr. Tirschwell's letter that

would provide any support for Toll's argument that Briarwood had previously "refused" to

obtain final subdivision approval and general steep slope approval for hypothetical houses.

9.     Indeed, Toll's January 22nd letter reveals that Toll had simply decided that

Pomona's established steep slope process, which may require a second trip to the Planning Board

at the time of the application for a building permit, was too onerous to Toll in a declining market

environment. Toll's complaints regarding the Village's rights regarding phasing of construction,

certification requirements and "extensive and time consuming" review process did not present

any new issue and certainly did not present anything over which Briarwood had any control.

10.     The Contract's due diligence provision allowed Toll the opportunity to review

local ordinances, and if it were not satisfied with any issue whatsoever, it could have rescinded

the Contract. It is undisputed that the due diligence period passed without Toll opting to rescind

the Contract. Either Toll knew about the requirements during the due diligence period or it

should have known about them.[1]  In any event, its belated complaints regarding the Village's procedures were insufficient to justify its repudiation the Contract. It does show, however, that Toll was desperate to find some reason to get out of a contract that was no longer economically in its favor.

11.     What is undisputable, however, is that Toll has failed to offer any admissible evidence that Briarwood "refused" to obtain final subdivision approval using hypothetical houses designated on the subdivision map. Therefore, Toll has failed to support its central argument in support of its repudiation and summary judgment should be granted to Briarwood.

12.     It is respectfully submitted that Toll's papers exhibit a mutation of its position, which was done for litigation expediency. At the time of its repudiation, Toll's position was a rejection of Pomona's potential requirement that a builder return to the Planning Board for Steep Slope approval at the time of the application for a building permit. This was clearly set forth in Toll's letter dated December 22, 2006 (Exhibit 10 to Toll's papers), which was written after Pomona noted to Briarwood the existence of steep slopes that had implicated the Steep Slope Ordinance. In this letter Toll set forth issues that it contended had to be addressed. Toll wrote: *"Lots that are subject to steep slope requirements will be subject to Planning Board site plan review. "*  In essence, Toll stated that Pomona's application of its own ordinance was an issue Briarwood had to address. How?  Briarwood could not change the ordinance or Pomona's application of its ordinance, which ordinance was known by Toll during the due diligence period.

13.     Moreover, by using the terms "lots" and "site plan review," Toll's references are to activities which take place after subdivision approval. Indeed, "lots" require an approved

---

[1] Toll's papers indicate that they were, in fact, aware of Pomona's Ordinances at the time of the execution of the Contract (See, Toll's Memo of Law, p. 20).

subdivision, and "site plan review" addresses site specific (lots) development. Thus, Toll's issue related to events which would occur after subdivision approval and after Closing.

14.    Likewise, Toll's cancellation letter dated January 22, 2008 carries these notions of a site specific approval process forward. Once again, Toll's objection is not to the steep slope approvals obtained as part of subdivision approval, but that which must be addressed as part of obtaining a building permit, which would necessarily occur after the closing of title.

15.    Consistent with these letters, Toll's Senior V.P., Daniel Zalinsky ("Zalinsky") presents in his affidavit the adamant position that Toll would not provide site specific building plans, which would be required to get site specific final steep slope approval during the subdivision approval process. Zalinsky states:

> Until Toll had prospective buyers for individual lots, it could not provide with certainty building plans for these lots. Toll is a custom builder of luxury homes. Toll develops individual lot site plans depending upon the desires of our buyers. Toll could not (and would not) begin the process of drawing detailed site plans for a potential 41-lot subdivision until it secured the fundamental consideration to which it was entitled under the Contract - *final, unappealable* subdivision approval. It would have been premature exercise in futility and fiscal waste to begin drafting individual house plans for 41 lots prior to knowing whether Toll was going to actually purchase and develop the project.

(Zalinsky Aff. ¶ 28).

16.    It was Toll's letters coupled with Toll's adamant position that it would not provide any site specific plans which formed the backdrop to Donald Tirschwell's letters. Simply stated, Toll was clear that it did not like Pomona's bifurcated process of obtaining steep slope approvals, and it was equally clear that it did not intend to provide Briarwood with the means to seek site specific approvals during the subdivision approval process.[2]

---

[2] Pomona's bifurcated steep slope approval process is discussed in depth below.

17. When one juxtaposes Toll's position at the time of its repudiation of the Contract, with that set forth in its papers herein, it is clear that Toll's position has mutated disingenuously. The reason is obvious. Toll realized that its steep slope issues necessarily arose after subdivision approval and were therefore outside the scope of the Contract. This being so, Toll recognized that an approval process which was part of the building permit application could not support its feigned cause for repudiation.

