UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIARWOOD FARMS, INC.                           Index No. 07-civ-3657 (clb)

                  Plaintiff,

- against -

TOLL BROS., INC.

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Briarwood's Response to Toll's Local Rule 56.1 Statement**

    1.    On November 7, 2005, Toll Broths., Inc. ("Toll") and Briarwood Farms, Inc. ("Briarwood") entered into an Agreement of Sale (the "Contract") whereby Toll would acquire from Briarwood the Property which was the subject of the subdivision application. Exhibit "3".

**Briarwood Admits This Allegation**

    2.    The Contract, at Section 16(a)(iii), expressly conditioned Toll's obligation to purchase the Property upon Briarwood securing and delivering to Toll final, unappealable subdivision approval, defined in the Contract as follows:

> .. the receipt by Seller for Buyer, at Seller's sole cost and expense, of final, unappealable subdivision approval of the Property in accordance with the Subdivision Plan (the 'Final Approval'), and the satisfaction by Seller of any conditions of the Final Approval, such that upon posting of customary security and payment of application and inspection fees by Buyer, Buyer may file the plat and commence infrastructure improvements and apply for and obtain building permits.

(Id.)(emphasis added).

**Briarwood admits the parties entered into the Contract, and respectfully refers the Court to the Contract to establish the terms thereof and otherwise denies this allegation.**

    3.    The Contract further provided that the "Final Approval," as defined above, "shall be final and unappealable at the time of Closing and shall be subject only to such conditions as

Buyer [Toll] may approve at [Toll's] sole discretion, which approval shall not be unreasonably withheld with respect to those modifications which do not have a material adverse effect on the proposed development." (id.)(emphasis added).

**Briarwood admits the parties entered into the Contract, and respectfully refers the Court to the Contract to establish the terms thereof and otherwise denies this allegation.**

4.      Toll is in the business of building homes and time is critical in this process. In order to avoid potential extensive delays and the attendant expense associated with securing final subdivision approval and/or litigation concerning same, the Contract expressly provided that Toll was to receive "final, unappealable" subdivision approval, with all the requisite permits, to enable Toll "upon posting of customary inspection fees . . . [to] file the plat and commence infrastructure improvements and apply for and obtain building permits." Zalinsky Dec.; Exhibit "3", ¶16(a)(iii), p. 7.

**Briarwood admits the parties entered into the Contract, and respectfully refers the Court to the Contract to establish the terms thereof and otherwise denies this allegation.**

5.      Chapter 118 of the Village Code sets forth the procedures for subdivision approval and requires (i) preliminary subdivision approval, (ii) final subdivision approval, and (iii) SEQRA approval in conjunction with the subdivision review process. (Id.)

**Briarwood admits the existence of a Village Code of the Village of Pomona, and respectfully refers the Court to the Village Code to establish the law set forth therein.**

6.      Chapter 118 of the Village's Code also governs subdivision design requirements and specifically directs applicants to design a subdivision ". in reasonable conformity to existing topography to minimize grading, cut and fill to retain, insofar as possible, the natural contours, to limit storm water runoff and to conserve the natural vegetative cover and soil." Id. Section 118-22(A)(1). Chapter 118 of the Village Code further provides that steep slope preservation and the

Steep Slope Ordinance (Chapter 119), "shall be followed where applicable" by the Planning Board in the subdivision review process. Id. Section 118-22(B)(3).

**Briarwood admits the existence of a Village Code of the Village of Pomona, and respectfully refers the Court to the Village Code to establish the law set forth therein.**

       7.     Chapter 119 of the Village Code, entitled "Site Development Plan Review," governs the development of land which contains steep slopes.2 Exhibit "7". Pursuant to Section 119-2(A), a property owner cannot disturb a steep slope area without having first obtained a "site development plan permit", commonly referred to as a steep slope permit. Id.. Where steep slope permits are required in conjunction with subdivision approval under Village Code Chapter 118, the Planning Board is the "approving authority" for issuance of all steep slope permits. Id. Section 119-4(B).

**Briarwood admits the existence of a Village Code of the Village of Pomona, and respectfully refers the Court to the Village Code to establish the law set forth therein.**

       8.     Chapter 119 specifically encourages the simultaneous review and approval of steep slope permits by the Planning Board in conjunction with the Planning Board's subdivision approval review process and attendant SEQRA review:

> § 119-7. Procedures for review and decision making.
>
> A. It is the intent of this chapter to incorporate the consideration of steep slope protection into the Village's existing land use and development approval procedures in conjunction with the procedures of the New York State Environmental Quality Review Act, To the maximum extent possible, the review, hearings and decisions upon any application processed under this chapter will run concurrently with similar procedures that the approving authority may undertake in connection with the other applications that are directly related.