18. Thus, for litigation purposes, Toll misstates what was contained in Donald Tirschwell's letters and states that Briarwood refused to obtain the "hypothetical" steep slope approvals mandated in the subdivision approval process. In other words, Toll is ludicrously arguing that Briarwood refused to obtain subdivision approval. To reiterate, there is nothing in the record which would remotely support the position that Briarwood ever ceased or slowed down its pursuit of subdivision approval. Without any such evidence, Toll's argument falls flat on its face. Moreover, such an argument is belied by the fact that Briarwood has now, in fact, obtained subdivision approval.

## There was no Contractual Deadline for
## Briarwood to Obtain Final Subdivision Approval

19. Nor can Toll contend that the timing of obtaining the final approval justified its repudiation of the contract. As set forth in Briarwood's Rule 56.1 statement, the Contract did not contain a date by which Briarwood would obtain final subdivision approval. Paragraph 4 of the Contract provided:

> Closing ... shall be made at the offices of the Title Company and on or by the date which is thirty (30) days following the date upon which all conditions to Closing set forth in Section 16 hereunder have been satisfied [*i.e.* obtaining final subdivision approval].

20.     There was never any modification of this term, nor was there any attempt to modify this term by setting forth a closing date with time being "of the essence." Both Briarwood and Toll are experienced land developers who understand the time it takes to obtain final subdivision approval. Thus, Toll cannot now suggest that the timing of obtaining subdivision was, in any way, a factor in its repudiation of the Contract.

21.     It is well settled that in cases of anticipatory breach, the controlling date is the date of the repudiation. In this case, January 22, 2007. The law of anticipatory breach of contract was set forth in the moving papers, and that law was not challenged in Toll's opposition. Briarwood stands on the law previously cited. In summary, A repudiation occurs upon an overt communication of intention not to perform agreed-upon obligations. Upon that repudiation, the selling party (Briarwood in this case) becomes relieved of any duty to tender performance or wait for the time of performance to arrive before suing. Briarwood opted to commence this lawsuit immediately after Toll's repudiation. Thus, it is immaterial whether Briarwood ever received final subdivision approval. Notwithstanding, Briarwood final subdivision approval is imminent indicated in the accompanying affidavit of David Zigler.

**General Steep Slope Permits for Hypothetical Houses**
**Listed on a Subdivision Map are Distinct from Specific**
**Steep Slope Permits for Building Permits for Houses that**
**Deviate from the Hypothetical Houses Listed on the Map**

22.     To the extent Toll attempts justify its repudiation by relying upon any refusal by Briarwood to obtain site specific steep slope permits in connection with the building permit process, that responsibility is clearly Toll's under the Contract. Indeed, under the Contract (¶4), closing takes place thirty days after final subdivision approval. The Contract has no provisions addressing obtaining building permits, which occurs after the property is subdivided.

23.    As shown in the moving papers, and as Toll acknowledges, while general steep

slope approval is obtained during the subdivision approval process for hypothetical houses

designated on the subdivision map, it is recognized in Pomona that final Steep Slope approval is

generally a function of the process for obtaining a building permit. As the Village Engineer

testified, it is common in Pomona for the actual houses built on approved subdivision lots to be

different than the hypothetical houses designated on the subdivision map. When that occurs, the

builder must return to the Planning Board to obtain a new steep slope permit. (Village Engineer

Dep. Pp. 25, 44, 54).[3]

_____

[3] As noted in the moving papers, and ignored by Toll, Pomona's Village Engineer, P.J. Corless
("Corless" or "Village Engineer") described the process in his deposition at page 24:

> Coreless:  Again, for the sake of clarity and detail, if you were to have a
> mythical 40-lot subdivision, the applicant by his engineer and attorney,
> would put on a mythical house, a 40 by 60 box, and show grading for that
> and show where that is in relation to steep slopes, and where the driveways
> are and where the utilities are. And when final subdivision is granted, that
> lot would have a steep slope approval for that mythical 40 by 60 box.

> In the real world the house might be 40 by 72 or 32 and 75, and all kinds of
> -- so we make them come back, whenever it's bigger, come back for another
> steep slope permit and another public hearing. So you could go away with
> approval for 40 lots, but you really don't have a specific site plan approval
> until you come up with a real house.

And, at page 51:

> Q    ... If the footprint of the proposed house fits within the box, do you
> have to go back?

> A    No.

With respect to the issues presented herein, the entire testimony of the Village Engineer is
illuminating, and it was annexed as Exhibit H to the moving papers.  Excerpts of the relevant
testimony were quoted in the prior affirmation of Joseph J. Haspel, Esq. in support of
Briarwood's motion, and the Court is respectfully referred thereto.