Id. Section 119-7(A) (emphasis added).

**Briarwood admits the existence of a Village Code of the Village of Pomona, and respectfully refers the Court to the Village Code to establish the law set forth therein.**

9. On March 25, 2008, the Village of Pomona's Engineer P.J. Corless, who has been the Village Engineer for 31 years and was actively involved in the Village's review of the subdivision application which is the subject of this litigation, was deposed. Exhibit "8." Consistent with the aforesaid provisions of the Village Code, Mr. Corless confirmed the following:

- The purpose of the Steep Slope Ordinance "was to control land disturbance on areas that would result in water pollution .. ." (Ex. "8," p. 10, 1. 5-10);

- The law prohibits the disturbance of any steep slope without the issuance of a steep slope permit. (Id. p. 10, 1. 15 to p. 11, 1. 9);

- Under Section 119-4, any steep slope permits required in conjunction with a subdivision application are referred to and issued by the Planning Board. (Id. p. 12, 1. 15 to p. 13, 1, 7);

- Steep slope permits under the Steep Slope Ordinance are issued by the Planning Board as part of the final subdivision review process. (Id. p, 23, 1. 11 to p. 24, 1. 19);

- In order to secure final subdivision approval, a developer must obtain from the Planning Board during the final subdivision plat review process steep slope permits for houses designated on building lots impacted by steep slopes. (Id. p. 25, 1. 13-23);

- Steep slope permits are the type of final details which must be resolved by an applicant to progress from preliminary subdivision approval to receive final subdivision approval from the Planning Board. (Id. p. 26, 1. 2-6);

- Under Section 119-7, the information required to be submitted to Planning Board to secure steep slope permits is rather elaborate, requires additional public hearings, the posting of letters of credit and may involve a phased site plan review if desired by the Planning Board. (Id, p. 26, L 7 to p. 27, 1. 3);

- No building permit can be issued for the construction of a single-family home on a steep slope area until the Planning Board issues final subdivision approval. (Id. p. 14, 1. 8-13 and p. 28, 1. 4-14);

- Based upon Village Engineer Corless' experience, its takes 12 to 24 months to secure steep slope permits between the time of preliminary subdivision approval and final subdivision approval. (Id. p. 30, l. 21 to p. 31, l. 11);

- After issuance of final subdivision approval with steep slope permits, a new steep slope permit must be secured from the Planning Board only if the owner of the lot wants to build a house that exceeds the parameters of the "hypothetical" home depicted on the final approved subdivision plat for which the steep slope permit was issued. This approval process typically takes three to six months. (Id. p. 31, l. 12-19);

- The Halley Estates II proposed preliminary subdivision plat included a Disturbed Slope Map (Ex. "9") which depicted (i) the hypothetical house locations on each building lot and (ii) those areas within the subdivision impacted by steep slopes which required a steep slope permit. (Ex. "8," p. 39, l. 14 to p. 40, l. 15);

- Thirty-three (33) of the 40 single-family lots depicted on the Halley Estates II proposed preliminary subdivision map required steep slope permits from the Planning Board before final subdivision approval could be granted. (Id. p. 41, l. 19 to p. 43, l. 23);

- Each of the 33 building lots with steep slopes required a steep slope permits to be issued by the Planning Board. (Id. p. 43, l. 22 to p. 44, l. 7);

- To date no steep slope permits have been issued for those 33 lots and the Planning Board has not granted final subdivision approval for the land which is the subject of this litigation. (Id. p. 44, l. 8-13);

- Until final subdivision approval and the requisite steep slope permits are granted, no building permit for the building lots can be issued to enable construction of single-family homes thereon. (Id. p. 45, l. 5-16);

- When final subdivision approval is granted, the Planning Board will have considered all the criteria under the steep slope law, (Id. p. 62, l. 4-15). To the extent a lot owner seeks to construct a home or improvement (e.g. pool) which exceeds the size of the hypothetical house depicted on the approved final plat, the owner must go back before the Planning Board to secure a modified steep slope permit. (Id. p. 62, l. 16-24); and

- The process of securing a modified steep slope permit is not merely a matter of "tweaking" but an extensive process which involves costs ranging "in the hundreds of thousands of dollars." (Id. p. 55, l. 3-15).