24.    Obviously, this process can only occur when there is an application for a building permit, since it is only when a building permit is sought that site specific building plans are presented. Under the clear terms of the Contract, Briarwood is obligated only to obtain final subdivision approval so that Toll can "apply for and obtain building permits." (Contract ¶16(a)(iii)). To the extent Toll must obtain a new steep slope permit as part of the application for its building permit, that duty is Toll's and Toll's alone. Most importantly, since Toll has admitted its familiarity with Pomona's Ordinances when it entered the Contract, Pomona's bifurcated steep slope procedure was known to Toll during the due diligence period.[4]

25.    Moreover, since a specific steep slope permit cannot issue without site specific building plans, and since Toll has admitted that it would not issue plans until after subdivision approval (see ¶15, *supra*), it would be impossible for Briarwood to have obtained any more site specific steep slope permits that those permitted for the hypothetical houses.

26.    Thus, as a matter of law, Briarwood cannot have breached the Contract by any purported refusal to obtain site specific steep slope approval, since Toll had not even drawn up any specific building plans necessary to obtain such approval.

**The Other Issues**

**Klinger Court**

27.    Toll's papers indicate that "Klinger Court was a road to be constructed within the subdivision." This is partially correct, as Klinger Court was going to be extended as part of the subdivision. However, the issue relating to Klinger Court concerned that part of the road which was not part of the subdivision - the part which was being used as an access road to the

---

[4] The judicial admission of Toll's knowledge of Pomona's Village Code addressing steep slopes is located at page 20 of its Memorandum of Law.

subdivision. The Village required that if the old part of Klinger Court was damaged by construction vehicles, that the developer repave the entire road.

28.   As was indicated in the moving papers Briarwood did agree to bear the cost of any complete resurfacing, if required. Thus, this cause for cancellation is no cause at all, and it is not possibly one which could justify cancellation of the Contract. Toll's suggestion that Briarwood did not previously agree to bear this expense is belied by Donald Tirschwell, Esq.'s letter dated January 30, 2007, at page 2), where he expressly confirmed Briarwood's prior offer to bear this cost.

## The Cul-de-Sac

29.   Contrary to what is set forth in Toll's papers, while a Village Engineer has accepted criteria for grading roads, there is no "standard" road grade. It does not take an expert to state that road grading is an issue to be determined based upon safety considerations and the facts of each case. This is why the Pomona Code provides the Village Engineer with final say with respect to grading issues (Pomona Coda A134-30 - quoted in moving papers).   As was set forth in the moving papers, there is no right to a 10% grade on any street in Pomona. One must ask whether anyone would want to live on a cul-de-sac with a 10% grade, especially after a snow or ice storm.

30.   Most importantly, like Briarwood's willingness to pay the Klingher Road expense to facilitate this transaction, Briarwood had indicated to Toll that it would bear any additional cost to obtain the 4% cul-de-sac grade required by the Village Engineer. This was set forth in a letter of Donald Tirschwell, Esq. dated December 28, 2006, which is annexed as Exhibit A. It is also more fully discussed in the accompanying affirmation of Joseph Herskowitz.

31.     In addition, Briarwood stands upon its position as set forth in the moving papers, and the Court is respectfully referred thereto. In particular, Toll had the opportunity to investigate the Village Engineer's grading requirements for cul-de-sacs during its due diligence period. Like with the Steep Slope Ordinance, Toll should not be permitted to repudiate a contract because it does not like the application of a Village ordinance.

32.     Toll attempts to create an issue of fact by hollowly asserting that the change of the cul-de-sac grade would reduce the value of the lots and cost a significant amount. However, based upon Mr. Tirschwell's letter dated December 28, 2006, and the accompanying affirmation of Joseph Herskowitz, Toll cannot possibly rely upon this ground to justify repudiation of the Contract.

**Drainage Easements**

33.     As stated in the moving papers, Briarwood first consented to remove the lots with easements from the sale. Then, it redesigned the subdivision to remove the drainage easements Toll considered objectionable. Simply stated, Briarwood did what Toll requested and there is no issue.

**Landscaping**

34.     In its Cancellation Letter Toll wrote: "Any landscaping requirements would need to be specified and reviewed and approved by us prior to Closing." Initially, such language would indicate that the Cancellation Letter was not really a Cancellation Letter, but a posturing letter. Why else would it refer to Toll's future acts and needs. Landscaping requirements never reached the discussion and approval stage.

## Conclusion

For all the foregoing reasons, it is respectfully requested that summary judgment be granted in total.

Respectfully submitted,

Joseph J. Haspel
*Attorney for Plaintiff*
40 Matthews Street
Suite 201
Goshen, New York 10924
845-294-8950