**Briarwood admits that Village Engineer P.J. Corless was deposed, but denies that the**

paraphrasing of his testimony accurately reflects his testimony. Briarwood further denies the statements as the paraphrasing of the testimony is out of context, and to a significant extent based upon the review of an outdated map which Toll's counsel acknowledged was "not completely clear, because it's been copied a number of times." (Dep. P. 46). Moreover, the testimony fails to consider the changes in terrain which will result from the building of the subdivision's improvements (i.e. roads). In the affidavit submitted with Briarwood's motion for summary judgment, David Zigler, the president of Atzl, Scatassa & Zigler, P.C. ("ASZ"), which is the firm retained by Plaintiff, Briarwood Farms, Inc. ("Briarwood") to pursue and obtain final approval, stated:

> 12. In addition, until the final configuration of the subdivision is made, the number of lots which would be subject to the Steep Slope Ordinance is not certain. Moreover, a developer may be able to develop a lot which may be subject to the Steep Slope Ordinance without implicating the Steep Slope Ordinance. Indeed, the Steep Slope Ordinance is only implicated when the area of a lot which contains the steep slopes is disrupted by construction of the home.
>
> 13. With respect to Halley, the configuration of the subdivision was developed in a manner to minimize the number of lots where building thereon would implicate the Steep Slope Ordinance. Indeed, during the subdivision approval process, the applicant must provide a topographical map which illustrate steep slopes in three different criteria of slope (the "Topo Map"). Yet, the Topo Map does not identify which lots need steep slope permits under the ordinance. This is because the Topo Map generally does not contain the final site plan for the lot. It does, however, indicate a generic home on a generic site so non-specific engineering and environmental issues can be addressed during the subdivision approval process.
>
> 14. Thus, without the presentation of actual site plans for each lot, the number of Halley lots which will require Steep Slope permits is unknown. Moreover, in Halley's case, Briarwood has already taken action during the subdivision approval process which would obviate the need to seek Steep Slope permits at the time of the application for building permits. Specifically, Briarwood has already gathered permission during the subdivision approval process to grade off road, and with respect to proposed lots 7, 26, 27, 28 and 29 that grading would eliminate the Steep Slopes as currently designated on the Topo Map. In addition, the "hypothetical" house footprint contained on the subdivision maps are, in fact, the footprint of the typical home Briarwood intends to build. Thus, there would be no need to obtain a Steep Slope permit at the time the builder seeks a building permit. . . . Regardless, in the unlikely event that the builder were required to seek a Steep Slope permit based upon the Topo Map, the process in obtaining the permit would be truncated as a result of the prior

**grading approvals obtained during the subdivision approval process.**

**See, Affidavit of Zigler provided with motion for summary judgment. Based upon the final approved subdivision, it is believed that the building of eight lots may implicate the Steep Slope ordinance. (Reply affidavit of D. Zigler)**

10. Beginning in or about October 2006, representatives of Toll and Briarwood began meeting to discuss the various requirements which the Village Planning Board and Village Engineer had identified as conditions to preliminary subdivision approval. By late December 2006, significant issues remained between Toll and Briarwood, which Toll claimed had a material adverse impact on the proposed development which constituted grounds to terminate the Contract under Sections 16(a)(iii) and (b). (Zalinsky Dec; Exhibit "10").

**Briarwood denies this statement of fact, but admits that there were meetings. See ¶¶ 17 - 21 of Affidavit of D. Zigler.**

11. Of the issues raised by Toll, the most significant was Briarwood's failure to secure the steep slope permits. The "Disturbed Slope Map" identified 33 out of the 41 proposed building lots (or 80.5% of the project) required steep slope permits. (Zalinsky Dec; Exhibit 9) The impacted lots are reflected on the "Disturbed Slope Map" which was part of the preliminary subdivision plat approved by the Planning Board. Exhibit "9". By letter dated December 22, 2006, Toll demanded that in light of the Village Steep Slope Ordinance, the 33 affected lots and the requirements of the Contract, Briarwood must secure the required steep slope permits in conjunction with obtaining final subdivision approval. Exhibit "10". Such request is unequivocally supported by the deposition testimony of Village Engineer Corless. Exhibit "8".

**Briarwood denies this statement, but admits that Toll made demands upon Briarwood. See Zigler Reply affidavit which indicates that only eight lots may require steep slope permits for building. Regardless, this is irrelevant because of Toll's conduct. Had Toll provided site specific building plans on the lots which implicate the Steep Slope ordinance, Steep Slope approvals may have been obtained during the subdivision approval process. Regardless, the approved subdivision has steep slope approvals for the "mythical" houses set forth on the approved subdivision map.**

12. By letter dated December 28, 2006, Briarwood responded to Toll's December 22, 2006 letter and adequately addressed three of the eight conditions identified by Toll as materially adverse to the development. However, five objectionable conditions remained and by letter dated January 22, 2007, Toll again reiterated its request that Briarwood resolve same and that, failing same, Toll would terminate the Contract. (Ex. "12"). The five remaining objectionable items were as follows:

- Repavement of Klinger Court

Klinger Court was a road to be constructed within the subdivision. The original preliminary subdivision plans reviewed during the due diligence period provided that any road damage caused during construction had to be repaired before formal dedication of the road to the Village. This was a standard provision and not objectionable to Toll since most damage is modest and easily repaired.

However, the revised preliminary subdivision plans which were the subject of the Planning Board's proposed preliminary subdivision approval enhanced this repair obligation significantly. The revised plans provided that if the road was damaged, the Village Engineer could, in his discretion, require Toll to repave the entire roadway with a 1 1/2 inch wearing course, curb to curb. Repaving the entirety of Klinger Court, which was 27,000 square feet, would cost Toll an additional $30,000.

- The Steep Slope Issue

As Toll reiterated its position that Section 16(a)(iii) of the Contract required "satisfaction by Seller of any conditions of Final Approval, such that upon posting of customary security and payment of application and inspection fees by Toll, Toll may file the plat and commence infrastructure improvements and apply for and obtain building permits" (emphasis added). The steep slope permit review process was precisely the type of additional review and approval process which was intended to be addressed as part of the subdivision review process, so that Toll has comfort that all lots are fully developable without the need for further approvals.

- Decreasing the Grade of the Cul-de-Sac Road

Village Engineer Carless conditioned final subdivision approval on the grade of the road servicing the cul-de-sac (which contained the premium

subdivision lots) to have a maximum grade of no more than 4%, rather than the standard 10% provided under applicable Village Code provisions relating to roadways. The cost of the grading, blasting and other associated work required to reduce the grade of the roadway from 10% to 4% was approximately $560,000. In addition, this change significantly impacted the value of the 10 premium lots in the cul-de-sac area (Lots 9 through 18), resulting in a significant diminution of anticipated value.

- Easements Required for Existing Drainage Swale in Rear of Lots 25 through 28 The preliminary subdivision plans Toll reviewed during the due diligence period did not require any drainage easements for the swale located in the rear of Lots 25 through 28. However, the revised preliminary subdivision plans which were the subject of the Planning Board's proposed preliminary approval resolution required (i) a new drainage system to be installed and (ii) drainage easements to be created which would burden each of these four lots. Toll's cost of installing the additional drainage work would have been $85,000. In addition, burdening these lots with a drainage easement would have an adverse impact on their market value in an amount that would not be calculated with any certainty.

Additional Landscaping Requirement

The landscaping obligations were also dramatically changed by the revised preliminary subdivision plans which were the subject of the Planning Board's preliminary subdivision approval resolution. The original plans reviewed by Toll during the due diligence period provided for typical landscaping throughout the subdivision. However, the revised plans which were the subject of the Planning Board's preliminary approval resolution, required installation of decorative plantings far in excess of that initially required. Therefore, there was substantial confusion concerning the extent, nature and cost of the landscaping that had to be installed. The potential additional cost could easily have exceeded $100,000. Toll therefore requested that this issue be clarified.

**Briarwood admits that Toll sent the two letters referenced and refers the Court to the letters which speak for themselves. Briarwood expressly denies that Toll reiterated any request but it expressly stated that "Buyer hereby cancels the Agreement ..."**

The "five remaining objectionable items" are addressed in the accompanying affidavit of Joseph J. Haspel. In summary, with respect to "Repavement of Klingher Court, " Briarwood had offered to bear the expense of the Repaving as indicated in letter of Donald Tirschwell, Esq. dated January 30, 2007 (page 2), thus mooting the issue.

With respect to "The Steep Slope Issue" - Briarwood was obtaining steep slope approvals to the extent required in order to obtain final, nonappealable subdivision approval. To obtain more, Toll was responsible to provide site specific building plans, which it refused to

provide.

**With respect to "Decreasing the Grade of the Cul-de-Sac," the Village Code provides that Road Grading is within the sole discretion of the Village Engineer, which was known to Toll at the time of the Contract. Regardless, as this issue is insignificant as the added cost of changing the grade is approximately $25,000 or less than two-tenths of one percent (0.2%) of the total purchase price of the transaction, Briarwood had agreed to bear any additional costs incurred in changing the grade. See Reply Affidavit of Yosef Herskowitz and Exhibit A thereto.**

**With respect to the "Easements Required for Existing Drainage Swale" - at the request of Toll, the subdivision was re-engineered to alleviate these easement. Accordingly, this issue was mooted. See ¶20 of Affidavit of D. Zigler.**

**With respect to the "Landscaping Issue" - This issue never developed as Toll's cancellation letter provided only a need to "clarify this issue." See ¶21 of Affidavit of D. Zigler.**

13.  The aforesaid four additional material objections would have imposed on Toll additional costs of at least $775,000 and had a significant adverse impact on the market value of multiple building lots. As such, the five objectionable conditions cited by Toll collectively had a "material adverse effect" on the development as provided in Section 16(d), warranting the termination of the Contract as a result of Briarwood's refusal to cure same. Exhibit 10; (Zalinsky Dec., ¶30).

**Briarwood denies these allegations in full. As set forth above, Briarwood had agreed to bear the costs associated with the Klinger Court issue and the Cul-de-Sac grading issue. Briarwood reengineered the plans so as to not require the drainage easement. Landscaping never made it to the stage of any meaningful discussion.**

14.  By letter dated January 30, 2007, Briarwood's counsel, Donald Tirschwell, Esq. rejected Toll's Contract termination notice. (Ex. "13"). His response with respect to the steep slope permit issue confirmed Briarwood's refusal to secure the steep slope permits, even for the hypothetical home sites depicted on Briarwood's preliminary subdivision plat.

**Briarwood admits that Donald Tirschwell, Esq. sent a letter dated January 30, 2007 and refers the Court to the letter which speaks for itself. Briarwood denies the remainder of the allegations set forth and expressly states that Tirschwell's letter did not indicate**

**Briarwood's refusal to secure the steep slope permits, even for the hypothetical home sites depicted on Briarwood's preliminary subdivision plat. As a matter of law, steep slope approval on hypothetical building foot prints is required in order to obtain subdivision approval, which Briarwood agreed to obtain.**

15. Tirschwell's letter never requested that Briarwood be provided with actual building plans. Exhibit 13. Moreover, Tirschwell's letter never advised that if Briarwood had received any actual building plans that Briarwood would obtain steep slope approval in conjunction with final, unappealable subdivision approval. Id.

**Briarwood admits that Donald Tirschwell, Esq. sent a letter dated January 30, 2007 and refers the Court to the letter which speak for itself. Briarwood denies the remainder of the allegations set forth. Toll has made a judicial admission that:**

> Until Toll had prospective buyers for individual lots, it could not
> provide with certainty building plans for these lots. Toll is a custom
> builder of luxury homes. Toll develops individual lot site plans
> depending upon the desires of our buyers. Toll could not (and would
> not) begin the process of drawing detailed site plans for a potential 41-
> lot subdivision until it secured the fundamental consideration to which
> it was entitled under the Contract - *final, unappealable* subdivision
> approval. It would have been premature exercise in futility and fiscal
> waste to begin drafting individual house plans for 41 lots prior to
> knowing whether Toll was going to actually purchase and develop the
> project.

**(¶28 Zalinsky affidavit). This position is consistent with Briarwood's characterization of Toll's position as set forth in the moving papers. The fact that Tirschwell's letter never advised that if Briarwood had received any actual building plans that Briarwood would obtain steep slope approval is irrelevant as such was an issue discussed between land use professional. See Affidavit of D. Zigler.**

16. Briarwood never secured from the Village Planning Board, nor tendered to Toll, either (i) final, unappealable subdivision approval or (ii) the steep slope permits required for such final approval.

**Briarwood denies this allegation. Moreover, the allegation is irrelevant as there was no time frame for obtaining final approvals set forth in the Contract, and Toll anticipatorily breached the Contract. See Zigler Reply Affidavit.**

17. Through its January 22, 2007 letter, Toll formally terminated the Contract pursuant to Section 16(c) and provided Briarwood of notice of its Contract default in failing to diligently pursue in good faith the resolution of condition to closing under Section 15(f). Exhibit 12. B.

**Briarwood admits that Toll sent the referenced letter and refers the Court to the letter which speaks for itself. Briarwood denies any default of the Contract.**

        Respectfully submitted,

        _____
        Joseph J. Haspel
        *Attorney for Plaintiff*
        40 Matthews Street
        Suite 201
        Goshen, New York 10924
        845-294-8950